UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
BRAVE BULK TRANSPORT LTD.,                    **07 Civ. 4546 (CM)**

                          Plaintiff,          DECLARATION


            -against-


SPOT ON SHIPPING LTD., a.k.a. SPOT
ON SHIPPING LTD. BVI, a.k.a. SPOT ON,
a.k.a. CLAYTON STAR COMPANY LIMITED
a.k.a. CLAYTON STAR and PHEW ASSET
MANAGEMENT LIMITED a.k.a. PEHW ASSET
MANAGEMENT LTD. and ZHANGGANG SHIPPING
LIMITED,

                          Defendant.
----------------------------------------X


        I, Zhang Jinglu, hereby declare as follows:


        1.    I am a director and shareholder for defendant ZHANGGANG

SHIPPING LIMITED (ZSL).  Based upon my personal knowledge and my

review of the file maintained by my office, I am familiar with the

corporate structure and operations of ZSL with regard to this and

other matters.


        2.    Herewith attached are true copies of the following:

        Exhibit A:      Amended Complaint;

        Exhibit B:      Ex Parte Order for Process of Maritime
                        Attachment;

        Exhibit C:      Forward Freight Agreement dated February
                        26, 2007 produced by plaintiff's
                        counsel;

Exhibit D:    ZSL's Certificate of Incorporation and Business Registration Certificate; and

Exhibit E:    ZSL's Contract with Spot On (Hong Kong) Group Corporation Limited.

3.    The writ of attachment in this case was obtained to secure a foreign lawsuit, which, according to the pleadings, has not yet even been commenced, to enforce a Forward Freight Agreement (FFA), pursuant to which "Defendant Spot On agreed to sell and buy freight futures with the Plaintiff." (Amended Complaint, Exhibit A, at ¶¶ 7,8,12).

4.    The Amended Complaint added ZSL as an a defendant based on general allegations that ZSL may have functioned as the "alter ego" and/or "alias" and/or "agent" and/or "shell corporation" and/or "joint venturer" of defendant SPOT ON SHIPPING LIMITED. Id. at ¶¶ 22-28.

5.    Accordingly, electronic funds transfers involving ZSL have now been, and, upon information and belief, will continue to be attached pursuant to the writ which plaintiff has caused to be issued in this action.

6.    However, the allegations in plaintiff's Amended Complaint concerning ZSL and its alleged alter ego status are categorically false.

2

7. ZSL is a bulk carrier of iron ore for Zhangdian Iron Steel Works, located in Shandong province, China, and has been registered as an independent corporation in Hong Kong since February 2006. Zhangdian Iron Steel Works is an entirely Chinese government-owned enterprise, see www.zdsteel.com. ZSL's operations are devoted entirely to ocean shipping or iron ore, over 6 million metric tons annually, imported by Zhangdian Iron Steel Works. ZSL has never done business for other parties.

8. As per what I know, Spot On (Hong Kong) Group Corporation Limited provides arms-length shipping market information, operation and management services to many companies for consideration. I guarantee that ZSL and SPOT ON SHIPPING LIMITED are by no means related corporations.

9. To be perfectly clear, none of ZSL's directors are also directors of SPOT ON SHIPPING LIMITED.

10. None of ZSL's shareholders are also shareholders of SPOT ON SHIPPING LIMITED.

11. No funds belonging to ZSL have ever been used for the personal use of ZSL's or SPOT ON SHIPPING LIMITED's owners or directors.

3

12.  ZSL does not share any bank accounts with SPOT ON SHIPPING LIMITED.

13.  ZSL and SPOT ON SHIPPING LIMITED have never answered for each other's debts or paid or received funds on the each other's behalf.

14.  ZSL and SPOT ON SHIPPING LIMITED have never loaned money to, or acted as surety for, each other.

15.  ZSL and Spot On Shipping limited have never formed any joint ventures.

16.  ZSL and SPOT ON SHIPPING LIMITED are not part of the same corporate group.

17.  ZSL and SPOT ON SHIPPING LIMITED have never commingled funds or made use of each other's property.

18.  ZSL's business decisions are made independently, without any influence whatsoever by SPOT ON SHIPPING LIMITED.

19.  In fact, ZSL and SPOT ON SHIPPING LIMITED have no business dealings at all with each other.

20.   ZSL was completely uninvolved in the FFA between plaintiff and SPOT ON SHIPPING LIMITED, and ZSL did not benefit in any way from that Agreement.



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.



Executed on August 22, 2007

Hong Kong, China




_Jinglu Zhang_ _____ (L.S.)

Zhang Jinglu

TISDALE LAW OFFICES
11 West 42nd Street, Suite 900
New York, NY 10036
Tel:    (212) 354-0025
Fax:    (212) 869-0067
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

BRAVE BULK TRANSPORT LTD.,                                   :

            Plaintiff,                      :          07 CV 4546 (CM)

     - against -                            :          ECF CASE

SPOT ON SHIPPING LTD., a.k.a. SPOT ON           :
SHIPPING LTD. BVI., a.k.a. SPOT ON,
a.k.a CLAYTON STAR COMPANY LIMITED              :
a.k.a. CLAYTON STAR and PEHW ASSET
MANAGEMENT LIMITED a.k.a. PEHW                  :
ASSET MANAGEMENT LTD.
and ZHANGGANG SHIPPING LIMITED,                 :

           Defendants.                     :
-------------------------------------------------------------X

## VERIFIED AMENDED COMPLAINT

The Plaintiff, BRAVE BULK TRANSPORT LTD. (hereinafter "Plaintiff"), by its

attorneys, Tisdale Law Offices, as and for its Verified Amended Complaint against the

Defendants, SPOT ON SHIPPING LTD. a.k.a. SPOT ON SHIPPING LTD. BVI a.k.a. SPOT

ON (hereinafter "Spot On") a.k.a. CLAYTON STAR COMPANY LIMITED a.k.a. CLAYTON

STAR (hereinafter "Clayton Star"), PEHW ASSET MANAGEMENT LIMITED a.k.a. PEHW

ASSET MANAGEMENT LTD. (hereinafter "Pehw Asset") and ZHANGGANG SHIPPING

LIMITED (hereinafter "Zhanggang")(collectively referred to as the "Defendants") allege, upon

information and belief, as follows:

1.    This is an admiralty and maritime claim within the meaning of Federal Rule of Civil Procedure 9(h) and 28 United States Code § 1333.

2.    At all material times, Plaintiff was and still is an entity duly organized and existing by virtue of foreign law.

3.    Upon information and belief, at all material times, the Defendant Spot On was and still is an entity duly organized and existing by virtue of foreign law places of business in the British Virgin Islands and Hong Kong with offices at Room 1818-1823, 18th floor, Sun Hung Kai Centre, No. 30 Harbour Road, Wanchai, Hong Kong.

4.    Upon information and belief, at all material times, the Defendant Pehw Asset was and still is an entity duly organized and existing by virtue of foreign law with a principal place of business in Hong Kong and/or the British Virgin Islands operating out of the same address as Spot On.

5.    Upon information and belief, Spot On notified the Plaintiff on or about March 30, 2007 by email that its name had changed and that "Spot On Shipping Limited ("The Company") has been acquired at 100% equity by PEHW Asset Management Limited, which is a subsidiary company under PEHW Fund Limited.  So the operation of The Company should be named as "PEHW Asset Management Limited" afterwards, which is also the official name for the purpose of ffa contract."

6.    Upon information and belief, Pehw Asset notified the Plaintiff on or about May 7, 2007 by email that the name and contact details of "Spot On Shipping Limited, BVI" had been changed to "Clayton Star Company Limited."  As such, Clayton Star is a name by which Spot On is also known.

2

7.     Upon information and belief, at all material times, the Defendant Zhanggang was and still is an entity duly organized and existing by virtue of foreign law with a principal place of business in Hong Kong.

8.     By way of a Forward Freight Agreement dated February 26, 2007 (hereinafter the "FFA"), Defendant Spot On agreed to sell and buy freight futures with the Plaintiff.

9.     The FFA provided for settlement dates of the last day of three contract months: April, May and June of 2007.

10.    Despite due demand for payment, Defendant has failed to remit payment to Plaintiff in breach of the FFA.

11.    As a result of Spot On's breach of the FFA contract, Plaintiff has suffered a loss in the total principal sum of $380,769.67, as best can now be estimated, exclusive of interest, recoverable costs and reasonable attorneys fees.

12.    Pursuant to clause 16 of the FFA contract all disputes arising thereunder are to be submitted to the English High Court of Justice with English law to apply.

13.    Plaintiff is currently preparing to commence litigation against the Defendants in the English High Court on its claims as described hereinabove.

14.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in English High Court proceedings conducted pursuant to English Law.  As best as can now be estimated, Plaintiff expects to recover the following amounts:

| | | |
|---|---|---|
| A. | Principal claim: | $380,769.67 |
| B. | Estimated interest on the principal claims at 6.5% for three years: | $79,260.27 |
| C. | Attorneys' fees and other recoverable costs: | $80,000.00 |

3

Total:                                                    $540,029.94

15.     Upon information and belief, Pehw Asset is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Pehw Asset is actually carrying on Spot On's business and operations as if same were its own.

16.     Upon information and belief, Defendant Pehw Asset is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Pehw Asset.

17.     Upon information and belief, Defendants Pehw Asset and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, and used to carry on such individuals' own business. Further, the Defendants share the same offices, employees, telephone numbers, fax numbers and/or email addresses.

18.     Upon information and belief, Defendant Pehw Asset has no separate, independent identity from Defendant Spot On as they use their names interchangeably with design to fraudulently avoid payment of just debts to their creditors.

19.     In the alternative, Defendant Pehw Asset is merely a shell corporation through which Spot On conducts its business.

20.     In the further alternative, Defendants Pehw Asset and Spot On are partners and/or are joint venturers.

21.     In the further alternative, Defendants Pehw Asset and Spot On are affiliated companies such that the Defendant Pehw Asset is now, or will soon be, holding assets belonging to Defendant Spot On and vice versa.

22.     Upon information and belief, Zhanggang is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Zhanggang is actually

4

carrying on Spot On's business and operations as if same were its own.

23. Upon information and belief, Defendant Zhanggang is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Zhanggang.

24. Upon information and belief, Defendants Zhanggang and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, including Mrs. Wei-Lu Zhang and Ms. Sammy Yu, and used to carry on such individuals' own business.

25. Upon information and belief, Defendant Zhanggang has no separate, independent identity from Defendant Spot On as they use their names interchangeably with design to fraudulently avoid payment of just debts to their creditors.

26. In the alternative, Defendant Zhanggang is merely a shell corporation through which Spot On conducts its business.

27. In the further alternative, Defendants Zhanggang and Spot On are partners and/or are joint venturers.

28. In the further alternative, Defendants Zhanggang and Spot On are affiliated companies such that the Defendant Zhanggang is now, or will soon be, holding assets belonging to Defendant Spot On and vice versa.

29. The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees including, but not limited to, ABN-AMRO, American Express

Bank, Bank of America, Bank of New York, Deutsche Bank, Citibank, HSBC Bank USA Bank, J.P. Morgan Chase, Standard Chartered Bank, Wachovia Bank N.A., and/or Commerzbank Aktiengesellschaft AG which are believed to be due and owing to the Defendants.

30.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims attaching any assets of the Defendants held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendants, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Complaint;

B.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and federal common law attaching all tangible or intangible property in whatever form or any other funds held by any garnishee, including, but not limited to, ABN-AMRO, American Express Bank, Bank of America, Bank of New York, Deutsche Bank, Citibank, HSBC Bank USA Bank, J.P. Morgan Chase, Standard Chartered Bank, Wachovia Bank N.A. and/or Commerzbank Aktiengesellschaft AG which are due and owing to the Defendants, in the amount of $540,029.94 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters

alleged in the Verified Complaint;

C.     That this Court recognize and confirm any foreign judgment/award of costs on the

claims had herein as a judgment of this Court;

D.     That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof; and

E.     That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: July 9, 2007
       New York, NY

                              The Plaintiff,
                              BRAVE BULK TRANSPORT LTD.,

                    By:  _____
                              Lauren C. Davies (LD 1980)
                              Thomas L. Tisdale (TT 5263)
                              TISDALE LAW OFFICES
                              11 West 42nd Street, Suite 900
                              New York, NY 10036
                              (212) 354-0025 (Phone)
                              (212) 869-0067 (Fax)
                              ldavies@tisdale-law.com
                              ttisdale@tisdale-law.com

## ATTORNEY VERIFICATION

State of Connecticut   )
                       )    ss: Southport
County of Fairfield    )

    1.      My name is Lauren C. Davies.

    2.      I am over 18 years of age, of sound mind, capable of making this Verification and fully competent to testify to all matters stated herein.

    3.      I am the attorney for the Plaintiff in this action.  I am fully authorized to make this Verification on its behalf.

    4.      I have read the foregoing Verified Complaint and the contents thereof are true and accurate to the best of my knowledge, information and belief.

    5.      The reason that this Verification was made by me and not the Plaintiff is that the Plaintiff is a corporation none of whose officers are present in this District.

    6.      The source of my knowledge is information and records furnished to me by the Plaintiff and its solicitors, all of which I believe to be true and accurate.

Dated: July 9, 2007
      Southport, CT

                                Lauren C. Davies

M. MAHON, 5.
640

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
BRAVE BULK TRANSPORT LTD.,                          :

                    Plaintiff,                      :          07 CV 4546 (CM)

          - against -                               :          ECF CASE

SPOT ON SHIPPING LTD., a.k.a. SPOT ON              :
SHIPPING LTD. BVI., a.k.a. SPOT ON,
a.k.a CLAYTON STAR COMPANY LIMITED                 :
a.k.a. CLAYTON STAR and PEHW ASSET
MANAGEMENT LIMITED a.k.a. PEHW                      :
ASSET MANAGEMENT LTD.
and ZHANGGANG SHIPPING LIMITED,                    :

                    Defendants.                     :
-----------------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:                               │
│ DATE FILED: 7.10.07                  │
└─────────────────────────────────────┘
```

## AMENDED EX PARTE ORDER FOR PROCESS OF MARITIME ATTACHMENT

**WHEREAS**, on July 9, 2007 Plaintiff, BRAVE BULK TRANSPORT LTD., filed a

Verified Amended Complaint herein for damages amounting to **$540,029.94** inclusive of interest,

costs and reasonable attorney's fees, and praying for the issuance of Process of Maritime

Attachment and Garnishment pursuant to Rule B of the Supplemental Admiralty Rules for

Certain Admiralty and Maritime Claims of the Federal Rules and Civil Procedure; and

**WHEREAS**, the Process of Maritime Attachment and Garnishment would command that

the United States Marshal or other designated process server attach any and all of the

Defendants' property within the District of this Court; and

**WHEREAS**, the Court has reviewed the Verified Amended Complaint and the

Supporting Affidavit, and the conditions of Supplemental Admiralty Rule B appearing to exist, it

is hereby

**ORDERED**, that Process of Maritime Attachment and Garnishment shall issue against

all tangible or intangible property belonging to, claimed by or being held for the Defendants by any garnishees within this District, including but not limited to, ABN Amro, American Express Bank, Bank of America, Bank of New York, Citibank, Deutsche Bank, HSBC (USA) Bank, JP Morgan Chase, Standard Chartered Bank Wachovia Bank and/or Commerzbank Aktiengesellschaft AG in an amount up to and including $540,029.94 pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure; and it is further

ORDERED that any person claiming an interest in the property attached or garnished pursuant to said order shall, upon application to the Court, be entitled to a prompt hearing at which the Plaintiff shall be required to show cause why the attachment and garnishment should not be vacated or other relief granted; and it is further

ORDERED that supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further Order of the Court; and it is further

ORDERED that following initial service by the United States Marshal or other designated process server upon each garnishee, that supplemental service of the Process of Maritime Attachment and Garnishment, and this Order, may be made by way of fax transmission or other verifiable electronic means, including e-mail, to each garnishee; and it is further

ORDERED that service on any garnishee as described above is deemed effective continuous service throughout the day from the time of such service through the opening of the garnishee's business the next business day; and it is further

ORDERED that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) each garnishee

2

may consent, in writing, to accept service by any other means; and it is further

ORDERED that a copy of this Order be attached to and served with said Process of Maritime Attachment and Garnishment.

Dated: July 9 , 2007

SO ORDERED:

_____
U. S. D. J.



FFABA 2005 (TM)

### FORWARD FREIGHT AGREEMENT BROKERS ASSOCIATION ('FFABA')
### FORWARD FREIGHT 'SWAP' AGREEMENT

Trade Ref            185711
Contract Date        26 February 2007

The purpose of this confirmation is to state the terms and conditions of the forward freight swap agreement entered into between:

**Seller**

**SPOT ON SHIPPING LIMITED**
Room 1818-1823, 18th floor,
Sun Hung Kai Centre
No.30 Harbour Road,
Wanchai
Hong Kong

Contact: Sammy Yu
Phone: +852-3667 9091
Fax: +852-3667 9096
Email: ffa@clayton-star.com

and

**Buyer**

**BRAVE BULK TRANSPORT OF MALTA**
Apollon Building No 2
331 Kifisias Ave
145 61 Kifisia
Greece
Contact: George Leventis
Phone: +30 2106250001
Fax: +30 2106250018
Email: leventisg@brave.gr

Trade Ref    185711

This agreement between the parties as constituted by this confirmation is referred to as the "Agreement"

Until superseded by notice information in subsequent confirmation or other communication, the above addresses are hereby recognized as the correct addresses to which any notification under this Agreement may properly be served.

**1. Contract Route**

As per BCI TC - Baltic Capesize Index Average of Routes (8/9/10/11) as defined on the Contract Date including any relevant official forthcoming amendments published at the Contract Date which will become effective prior to the settlement of this Agreement.

**2. Contract Rate**

USD 72000.00 per Day

**3. Contract Quantity**

45.5 Days

**4. Contract Months**

April 2007, May 2007, June 2007

**5. Contract Period**

Average of All BCI Index days of the contract month(s) up to and including the Settlement date(s)

**6. Settlement Date**

The last Baltic Exchange Index publication day of each Contract Month

**7. Settlement Rate**

(a) The Settlement Rate shall be the average of the rates for the Contract Route(s) published by the Baltic Capesize Index over the Settlement Period defined as All of the Baltic Capesize Index publication days of the Contract Month(s) up to and including the Settlement Date.

(b) If for any reason the Baltic Capesize Index cannot provide any rate required for establishing the Settlement Rate, then the current chairman of the FFABA may be instructed by either party to form a panel comprising of a minimum of three independent brokers (the "Panel") to determine an appropriate rate, which determination will be final and binding on both parties.

(c) Each party shall bear its own costs and expenses in connection with any determination made pursuant to this clause 7.

(d) The parties shall severally indemnify and hold harmless each of the members of the Panel, the Baltic Capesize Index and its members and the FFABA and its members (the "Indemnified Persons") against all liabilities, actions, demands,

costs and expenses incurred by any of them arising directly out of or in connection with the formation of the Panel and any determination made by the Panel.

(e) As between the parties, each party shall have a right of contribution against the other party in respect of any indemnity payment made pursuant to the preceding paragraph so that their respective liabilities pursuant to that paragraph shall be equal.

### 8. Settlement Sum

The "Settlement Sum" is the difference between the Contract Rate and the Settlement Rate multiplied by the Contract Quantity. If the Settlement Rate is greater than the Contract Rate, the Seller shall pay the Buyer the Settlement Sum. If the Settlement Rate is less than the Contract Rate, the Buyer shall pay the Seller the Settlement Sum.

### 9. Payment Procedure and Obligations

(a) Payment of the Settlement Sum is due on the later of two (2) London business days after presentation of payee's invoice (with complete payment instructions) or (5) London business days after the Settlement Date and for this purpose a "London business day" means a day (other than Saturday or Sunday) on which commercial banks are open for business in London). The Settlement Sum will be deemed "paid" when it has been received into the bank account designated by the payee.

(b) Payment of the Settlement Sum shall be made telegraphically, in full, in United States dollars. The cost incurred in effecting payment shall be for the account of the payer. Payment may only be affected directly between parties. The Settlement Sum shall be paid without any deduction or set off unless agreed by the Buyer and Seller in writing.

### 10. ISDA Master Agreement

This Agreement incorporates by reference the 1992 ISDA Master Agreement (Multicurrency - Cross Border) (without Schedule) as if it were fully set out in this Agreement and with only the following specific modifications and elections:

(a) Section 2(c)(ii) shall not apply so that a net amount due will be determined in respect of all amounts payable on the same date in the same currency in respect of two or more Transactions;

(b) Seller is the Calculation Agent;

(c) The most current published set of ISDA ® Commodity Definitions and ISDA Definitions shall apply;

(d) Credit Event Upon Merger is applicable to both parties;

(e) For the purposes of payments on Early Termination, Loss will apply and the Second Method will apply;

(f) The Termination Currency is United States dollars;

(g) The Applicable Rate shall mean the one month USD-LIBOR plus 2%, reset daily and compounded monthly ; and

(h) Local Business Day or banking day shall each refer to such a day in London,

(such form, as modified, the "Standard Agreement" and this Agreement, including the incorporated Standard Agreement,

Trade Ref    185711

shall govern the transaction referred to in and constituted by this Agreement except as expressly modified by this Agreement.

## 11. Capacity and Good Standing

In addition to the representations contained in Section 3 of the Standard Agreement, each party warrants that:

(a)  it is duly organized and validly exists under the jurisdiction of its organization or incorporation, and is solvent and in good standing;

(b)  it has the power to execute, deliver and perform this Agreement;

(c)  All governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(d)  In the event that either party to this Agreement is a person organized under, domiciled in, or having principle place of business in, the United States, each party represents to the other party that it is an "eligible contract participant" as defined in paragraph 1a(12) of the Commodity Exchange Act (7 U.S.C. paragraph 1a(12), as amended).

## 12. Telephone Recording

Each party consents to the recording of telephone conversations in connection with this Agreement.

## 13. Commission

Each of the parties agrees to pay brokers' commission to any broker (a "Broker") as agreed with any Broker.

## 14. Non-Assignability

Except as provided in Section 7 of the Standard Agreement, this Agreement is non-assignable unless otherwise agreed in writing between the parties to this Agreement.

## 15. Principal To Principal

This is a principal to principal contract with settlement directly between the two parties. Both parties agree that any Broker shall be under no obligation or liability in relation to this Agreement. Both parties agree jointly and severally to indemnify and hold harmless any Broker against all actions, including but not limited to all claims, demands, liabilities, damages, costs and expenses both from the two parties and any third party. Claims, demands, liabilities, damages, costs and expenses suffered or incurred are to be settled directly by or between the two parties.

## 16. Law and Jurisdiction

Pursuant to Section 13(b) of the Standard Agreement, this Agreement shall be governed by and construed in accordance with English law and shall be subject to the exclusive jurisdiction of the High Court of Justice in London, England. The terms of Section 12(a) of the Standard Agreement notwithstanding, proceedings may be validly served upon either party by sending the same by ordinary post and/or by fax to the addresses and/or fax numbers for each party given above.

**17. Entire Agreement**

This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

**18. Payment Account Information**

For Seller:
BANK NAME: HSBC Hong Kong
BANK ADDRESS: 1 Queen's Road Central, Hong Kong
A/C NO: 817-088388-838
SWIFT CODE: HSBCHKHHHKH IN FAVOUR OF: SPOT ON SHIPPING LIMITED

For Buyer:
HSBC Bank plc
93 Akti Miaouli Street
Piraeus
Greece
Account: 001-012244.036
Swift: MIDLGRAAA
In favour of: Brave Bulk Transport Limited
Corp. bank: HSBC Bank plc – New York
Swift code: MRMDUS33

**19. Third party rights**

(a) Unless provided to the contrary in this Agreement, a person who is not a party to this Agreement has no rights under the contract (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Agreement.

(b) Any Indemnified Person and any Broker shall have the right to enjoy the benefit of and enforce the terms of clause 7(d) in the case of any Indemnified Person and clause 13 in case of any Broker.

(c) Notwithstanding any term of this Agreement, the consent of any person who is not a party to this Agreement is not required to rescind or vary this Agreement.

**20. Inclusion of historical FFAs under Master Agreement**

(a) Unless the parties to this Agreement specifically agree otherwise in writing, this clause 20 shall apply in accordance with its terms.

(b) This clause 20 applies to this Agreement and every other agreement entered into between parties to this Agreement (and no other persons) before the date of this Agreement:

(i) that expressly stated to be subject to, or is subject to substantially the same terms as, either the FFABA 2000 terms or the FFABA 2005 terms, (excluding for the avoidance of doubt terms as to the Contract Route(s), Contract Rate, Contract Quantity, Contract Month(s), Contract Period and Settlement Date), with or without amendment; and

(ii) that does not incorporate a clause substantially in the same form as this clause 20.

(c) Each agreement to which this clause 20 applies shall be treated as a confirmation (each a "Confirmation") under a master agreement (the "Master Agreement") constituted by the Standard Agreement as modified by, and in the form as incorporated in, the Agreement pursuant to clause 10 as if such agreement has been entered into between parties on the terms of the Master Agreement on the date of the first such Confirmation.

Trade Ref    185711

(d) If there is any inconsistency between the provisions of any agreement constituted pursuant to paragraph (c) above and the agreement constituting a transaction to which this clause 20 applies, the provisions of the agreement constituting the transaction to which this clause 20 applies will prevail for the purposes of the transaction under such agreement.

(e) This clause 20 shall not affect the rights or obligations of the parties under any transaction accrued before the date of this Agreement.

(f) This clause 20 is effective notwithstanding any entire agreement clause or similar provision in any such agreement relevant to any such transaction.

**21. Inclusion of subsequent FFAs under Master Agreement**

(a) Unless the parties to this Agreement specifically agree otherwise in writing, this clause 21 shall apply in accordance with its terms.

(b) This clause 21 applies to every agreement entered into between the parties to this Agreement (and no other persons) after an agreement incorporating a Master Agreement (as defined in and pursuant to a clause substantially in the same form as and equivalent to clause 20) has been entered into by them.

(c) This Agreement shall constitute a Confirmation under the Master Agreement on the terms of clauses 20 (c), (d), (e) and (f) as if they were incorporated and fully set out in this clause 21 with appropriate and necessary modifications for such incorporation.

Trade Ref    185711

Signed for the Buyer by
[printed name]

Signed for the Seller by
[printed name]

Duly authorised signatory

Duly authorised signatory

Date ...................

Date ...................

[Company Seal or Stamp]

[Company Seal or Stamp]

**Trade Ref    185711**

ICAP Hyde Derivatives Ltd 2 Broadgate, London EC2M 7UR. Tel: +44(0)20 7532 4934 Fax: +44(0)20 7000 5942
Each of the Buyer and the Seller (the "counterparties") has agreed that ICAP Hyde Derivatives Limited is its broker for the sole purposes of 'passing names' and for confirming the details of the transaction set out above in accordance with accepted market practice. ICAP Hyde Derivatives Limited has arranged the transaction as name passing or introducing broker. Nothing in the transaction shall create any fiduciary or agency relationship between ICAP Hyde Derivates Limited and either of the counterparties. Each of the counterparties agrees that no reliance has or may be placed by either of them on any representation made by ICAP Hyde Derivates Limited, its directors, employees or agents. ICAP Hyde Derivates Limited is not responsible for the provision of advice to any person in connection with the transaction. It is also not responsible for the exercise of any options. ICAP Hyde Derivates Limited is not responsible for any other obligation or liability arising under the transaction and is not liable for the capacity, reliability, or performance of the counterparties with regard to the transaction; in particular, ICAP Hyde Derivates Limited accepts no liability for the commercial advisability of the transaction. ICAP Hyde Derivates Limited is not responsible for the failure by either of the above-named counterparties or any other person in supplying relevant information relating to the transaction, in properly documenting the transaction or in satisfying any legal requirements or taxation issues or conditions in relation thereto, including, without limitation, the obtaining of any necessary consents or the failure for whatever reason of completion of such transaction. Transaction times are available on request. ICAP Hyde Derivates Limited is authorised and regulated by the Financial Services Authority. The transaction is subject to English law.

Please advise ICAP Hyde Derivates Limited immediately if the details of this confirmation differ from your understanding.

**Trade Ref    185711**



No. 1026733
編號

# COMPANIES ORDINANCE
## (CHAPTER 32)
### 香 港 法 例 第 32 章
### 公 司 條 例

## CERTIFICATE OF INCORPORATION
### 公 司 註 冊 證 書

* * *

**I hereby certify that**
本 人 謹 此 證 明

## ZHANGGANG SHIPPING LIMITED
### 張鋼船務有限公司

**is this day incorporated in Hong Kong under the Companies Ordinance,**
於 本 日 在 香 港 依 據 公 司 條 例 註 冊 成 為

**and that this company is limited.**
有 限 公 司 。

**Issued by the undersigned on** 27 February 2006 .
本 證 書 於 二 〇 〇 六 年 二 月 二 十 七 日 簽 發 。

Miss Nancy O. S. YAU
...............................................................
**for Registrar of Companies**
**Hong Kong**
香港公司註冊處處長
（ 公 司 註 冊 主 任 邱愛琛 代行 ）

FORM 2

正 XXX XXX
ORIGINAL X

商業登記條例）（第 310 章）
BUSINESS REGISTRATION ORDINANCE (Chapter 310)
《商業登記規例》
BUSINESS REGISTRATION REGULATIONS

副　本
DUPLICATE

商業 ／ 分行登記證
Business/Branch Registration Certificate

||||||||||||||||||||||||||||||||||||||||||||||||||||

業務/法團所用名稱
Name of Business/
Corporation

張鋼船務有限公司
ZHANGGANG SHIPPING LIMITED

總務/分行名稱
Business/
Branch Name

**********************************************
**********************************************

地　址
Address

SUITES 1818-23 18/F
SUN HUNG KAI CENTRE
30 HARBOUR ROAD WANCHAI
HK

業務性質
Nature of Business

SHIPPING

法律地位
Status

BODY CORPORATE

| 生效日期<br>Date of Commencement | 屆滿日期<br>Date of Expiry | 登記證號碼<br>Certificate No. | 登記費及徵費<br>Fee and Levy |
|---|---|---|---|
| 27/02/2007 | 26/02/2008 | 36492099-000-02-07-3 | $2,600 |

（登記費 FEE = $2,000）
（徵費 LEVY = $ 600）

請注意下列《商業登記條例》的規定 (SEE OVERLEAF FOR ENGLISH VERSION)

第 6(6) 條規定凡就任何業務發出商業登記證或分行登記證，不得當作證明以下意思：有關該業務或經營該業務的人或受僱於該業務的僱員的任何法律規定已獲遵從。

第 7(2) 條規定任何經營業務人士，須在現有商業登記證期滿後未有收到繳款通知書，業於 1 個月內以書面通知稅務局局長。

第 8 條規定凡申請登記表格內所列業務詳情有任何變更時或凡某項業務經已結束，任何經營有關業務的人或任何在結束商業時繼續與該業務的人須於須要變更生時或該項業結束時起計 1 個月內，以書面通知局長。

第 12 條規定各業務須展示其有效的商業登記證或有效的分行登記證於每一營業地點展示。

第 15(1) 條規定如觸犯本條例者可施行的罰則，包括罰款 $5,000 及監禁 1 年。

第 21 條規定需累收取徵費所得的全部款項須付還欠薪保障基金。

繳款時請將此商業登記及繳款通知書完整交出。在付款後，本繳款通知書方成為有效的商業登記證。
PLEASE PRODUCE THIS CERTIFICATE AND DEMAND NOTE INTACT AT TIME OF PAYMENT. THIS DEMAND NOTE
WILL ONLY BECOME A VALID BUSINESS REGISTRATION CERTIFICATE UPON PAYMENT.

茲收訖所示登記費及徵費收記。（請參閱背頁繳款辦法所載內容）
RECEIVED FEE AND LEVY HERE STATED IN PRINTED FIGURES. (Please see payment instructions overleaf.)

I.R.B.D. 101B (5/2006)
02/03/2007 56838159 850937 CHQ          $2,600.00          S

# COMMERCIAL SERVICES AGREEMENT

THIS AGREEMENT is made on the 27th of February, 2006 BETWEEN: -

( 1 )   ZHANGGANG SHIPPING LIMITED   a Company incorporated and existing under the laws of Hong Kong whose registered office is at Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong  ("the Principal") and

( 2 )   SPOT ON (HONG KONG) GROUP CORPORATION LIMITED   a Company incorporated and existing under the laws of Hong Kong whose registered office is at Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong ("the Manager").

WHEREAS  :  -

The Principal is desires to share office with the Manager and to appoint the Manager as manager to provide certain commercial services to the Principal in the respect of the management of business, accounts, shipping settlement and following operations and the Manager has agreed to render such services to the Principal, all upon the terms and conditions hereinafter set out.

IT IS MUTUALLY AGREED AS FOLLOWS : -

1.   APPOINTMENT

The Principal hereby appoints the Manager to act as manager of their business, accounts, shipping settlement and following operations with effect from 27th February, 2006 (the "Commencement Date") to provide the services set for the in clause 2 and otherwise upon the terms and conditions set forth in this Agreement, and the Manager hereby accepts such appointment.

2.   SERVICES

The Manager shall provide to the Principal all commercial services which relate to their business, accounts, shipping settlement and following operations, as per following listed items only.

2.1  The Principal declare in writing every shipment of iron ore with its details (laycan, cargo quantity, loading port and etc.) to the Manager at least 30 days prior to each laycan commencement. Accordingly, the Manager select and fix vessels by way of voyage charter, time charter on trip basis or other charters (subject to prior consent of the Principal) for the declared shipment. The Manager should nominate a performing vessel to Principal at least

15 days prior to the declared laycan commencement.

2.2 Regarding the rate at which every vessel is fixed for relevant shipment, the Manager need to follow the Principal's instruction and get prior final confirmation.

2.3 The Manager calculate and collect, on behalf and into the account of the Principal, all freight and demurrage payable in respect of the fixtures/agreements/contracts from Zhangdian Iron Steel Works and/or relevant Shippers; all dispatch payable in respect of the fixtures/agreements/contracts from relevant Owners.

2.4 The Manager calculate and pay, on behalf and from account of the Principal, all hire, freight and demurrage payable in respect of the fixtures/agreements/contracts to relevant Owners; all dispatch payable in respect of the fixtures/agreements/contracts to Zhangdian Iron Steel Works and/or relevant shippers.

2.5 The Manager perform day to day operations and duties in respect of the chartered vessels which may be required under any charter or contracts fixed.

2.6 The Manager contract for fuel and bunker for the fixtures/agreements/contracts when necessary and appointing agents at loading or discharging ports or other ports of call wherever necessary.

2.7 The Manager execute documents relating to fixing shipments and pass the original contracts to the Principal for their stamp and signature. The Manager shall get one final both parties signed original contract of each shipment and keep them in office.

2.8 The Manager operate the Principal's banking account or accounts as the Manager may deem necessary for the purposes hereof under supervision of the Principal.

2.9 The Manager handle claims and collections arising out of or in connection with the fixtures/agreements/contracts of vessels and following operations.

2.10 The Manager appoint surveyor in connection with the fixtures/agreements/contracts of vessels.

2.11 The Manager obtain legal advice in relation to disputes or other matters affecting the interests of the Principal in respect of the fixtures/agreements/contracts fixed and following operations, and to bring actions, suits, or proceedings or to make any (interim) appointment, employment or other arrangement to accomplish the foregoing with respect to disputes with any owners or supplier of services where time does not permit prior consultation with the Principal.

2.12 The Manager pay, on behalf and from the account of, the Principal all expenses incurred in or about the provision of the foregoing services.

2.13 All sums or earnings, receivable from a third party arising out of or in connection with the management of the business, accounts, shipping settlement and following operations shall be remitted or caused to be remitted by the Manager to such bank account as the Principal may designate.

2.14 The Manager shall send to the Principal all documents relating to the fixtures/agreements/contracts vessels and other contracts from time to time as may be required by the Principal including copies of any fixture note, charter or other documents setting out the terms of those fixtures/agreements/contracts.

3.    OFFICE SHARING

For purpose of shipping market information share, register, and liaison/communication, the Principal share the office (Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong) with the Manager against sharing the leasing hire, service charges and other relevant cost to maintain the office upon the terms and conditions set forth in this Agreement.

3.1   The Principal can use the sharing office in shipping market information share, register, and liaison/communication, purpose.

3.2   The Principal can dispatch employees to work in the sharing office for short period or under whole Agreement period. The Principal will pay for their dispatched employee, including their salary, allowance, bonus, premium, traveling expenses and other expenses.

3.3   The Principal equally share (50%) with the Manager in the office leasing hire, service charges and other relevant cost to lease the office against invoice from landlord.

3.4   The Principal pay for the necessary office furniture and computers, which their employees will use.

3.5   The Principal bear part of other expenses, including but not limited to administration cost, incidental expenses, depreciation, miscellaneous, etc., caused by leasing the office and/or doing business in the office upon mutual further agreement.

3.6   If the Manager pay any of above mentioned cost/expenses for the Principal, the Principal shall return such cost to the Manager within 5 (ten) days after their receipt of notice and relevant invoice.

## 4.   MANAGEMENT SERVICE FEE

4.1   For and in consideration of the services to be performed under this Agreement, the Principal shall pay to the Manager an annual fee in the amound of 10% of the Pricinpal's profit in each financial year. Every annual fee is payable no later than six consecutive calendar months after ending of the previous financial year, starting from 1st April to 31st March of following year.

4.2   If during the period of this Agreement the Manager shall be called upon by the Principal to render any services other than those described in Clause 2 hereof, compensation therefore shall be mutually agreed upon between the parties before the performance of such services.

## 5.   REPORTING

The Manager shall prepare and furnish to the Principal detailed accounts for the management of the business, accounts, shipping settlement and following operations at the request of the Principal from time to time and also such provisions for accruing and anticipated incomes and liabilities and contingencies as the Manager shall consider justified.

## 6.   LIABILITIES

It is agreed that all of the rights, benefits, obligations and liabilities under all fixtures /agreements/contracts concluded by the Manager in accordance with provisions of this

Agreement, even if concluded in the name of the Manager, shall be for the account of the Principal. Such fixtures/agreements/contracts may be concluded and executed in the name of the Manager always in accordance with the provisions of this Agreement, in which case such fixtures/agreements/contracts shall be regarded as if concluded by the Principal, and the Manager shall be fully released and discharged from all responsibilities, obligations and liabilities thereunder unless the Manage was acting in bad faith or willful misconduct in entering into such fixtures/agreements/contracts on behalf of Principal.

7.    INDEMNITIES

7.1   The Manager shall not be liable for any loss of or damage to the Principal and/or any loss, damage, expense and liability incurred by the Principal directly or indirectly, unless caused by willful misconduct on the part of the Manager.

7.2   The Principal shall indemnify the manager and hold the Manager harmless against any and all claims and demands (including costs and attorney's fees in the defending any such claim and demand, whether or not such claim or demand is found to be valid), which may be brought against the Manager pursuant to and in accordance with the provisions of this Agreement unless the Manager was acting in bad faith or willful misconduct in taking such action.

8.    MANAGEMENT PERIOD AND TERMINATION

8.1   The appointment of the Manager shall be deemed to have commenced and taken effect from the Commencement Date for a period of Five (5) years and such appointment shall (subject as hereinafter provided) continue automatically for a further period of Five (5) years.

8.2   Notwithstanding the terms of Clause 8.1, and without prejudice to the accrued rights hereunder, either party may terminate this Agreement, if and when:
      a)   this Agreement has been in operation for twelve months or at the expiry of any forms of fixtures/agreements/contracts whichever is the later but subject to giving three month prior notice in writing to the other party; or
      b)   the Principal ceases for any reason to be lawfully entitled to continue the appointment of the Manager made under this Agreement; or
      c)   either party goes into liquidation or becomes bankrupt or insolvent or has a receiver appointed or is unable to meet its debts as they fall due.

8.3   In the event the appointment of the Manager being terminated by either party pursuant to provisos (a), (b) and (c) of Clause 8.2, the management service fee payable to the Manager as stipulated in Clause 4.1 shall continue to be payable in proportion base on the period of that fiscal year.

8.4   Notwithstanding termination for any reason, the Manager shall continue to be responsible for the settlement of any outstanding matters in respect of the fixtures/agreements/contracts and shall co-operate with the Principal in prosecuting or defending any claims in connection with the fixtures/agreements/contracts provided always that the Principal shall continue to be responsible    for    the    payment    of    all    sums    arising    in    respect    of    the fixtures/agreements/contracts, the Principal also undertakes to pay an extra management

service fee to the Manager for handling all outstanding claims in respect of the fixtures/agreements/contracts in the amount to be mutually agreed.

9.  **INSPECTION OF BOOKS AND RECORDS**

The Manager shall keep customary business records respecting all collections, expenditures, accounts and records of transaction relating to the activities pursuant to this Agreement. The Principal shall have the right, upon giving prior notice to the Manager, to inspect all the accounting books, original vouchers under the custody of the Manager.

10.  **NOTICES**

Any notice or other communication to a party hereunder shall be in writing and shall be delivered or sent by postage prepaid mail or airmail, or by telex, telegram, cable or facsimile or other electronic transmission addressed to the address of such party or to such other address as such party shall have communicated to the other. In urgent situation, oral instruction can be made by the Principal for the Manager to continue the operations or business, which followed by written.

11.  **ARBITRATION AND GOVERNING LAW**

11.1  Any dispute between the parties arising out of or in connection with this Agreement or in relation to the rights and obligations of the Principal and the Manager hereunder shall be submitted to arbitration in London, in accordance with the provisions of the Arbitration Acts and any amendments thereto, each party nominating one arbitrator, and if the arbitrators cannot agree, then to nominate an umpire.

11.2  The decision of the arbitrators shall be final and binding and may be enforced by any judicial tribunal having jurisdiction thereof. Throughout the pendency of any dispute, the parties shall continue to perform their respective obligations under this Agreement except for matters in dispute.

11.3  This Agreement shall be governed by and interpreted in accordance with the laws of Hong Kong.

12.  **ASSIGNMENT**

It is mutually agreed between the parties hereto that the Manager may assign or appoint any other entities or individuals to perform all duties and obligations set forth in this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized signatories of the day and year first above written.

SIGNED by      Zhang Jinglu              }

For and on behalf of                     }

ZHANGGANG SHIPPING LIMITED               }


SIGNED BY      Bi Min                    )

For and on behalf of                     )

SPOT ON (HONG KONG) GROUP                )

CORPORATION LIMITED                      )