UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BRAVE BULK TRANSPORT LTD.,                    :

          Plaintiff,                    :        07 CV 4546 (CM)

     - against -                    :        ECF CASE

SPOT ON SHIPPING LTD., a.k.a. SPOT ON        :
SHIPPING LTD. BVI., a.k.a. SPOT ON,
a.k.a CLAYTON STAR COMPANY LIMITED           :
a.k.a. CLAYTON STAR and PEHW ASSET
MANAGEMENT LIMITED a.k.a. PEHW               :
ASSET MANAGEMENT LTD.
and ZHANGGANG SHIPPING LIMITED,              :

         Defendants.                    :
------------------------------------------------------------X

## DECLARATION OF LAUREN C. DAVIES IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF LAW SHOWING CAUSE IN OPPOSITION TO DEFENDANT ZSL'S MOTION TO VACATE AND IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION OF ORDER VACATING THE MARITIME ATTACHMENT

LAUREN C. DAVIES declares under penalty of perjury of the laws of the United States of America as follows:

1.     I am an attorney with the firm, Tisdale Law Offices, LLC, counsel for the Plaintiff herein, Brave Bulk Transport Ltd., ("Brave Bulk" or "Plaintiff") and I make this declaration based upon my own personal knowledge and upon information and documents furnished to me that I believe to be true and accurate.

2.     I submit this Declaration in Support of Plaintiff's memorandum of law showing cause in opposition to Defendant Zhanggang Shipping Ltd.'s ("ZSL") Motion to Vacate and in support of Plaintiff's motion for reconsideration of this Court's September 14, 2007 order vacating maritime attachment.

3.      By way of a Forward Freight Agreement dated February 26, 2007 (hereinafter the "FFA"), Defendant Spot On Shipping Ltd. ("Spot On") agreed to sell and buy freight futures with the Plaintiff. *See Forward Freight Agreement annexed hereto as Exhibit "1."*

4.      The FFA provided for settlement dates of the last day of three contract months: April, May and June of 2007. *See Verified Amended Complaint annexed hereto as Exhibit "2" at ¶ 9.*

5.      Despite due demand for payment, Defendant has failed to remit payment to Plaintiff in breach of the FFA. *See Exhibit "2" at ¶ 10.*

6.      As a result of Spot On's breach of the FFA contract, Plaintiff has suffered a loss in the total principal sum of $380,769.67, as best can now be estimated, exclusive of interest, recoverable costs and reasonable attorneys fees. *See Exhibit "2" at ¶ 11.*

7.      Pursuant to clause 16 of the FFA contract all disputes arising thereunder are to be submitted to the English High Court of Justice with English law to apply. *See Exhibit "2" at ¶ 12.*

8.      Plaintiff is currently preparing to commence litigation against the Defendants in the English High Court on its claims as described hereinabove. *See Exhibit "2" at ¶ 13.*

9.      As will be shown herein and as is sufficiently plead in the Verified Amended Complaint, at all material times Defendant ZSL was the alter-ego of Spot On. *See Exhibit "2" at ¶¶ 22-28.*

10.     In order to obtain personal jurisdiction over the Defendants and to obtain security for its maritime claims, Plaintiff commenced this action on May 30, 2007, by the filing of a Verified Complaint which included a prayer for an Ex-Parte Order for Process of Maritime Attachment pursuant to Rule B [of the Supplemental Rules for Certain Admiralty and Maritime

Claims] naming Spot On Shipping Ltd. a.k.a. Spot On Shipping Ltd. BVI a.k.a. Spot On, a.k.a.

Clayton Star Company Limited a.k.a. Clayton Star and Pehw Asset Management Limited a.k.a.

Pehw Asset Management Ltd.

11.    On the same day, the Court issued an Ex-Parte Order of Maritime Attachment and

Garnishment.  The Ex-Parte Order authorized Plaintiff to attach Defendants' property located

within this judicial district and belonging to the Defendants up to the sum of $540,029.94.

12.    The Ex-Parte Order and Process of Maritime Attachment and Garnishment

("PMAG") named garnishee banks believed to have assets due and owing to the Defendants  The

and were served upon the garnishee banks.

13.    On July 9, 2007, a Verified Amended Complaint which included a prayer for an

Amended Ex-Parte Order for Process of Maritime Attachment pursuant to Rule B was filed

naming Spot On Shipping Ltd. a.k.a. Spot On Shipping Ltd. BVI a.k.a. Spot On, a.k.a. Clayton

Star Company Limited a.k.a. Clayton Star and Pehw Asset Management Limited a.k.a. Pehw

Asset Management Ltd. and Zhanggang Shipping Ltd. (collectively referred to as the

"Defendants").

14.    On or about July 10, 2007, the Court issued an Amended Ex-Parte Order of

Maritime Attachment and Garnishment.  The Ex-Parte Order authorized Plaintiff to attach

Defendants' property located within this judicial district and belonging the Defendants up to the

sum of $540,029.94.

15.    Plaintiff claimed against both Spot On and ZSL in this action, as ZSL is merely a

shell corporation through which Spot On conducts its business.

16.    On or about August 14, 2007 and pursuant to the PMAG, Bank of New York

restrained ZSL's property in the sum of $7,219.44.

17.     On or about September 19, 2007 and pursuant to the PMAG, HSBC restrained ZSL's property in the sum of $1,000,000.00.

18.     As there is another maritime attachment action pending in the district which names ZSL as a defendant, filed under docket number 07 CV 3820 (VM), this security will be split amongst the two Rule B Plaintiffs.

19.     To date, Brave Bulk's share is likely to be $504,219.44, half of the total sum attached pursuant to the ex parte orders for process of maritime attachment served on the garnishee banks.

20.     As will be shown herein, ZSL is an alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that ZSL is actually carrying on Spot On's business and operations as if the same were its own.

21.     In its motion to vacate and the accompanying Declaration of Mr. Jinglu Zhang, ZSL maintains that they are a separate and distinct company from Spot On and that the only similarity between the two companies is that they rent office space in the same building.  For the reasons that follow, and based upon even a cursory review of the attached exhibits, it is evident that ZSL and Spot On are alter egos of each other and the scenario presented by Defendants is, at best, a misrepresentation of the facts.

22.     Even without the benefit of discovery, several facts have come to light showing that ZSL and Spot On are alter-egos.

23.     ZSL and Spot On have a common address and place of business at:  Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong.  *See Commercial Services Agreement at page 1 annexed hereto as Exhibit "3" and Exhibit "1."*

24.     This is also the address of "Spot On (Hong Kong) Group Corporation Limited"

which ("Spot On HK GCL") is another alter ego of "Spot On Shipping Ltd." ("Spot On").

a.     Upon information and belief, Spot On HK GCL is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Spot On HK GCL is actually carrying on Spot On's business and operations as if same were its own.

b.     Upon information and belief, Defendant Spot On HK GCL is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Spot On HK GCL.

c.     Upon information and belief, Defendants Spot On HK GCL and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, and used to carry on such individuals' own business. Further, the Defendants share the same offices, employees, telephone numbers, fax numbers and/or email addresses.

d.     Upon information and belief, Mrs. Wei-lu Zhang is a primary controller of Spot On and Spot On HK GCL.

e.     Upon information and belief, Defendant Spot On HK GCL has no separate, independent identity from Defendant Spot On as they are separately incorporated for the purpose of fraudulently avoid payment of just debts to their creditors.

f.     In the alternative, Defendant Spot On HK GCL is merely a shell corporation through which Spot On conducts its business.

g.     In the further alternative, Defendants Spot On HK GCL and Spot On are partners and/or are joint venturers.

h.     In the further alternative, Defendants Spot On HK GCL and Spot On are affiliated companies such that the Defendant Spot On HK GCL is now, or will soon be, holding assets belonging to Defendant Spot On and vice versa.

25.     ZSL and Spot On share a common email address: shipping@spoton-hk.com.  *See*

*Lloyd's MIU Investigation Report on ZSL at page 2 annexed hereto as Exhibit "4" and Exhibit*

*"1."*

26.    The corporate research conducted on these companies includes an Infospectrum report, and a Lloyd's MIU report. No information was uncovered that shows that ZSL is owned by an entity which is a Chinese government-owned enterprise.

27.    On the contrary, ZSL is a joint venture between Spot On and Zhangdian Steel Mill of China. *See Exhibit "4."*

28.    Further, we have been informed by Lloyd's MIU that they telephoned ZSL and were told that ZSL is a "ship charterer."

29.    Contrary to the false assertions made by ZSL, Spot On and ZSL do share common ownership. Specifically, upon information and belief, both Spot On (Hong Kong) Group Corporation Limited and ZSL are owned and run by the Zhang family. Madam Wei-Lu Zhang reported to be the president of ZSL and she is also a principal director of Spot On (Hong Kong) Group Corporation Limited. *See excerpt from Spot On's Annual Return annexed hereto as Exhibit "5" and compare with Exhibit "4."*

30.    Further, ZSL's chartering manager is Ms. Sammy Yu. Ms. Sammy Yu was also the contact between ICAP Hyde Derivaties Limited and Spot On in drafting the February 26, 2007 FFA. *See Email correspondence between ICAP and Spot On annexed hereto as Exhibit "6," see further Exhibit "4" which indicates that Sammy Yu is the manager of ZSL.*

31.    Sammy Yu's name appears on the first page of the FFA between Spot On and Brave Bulk as the "contact" for Spot On. *See February 26, 2007 FFA annexed hereto as Exhibit "1."*

32.    Upon information and belief, Spot On and ZSL's names are used interchangeably in the industry. *See Baltic Dry Index Dry Cargo Fixture Summary annexed hereto as Exhibit "7."*

33.    By conducting business through shell or pass through corporations, i.e. the multitude of related entities exposed in this action i.e. Spot On Shipping Ltd. a.k.a. Spot On Shipping Ltd. BVI a.k.a. Spot On, a.k.a. Clayton Star Company Limited a.k.a. Clayton Star and Pehw Asset Management Limited a.k.a. Pehw Asset Management Ltd. and Zhanggang Shipping Ltd. can effectively insulate themselves from liability.

34.    ZSL has submitted only an alleged Commercial Services Agreement, the validity of which is not ascertainable without the benefit of discovery.

35.    Aside from this single document, ZSL has made no showing that these companies are in fact separate and distinct entities other than the bald assertions of an alleged director.

36.    With the benefit of discovery, Plaintiff has no doubt that numerous other connections between ZSL and Spot On will be revealed.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 20, 2007.

Lauren C. Davies

## AFFIRMATION OF SERVICE

I hereby certify that on September 20, 2007, a copy of the foregoing DECLARATION OF LAUREN C. DAVIES was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: _____/s/_____
     Lauren C. Davies

# EXHIBIT 1



FFABA 2005 (TM)

### FORWARD FREIGHT AGREEMENT BROKERS ASSOCIATION ('FFABA')
### FORWARD FREIGHT 'SWAP' AGREEMENT

Trade Ref          185711
Contract Date      26 February 2007

The purpose of this confirmation is to state the terms and conditions of the forward freight swap agreement entered into between:

**Seller**

**SPOT ON SHIPPING LIMITED**

Room 1818-1823, 18th floor,
Sun Hung Kai Centre
No.30 Harbour Road,
Wanchai
Hong Kong

Contact: Sammy Yu
Phone: +852-3667 9091
Fax: +852-3667 9096
Email: ffa@clayton-star.com

and

**Buyer**

**BRAVE BULK TRANSPORT OF MALTA**

Apollon Building No 2
331 Kifisias Ave
145 61 Kifisia
Greece
Contact: George Leventis
Phone: +30 2106250001
Fax: +30 2106250018
Email: leventisg@brave.gr

Trade Ref    185711

This agreement between the parties as constituted by this confirmation is referred to as the "Agreement"

Until superseded by notice information in subsequent confirmation or other communication, the above addresses are hereby recognized as the correct addresses to which any notification under this Agreement may properly be served.

## 1. Contract Route

As per BCI TC - Baltic Capesize Index Average of Routes (8/9/10/11) as defined on the Contract Date including any relevant official forthcoming amendments published at the Contract Date which will become effective prior to the settlement of this Agreement.

## 2. Contract Rate

USD 72000.00 per Day

## 3. Contract Quantity

45.5 Days

## 4. Contract Months

April 2007, May 2007, June 2007

## 5. Contract Period

Average of All BCI Index days of the contract month(s) up to and including the Settlement date(s)

## 6. Settlement Date

The last Baltic Exchange Index publication day of each Contract Month

## 7. Settlement Rate

(a) The Settlement Rate shall be the average of the rates for the Contract Route(s) published by the Baltic Capesize Index over the Settlement Period defined as All of the Baltic Capesize Index publication days of the Contract Month(s) up to and including the Settlement Date.

(b) If for any reason the Baltic Capesize Index cannot provide any rate required for establishing the Settlement Rate, then the current chairman of the FFABA may be instructed by either party to form a panel comprising of a minimum of three independent brokers (the "Panel") to determine an appropriate rate, which determination will be final and binding on both parties.

(c) Each party shall bear its own costs and expenses in connection with any determination made pursuant to this clause 7.

(d) The parties shall severally indemnify and hold harmless each of the members of the Panel, the Baltic Capesize Index and its members and the FFABA and its members (the "Indemnified Persons") against all liabilities, actions, demands,

Trade Ref    185711

costs and expenses incurred by any of them arising directly out of or in connection with the formation of the Panel and any determination made by the Panel.

(e) As between the parties, each party shall have a right of contribution against the other party in respect of any indemnity payment made pursuant to the preceding paragraph so that their respective liabilities pursuant to that paragraph shall be equal.

## 8. Settlement Sum

The "Settlement Sum" is the difference between the Contract Rate and the Settlement Rate multiplied by the Contract Quantity. If the Settlement Rate is greater than the Contract Rate, the Seller shall pay the Buyer the Settlement Sum. If the Settlement Rate is less than the Contract Rate, the Buyer shall pay the Seller the Settlement Sum.

## 9. Payment Procedure and Obligations

(a) Payment of the Settlement Sum is due on the later of two (2) London business days after presentation of payee's invoice (with complete payment instructions) or (5) London business days after the Settlement Date and for this purpose a "London business day" means a day (other than Saturday or Sunday) on which commercial banks are open for business in London). The Settlement Sum will be deemed "paid" when it has been received into the bank account designated by the payee.

(b) Payment of the Settlement Sum shall be made telegraphically, in full, in United States dollars. The cost incurred in effecting payment shall be for the account of the payer. Payment may only be affected directly between parties. The Settlement Sum shall be paid without any deduction or set off unless agreed by the Buyer and Seller in writing.

## 10. ISDA Master Agreement

This Agreement incorporates by reference the 1992 ISDA Master Agreement (Multicurrency - Cross Border) (without Schedule) as if it were fully set out in this Agreement and with only the following specific modifications and elections:

(a) Section 2(c)(ii) shall not apply so that a net amount due will be determined in respect of all amounts payable on the same date in the same currency in respect of two or more Transactions;

(b) Seller is the Calculation Agent;

(c) The most current published set of ISDA ® Commodity Definitions and ISDA Definitions shall apply;

(d) Credit Event Upon Merger is applicable to both parties;

(e) For the purposes of payments on Early Termination, Loss will apply and the Second Method will apply;

(f) The Termination Currency is United States dollars;

(g) The Applicable Rate shall mean the one month USD-LIBOR plus 2%, reset daily and compounded monthly ; and

(h) Local Business Day or banking day shall each refer to such a day in London,

(such form, as modified, the "Standard Agreement" and this Agreement, including the Incorporated Standard Agreement,

Trade Ref    185711

shall govern the transaction referred to in and constituted by this Agreement except as expressly modified by this Agreement.

## 11. Capacity and Good Standing

In addition to the representations contained in Section 3 of the Standard Agreement, each party warrants that:

(a) It is duly organized and validly exists under the jurisdiction of its organization or incorporation, and is solvent and in good standing;

(b) It has the power to execute, deliver and perform this Agreement;

(c) All governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(d) In the event that either party to this Agreement is a person organized under, domiciled in, or having principle place of business in, the United States, each party represents to the other party that it is an "eligible contract participant" as defined in paragraph 1a(12) of the Commodity Exchange Act (7 U.S.C. paragraph 1a(12), as amended).

## 12. Telephone Recording

Each party consents to the recording of telephone conversations in connection with this Agreement.

## 13. Commission

Each of the parties agrees to pay brokers' commission to any broker (a "Broker") as agreed with any Broker.

## 14. Non-Assignability

Except as provided in Section 7 of the Standard Agreement, this Agreement is non-assignable unless otherwise agreed in writing between the parties to this Agreement.

## 15. Principal To Principal

This is a principal to principal contract with settlement directly between the two parties. Both parties agree that any Broker shall be under no obligation or liability in relation to this Agreement. Both parties agree jointly and severally to indemnify and hold harmless any Broker against all actions, including but not limited to all claims, demands, liabilities, damages, costs and expenses both from the two parties and any third party. Claims, demands, liabilities, damages, costs and expenses suffered or incurred are to be settled directly by or between the two parties.

## 16. Law and Jurisdiction

Pursuant to Section 13(b) of the Standard Agreement, this Agreement shall be governed by and construed in accordance with English law and shall be subject to the exclusive jurisdiction of the High Court of Justice in London, England. The terms of Section 12(a) of the Standard Agreement notwithstanding, proceedings may be validly served upon either party by sending the same by ordinary post and/or by fax to the addresses and/or fax numbers for each party given above.

Trade Ref    185711

### 17. Entire Agreement

This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

### 18. Payment Account Information

For Seller:
BANK NAME: HSBC Hong Kong
BANK ADDRESS: 1 Queen's Road Central, Hong Kong
A/C NO: 817-088388-838
SWIFT CODE: HSBCHKHHHKH IN FAVOUR OF: SPOT
ON SHIPPING LIMITED

For Buyer:
HSBC Bank plc
93 Akti Miaouli Street
Piraeus
Greece
Account: 001-012244.036
Swift: MIDLGRAAA
In favour of: Brave Bulk Transport Limited
Corp. bank: HSBC Bank plc - New York
Swift code: MRMDUS33

### 19. Third party rights

(a) Unless provided to the contrary in this Agreement, a person who is not a party to this Agreement has no rights under the contract (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Agreement.

(b) Any Indemnified Person and any Broker shall have the right to enjoy the benefit of and enforce the terms of clause 7(d) in the case of any Indemnified Person and clause 13 in case of any Broker.

(c) Notwithstanding any term of this Agreement, the consent of any person who is not a party to this Agreement is not required to rescind or vary this Agreement.

### 20. Inclusion of historical FFAs under Master Agreement

(a) Unless the parties to this Agreement specifically agree otherwise in writing, this clause 20 shall apply in accordance with its terms.

(b) This clause 20 applies to this Agreement and every other agreement entered into between parties to this Agreement (and no other persons) before the date of this Agreement:

(i) that expressly stated to be subject to, or is subject to substantially the same terms as, either the FFABA 2000 terms or the FFABA 2005 terms, (excluding for the avoidance of doubt terms as to the Contract Route(s), Contract Rate, Contract Quantity, Contract Month(s), Contract Period and Settlement Date), with or without amendment; and

(ii) that does not incorporate a clause substantially in the same form as this clause 20.

(c) Each agreement to which this clause 20 applies shall be treated as a confirmation (each a "Confirmation") under a master agreement (the "Master Agreement") constituted by the Standard Agreement as modified by, and in the form as incorporated in, the Agreement pursuant to clause 10 as if such an agreement has been entered into between parties on the terms of the Master Agreement on the date of the first such Confirmation.

Trade Ref    185711

(d) If there is any inconsistency between the provisions of any agreement constituted pursuant to paragraph (c) above and the agreement constituting a transaction to which this clause 20 applies, the provisions of the agreement constituting the transaction to which this clause 20 applies will prevail for the purposes of the transaction under such agreement.

(e) This clause 20 shall not affect the rights or obligations of the parties under any transaction accrued before the date of this Agreement.

(f) This clause 20 is effective notwithstanding any entire agreement clause or similar provision in any such agreement relevant to any such transaction.

## 21. Inclusion of subsequent FFAs under Master Agreement

(a) Unless the parties to this Agreement specifically agree otherwise in writing, this clause 21 shall apply in accordance with its terms.

(b) This clause 21 applies to every agreement entered into between the parties to this Agreement (and no other persons) after an agreement incorporating a Master Agreement (as defined in and pursuant to a clause substantially in the same form as and equivalent to clause 20) has been entered into by them.

(c) This Agreement shall constitute a Confirmation under the Master Agreement on the terms of clauses 20 (c), (d), (e) and (f) as if they were incorporated and fully set out in this clause 21 with appropriate and necessary modifications for such incorporation.

Signed for the Buyer by                          Signed for the Seller by
[printed name].                                  [printed name]


Duly authorised signatory                        Duly authorised signatory

Date .....................                        Date .....................

[Company Seal or Stamp]                           [Company Seal or Stamp]


**Trade Ref    185711**

ICAP Hyde Derivatives Ltd 2 Broadgate, London EC2M 7UR. Tel: +44(0)20 7532 4934  Fax: +44(0)20 7000 5942
Each of the Buyer and the Seller (the "counterparties") has agreed that ICAP Hyde Derivatives Limited is its broker for the sole purposes of 'passing
names' and for confirming the details of the transaction set out above in accordance with accepted market practice.  ICAP Hyde Derivatives Limited has
arranged the transaction as name passing or introducing broker.  Nothing in the transaction shall create any fiduciary or agency relationship between
ICAP Hyde Derivates Limited and either of the counterparties.  Each of the counterparties agrees that no reliance has or may be placed by either of
them on any representation made by ICAP Hyde Derivates Limited, its directors, employees or agents.  ICAP Hyde Derivates Limited is not responsible
for the provision of advice to any person in connection with the transaction.  It is also not responsible for the exercise of any options.  ICAP Hyde
Derivates Limited is not responsible for any other obligation or liability arising under the transaction and is not liable for the capacity, reliability, or
performance of the counterparties with regard to the transaction; in particular, ICAP Hyde Derivates Limited accepts no liability for the commercial
advisability of the transaction.  ICAP Hyde Derivates Limited is not responsible for the failure by either of the above-named counterparties or any other
person in supplying relevant information relating to the transaction, in properly documenting the transaction or in satisfying any legal requirements or
taxation issues or conditions in relation thereto, including, without limitation, the obtaining of any necessary consents or the failure for whatever reason
of completion of such transaction.  Transaction times are available on request.  ICAP Hyde Derivates Limited is authorised and regulated by the
Financial Services Authority.  The transaction is subject to English law.

Please advise ICAP Hyde Derivates Limited immediately if the details of this confirmation differ from your understanding.

**Trade Ref    185711**

# EXHIBIT 2

TISDALE LAW OFFICES
11 West 42nd Street, Suite 900
New York, NY 10036
Tel:    (212) 354-0025
Fax:    (212) 869-0067
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

BRAVE BULK TRANSPORT LTD.,                          :

        Plaintiff,                                 :        07 CV 4546 (CM)

    - against -                                      :        ECF CASE

SPOT ON SHIPPING LTD., a.k.a. SPOT ON               :
SHIPPING LTD. BVI., a.k.a. SPOT ON,
a.k.a CLAYTON STAR COMPANY LIMITED                  :
a.k.a. CLAYTON STAR and PEHW ASSET
MANAGEMENT LIMITED a.k.a. PEHW                       :
ASSET MANAGEMENT LTD.
and ZHANGGANG SHIPPING LIMITED,                     :

        Defendants.                                :
-------------------------------------------------------------X

## VERIFIED AMENDED COMPLAINT

The Plaintiff, BRAVE BULK TRANSPORT LTD. (hereinafter "Plaintiff"), by its

attorneys, Tisdale Law Offices, as and for its Verified Amended Complaint against the

Defendants, SPOT ON SHIPPING LTD. a.k.a. SPOT ON SHIPPING LTD. BVI a.k.a. SPOT

ON (hereinafter "Spot On") a.k.a. CLAYTON STAR COMPANY LIMITED a.k.a. CLAYTON

STAR (hereinafter "Clayton Star"), PEHW ASSET MANAGEMENT LIMITED a.k.a. PEHW

ASSET MANAGEMENT LTD. (hereinafter "Pehw Asset") and ZHANGGANG SHIPPING

LIMITED (hereinafter "Zhanggang")(collectively referred to as the "Defendants") allege, upon

information and belief, as follows:

1.    This is an admiralty and maritime claim within the meaning of Federal Rule of Civil Procedure 9(h) and 28 United States Code § 1333.

2.    At all material times, Plaintiff was and still is an entity duly organized and existing by virtue of foreign law.

3.    Upon information and belief, at all material times, the Defendant Spot On was and still is an entity duly organized and existing by virtue of foreign law places of business in the British Virgin Islands and Hong Kong with offices at Room 1818-1823, 18th floor, Sun Hung Kai Centre, No. 30 Harbour Road, Wanchai, Hong Kong.

4.    Upon information and belief, at all material times, the Defendant Pehw Asset was and still is an entity duly organized and existing by virtue of foreign law with a principal place of business in Hong Kong and/or the British Virgin Islands operating out of the same address as Spot On.

5.    Upon information and belief, Spot On notified the Plaintiff on or about March 30, 2007 by email that its name had changed and that "Spot On Shipping Limited ("The Company") has been acquired at 100% equity by PEHW Asset Management Limited, which is a subsidiary company under PEHW Fund Limited.  So the operation of The Company should be named as "PEHW Asset Management Limited" afterwards, which is also the official name for the purpose of ffa contract."

6.    Upon information and belief, Pehw Asset notified the Plaintiff on or about May 7, 2007 by email that the name and contact details of "Spot On Shipping Limited, BVI" had been changed to "Clayton Star Company Limited." As such, Clayton Star is a name by which Spot On is also known.

2

7.      Upon information and belief, at all material times, the Defendant Zhanggang was and still is an entity duly organized and existing by virtue of foreign law with a principal place of business in Hong Kong.

8.      By way of a Forward Freight Agreement dated February 26, 2007 (hereinafter the "FFA"), Defendant Spot On agreed to sell and buy freight futures with the Plaintiff.

9.      The FFA provided for settlement dates of the last day of three contract months: April, May and June of 2007.

10.     Despite due demand for payment, Defendant has failed to remit payment to Plaintiff in breach of the FFA.

11.     As a result of Spot On's breach of the FFA contract, Plaintiff has suffered a loss in the total principal sum of $380,769.67, as best can now be estimated, exclusive of interest, recoverable costs and reasonable attorneys fees.

12.     Pursuant to clause 16 of the FFA contract all disputes arising thereunder are to be submitted to the English High Court of Justice with English law to apply.

13.     Plaintiff is currently preparing to commence litigation against the Defendants in the English High Court on its claims as described hereinabove.

14.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party in English High Court proceedings conducted pursuant to English Law.  As best as can now be estimated, Plaintiff expects to recover the following amounts:

| A. | Principal claim: | $380,769.67 |
|----|------------------|-------------|
| B. | Estimated interest on the principal claims at 6.5% for three years: | $79,260.27 |
| C. | Attorneys' fees and other recoverable costs: | $80,000.00 |

3

Total:                                          $540,029.94

15.    Upon information and belief, Pehw Asset is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Pehw Asset is actually carrying on Spot On's business and operations as if same were its own.

16.    Upon information and belief, Defendant Pehw Asset is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Pehw Asset.

17.    Upon information and belief, Defendants Pehw Asset and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, and used to carry on such individuals' own business. Further, the Defendants share the same offices, employees, telephone numbers, fax numbers and/or email addresses.

18.    Upon information and belief, Defendant Pehw Asset has no separate, independent identity from Defendant Spot On as they use their names interchangeably with design to fraudulently avoid payment of just debts to their creditors.

19.    In the alternative, Defendant Pehw Asset is merely a shell corporation through which Spot On conducts its business.

20.    In the further alternative, Defendants Pehw Asset and Spot On are partners and/or are joint venturers.

21.    In the further alternative, Defendants Pehw Asset and Spot On are affiliated companies such that the Defendant Pehw Asset is now, or will soon be, holding assets belonging to Defendant Spot On and vice versa.

22.    Upon information and belief, Zhanggang is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Zhanggang is actually

4

carrying on Spot On's business and operations as if same were its own.

23.     Upon information and belief, Defendant Zhanggang is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Zhanggang.

24.     Upon information and belief, Defendants Zhanggang and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, including Mrs. Wei-Lu Zhang and Ms. Sammy Yu, and used to carry on such individuals' own business.

25.     Upon information and belief, Defendant Zhanggang has no separate, independent identity from Defendant Spot On as they use their names interchangeably with design to fraudulently avoid payment of just debts to their creditors.

26.     In the alternative, Defendant Zhanggang is merely a shell corporation through which Spot On conducts its business.

27.     In the further alternative, Defendants Zhanggang and Spot On are partners and/or are joint venturers.

28.     In the further alternative, Defendants Zhanggang and Spot On are affiliated companies such that the Defendant Zhanggang is now, or will soon be, holding assets belonging to Defendant Spot On and vice versa.

29.     The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees including, but not limited to, ABN-AMRO, American Express

Bank, Bank of America, Bank of New York, Deutsche Bank, Citibank, HSBC Bank USA Bank, J.P. Morgan Chase, Standard Chartered Bank, Wachovia Bank N.A., and/or Commerzbank Aktiengesellschaft AG which are believed to be due and owing to the Defendants.

30.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims attaching any assets of the Defendants held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendants, and to secure the Plaintiff's claims as described above.

    **WHEREFORE, Plaintiff prays:**

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Complaint;

B.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and federal common law attaching all tangible or intangible property in whatever form or any other funds held by any garnishee, including, but not limited to, ABN-AMRO, American Express Bank, Bank of America, Bank of New York, Deutsche Bank, Citibank, HSBC Bank USA Bank, J.P. Morgan Chase, Standard Chartered Bank, Wachovia Bank N.A. and/or Commerzbank Aktiengesellschaft AG which are due and owing to the Defendants, in the amount of $540,029.94 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters

6

alleged in the Verified Complaint;

     C.     That this Court recognize and confirm any foreign judgment/award of costs on the

claims had herein as a judgment of this Court;

     D.     That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof; and

     E.     That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: July 9, 2007
      New York, NY

                         The Plaintiff,
                         BRAVE BULK TRANSPORT LTD.,

By:     *Lauren C. Davies*

                         Lauren C. Davies (LD 1980)
                         Thomas L. Tisdale (TT 5263)
                         TISDALE LAW OFFICES
                         11 West 42nd Street, Suite 900
                         New York, NY 10036
                         (212) 354-0025 (Phone)
                         (212) 869-0067 (Fax)
                         ldavies@tisdale-law.com
                         ttisdale@tisdale-law.com

### ATTORNEY VERIFICATION

State of Connecticut  )
                      )    ss: Southport
County of Fairfield   )

1.    My name is Lauren C. Davies.

2.    I am over 18 years of age, of sound mind, capable of making this Verification and fully competent to testify to all matters stated herein.

3.    I am the attorney for the Plaintiff in this action. I am fully authorized to make this Verification on its behalf.

4.    I have read the foregoing Verified Complaint and the contents thereof are true and accurate to the best of my knowledge, information and belief.

5.    The reason that this Verification was made by me and not the Plaintiff is that the Plaintiff is a corporation none of whose officers are present in this District.

6.    The source of my knowledge is information and records furnished to me by the Plaintiff and its solicitors, all of which I believe to be true and accurate.

Dated: July 9, 2007
       Southport, CT

_____
Lauren C. Davies

8

# EXHIBIT 3

# COMMERCIAL SERVICES AGREEMENT

THIS AGREEMENT is made on the 27th of February, 2006 BETWEEN: -

( 1 )   **ZHANGGANG SHIPPING LIMITED**    a Company incorporated and existing under the laws of Hong Kong whose registered office is at Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong   ("the Principal") and

( 2 )   **SPOT ON (HONG KONG) GROUP CORPORATION LIMITED**    a Company incorporated and existing under the laws of Hong Kong whose registered office is at Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong ("the Manager").

**WHEREAS  :  -**

The Principal is desires to share office with the Manager and to appoint the Manager as manager to provide certain commercial services to the Principal in the respect of the management of business, accounts, shipping settlement and following operations and the Manager has agreed to render such services to the Principal, all upon the terms and conditions hereinafter set out.

**IT IS MUTUALLY AGREED AS FOLLOWS :-**

1.   **APPOINTMENT**

The Principal hereby appoints the Manager to act as manager of their business, accounts, shipping settlement and following operations with effect from 27th February, 2006 ("the "Commencement Date") to provide the services set for the in clause 2 and otherwise upon the terms and conditions set forth in this Agreement, and the Manager hereby accepts such appointment.

2.   **SERVICES**

The Manager shall provide to the Principal all commercial services which relate to their business, accounts, shipping settlement and following operations, as per following listed items only.

2.1   The Principal declare in writing every shipment of iron ore with its details (laycan, cargo quantity, loading port and etc.) to the Manager at least 30 days prior to each laycan commencement. Accordingly, the Manager select and fix vessels by way of voyage charter, time charter on trip basis or other charters (subject to prior consent of the Principal) for the declared shipment. The Manager should nominate a performing vessel to Principal at least

15 days prior to the declared laycan commencement.

2.2   Regarding the rate at which every vessel is fixed for relevant shipment, the Manager need to follow the Principal's instruction and get prior final confirmation.

2.3   The Manager calculate and collect, on behalf and into the account of the Principal, all freight and demurrage payable in respect of the fixtures/agreements/contracts from Zhangdian Iron Steel Works and/or relevant Shippers; all dispatch payable in respect of the fixtures/agreements/contracts from relevant Owners.

2.4   The Manager calculate and pay, on behalf and from account of the Principal, all hire, freight and demurrage payable in respect of the fixtures/agreements/contracts to relevant Owners; all dispatch payable in respect of the fixtures/agreements/contracts to Zhangdian Iron Steel Works and/or relevant shippers.

2.5   The Manager perform day to day operations and duties in respect of the chartered vessels which may be required under any charter or contracts fixed.

2.6   The Manager contract for fuel and bunker for the fixtures/agreements/contracts when necessary and appointing agents at loading or discharging ports or other ports of call wherever necessary.

2.7   The Manager execute documents relating to fixing shipments and pass the original contracts to the Principal for their stamp and signature. The Manager shall get one final both parties signed original contract of each shipment and keep them in office.

2.8   The Manager operate the Principal's banking account or accounts as the Manager may deem necessary for the purposes hereof under supervision of the Principal.

2.9   The Manager handle claims and collections arising out of or in connection with the fixtures/agreements/contracts of vessels and following operations.

2.10  The Manager appoint surveyor in connection with the fixtures/agreements/contracts of vessels.

2.11  The Manager obtain legal advice in relation to disputes or other matters affecting the interests of the Principal in respect of the fixtures/agreements/contracts fixed and following operations, and to bring actions, suits, or proceedings or to make any (interim) appointment, employment or other arrangement to accomplish the foregoing with respect to disputes with any owners or supplier of services where time does not permit prior consultation with the Principal.

2.12  The Manager pay, on behalf and from the account of, the Principal all expenses incurred in or about the provision of the foregoing services.

2.13  All sums or earnings receivable from a third party arising out of or in connection with the management of the business, accounts, shipping settlement and following operations shall be remitted or caused to be remitted by the Manager to such bank account as the Principal may designate.

2.14  The Manager shall send to the Principal all documents relating to the fixtures/agreements/contracts vessels and other contracts from time to time as may be required by the Principal including copies of any fixture note, charter or other documents setting out the terms of those fixtures/agreements/contracts.

3.   OFFICE SHARING

For purpose of shipping market information share, register, and liaison/communication, the Principal share the office (Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong) with the Manager against sharing the leasing hire, service charges and other relevant cost to maintain the office upon the terms and conditions set forth in this Agreement.

3.1 The Principal can use the sharing office in shipping market information share, register, and liaison/communication, purpose.

3.2 The Principal can disparch employees to work in the sharing office for short period or under whole Agreement period. The Principal will pay for their dispatched employee, including their salary, allowance, bonus, premium, traveling expenses and other expenses.

3.3 The Principal equally share (50%) with the Manager in the office leasing hire, service charges and other relevant cost to lease the office against invoice from landlord.

3.4 The Principal pay for the necessary office furniture and computers, which their employees will use.

3.5 The Principal bear part of other expenses, including but not limited to administration cost, incidental expenses, depreciation, miscellaneous, etc., caused by leasing the office and/or doing business in the office upon mutual further agreement;

3.6 If the Manager pay any of above mentioned cost/expenses for the Principal, the Principal shall return such cost to the Manager within 5 (ten) days after their receipt of notice and relevant invoice.

## 4.    MANAGEMENT SERVICE FEE

4.1 For and in consideration of the services to be performed under this Agreement, the Principal shall pay to the Manager an annual fee in the amound of 10% of the Principal's profit in each financial year. Every annual fee is payable no later than six consecutive calendar months after ending of the previous financial year, starting from 1st April to 31st March of following year.

4.2 If during the period of this Agreement the Manager shall be called upon by the Principal to render any services other than those described in Clause 2 hereof, compensation therefore shall be mutually agreed upon between the parties before the performance of such services.

## 5.    REPORTING

The Manager shall prepare and furnish to the Principal detailed accounts for the management of the business, accounts, shipping settlement and following operations at the request of the Principal from time to time and also such provisions for accruing and anticipated incomes and liabilities and contingencies as the Manager shall consider justified.

## 6.    LIABILITIES

It is agreed that all of the rights, benefits, obligations and liabilities under all fixtures /agreements/contracts concluded by the Manager in accordance with provisions of this

Agreement, even if concluded in the name of the Manager, shall be for the account of the Principal. Such fixtures/agreements/contracts may be concluded and executed in the name of the Manager always in accordance with the provisions of this Agreement, in which case such fixtures/agreements/contracts shall be regarded as if concluded by the Principal, and the Manager shall be fully released and discharged from all responsibilities, obligations and liabilities thereunder unless the Manager was acting in bad faith or willful misconduct in entering into such fixtures/agreements/contracts on behalf of Principal.

## 7.    INDEMNITIES

7.1    The Manager shall not be liable for any loss of or damage to the Principal and/or any loss, damage, expense and liability incurred by the Principal directly or indirectly, unless caused by willful misconduct on the part of the Manager.

7.2    The Principal shall indemnify the manager and hold the Manager harmless against any and all claims and demands (including costs and attorney's fees in the defending any such claim and demand, whether or not such claim or demand is found to be valid), which may be brought against the Manager pursuant to and in accordance with the provisions of this Agreement unless the Manager was acting in bad faith or willful misconduct in taking such action.

## 8.    MANAGEMENT PERIOD AND TERMINATION

8.1    The appointment of the Manager shall be deemed to have commenced and taken effect from the Commencement Date for a period of Five (5) years and such appointment shall (subject as hereinafter provided) continue automatically for a further period of Five (5) years.

8.2    Notwithstanding the terms of Clause 8.1, and without prejudice to the accrued rights hereunder, either party may terminate this Agreement, if and when:

a)    this Agreement has been in operation for twelve months or at the expiry of any forms of fixtures/agreements/contracts whichever is the later but subject to giving three month prior notice in writing to the other party; or

b)    the Principal ceases for any reason to be lawfully entitled to continue the appointment of the Manager made under this Agreement; or

c)    either party goes into liquidation or becomes bankrupt or insolvent or has a receiver appointed or is unable to meet its debts as they fall due.

8.3    In the event the appointment of the Manager being terminated by either party pursuant to provisos (a), (b) and (c) of Clause 8.2, the management service fee payable to the Manager as stipulated in Clause 4.1 shall continue to be payable in proportion base on the period of that fiscal year.

8.4    Notwithstanding termination for any reason, the Manager shall continue to be responsible for the settlement of any outstanding matters in respect of the fixtures/agreements/contracts and shall co-operate with the Principal in prosecuting or defending any claims in connection with the fixtures/agreements/contracts provided always that the Principal shall continue to be responsible    for    the    payment    of    all    sums    arising    in    respect    of    the fixtures/agreements/contracts, the Principal also undertakes to pay an extra management

service fee to the Manager for handling all outstanding claims in respect of the fixtures/agreements/contracts in the amount to be mutually agreed;

## 9. INSPECTION OF BOOKS AND RECORDS

The Manager shall keep customary business records respecting all collections, expenditures, accounts and records of transaction relating to the activities pursuant to this Agreement. The Principal shall have the right, upon giving prior notice to the Manager, to inspect all the accounting books, original vouchers under the custody of the Manager.

## 10. NOTICES

Any notice or other communication to a party hereunder shall be in writing and shall be delivered or sent by postage prepaid mail or airmail, or by telex, telegram, cable or facsimile or other electronic transmission addressed to the address of such party or to such other address as such party shall have communicated to the other. In urgent situation, oral instruction can be made by the Principal for the Manager to continue the operations or business, which followed by written.

## 11. ARBITRATION AND GOVERNING LAW

11.1 Any dispute between the parties arising out of or in connection with this Agreement or in relation to the rights and obligations of the Principal and the Manager hereunder shall be submitted to arbitration in London, in accordance with the provisions of the Arbitration Acts and any amendments thereto, each party nominating one arbitrator, and if the arbitrators cannot agree, then to nominate an umpire.

11.2 The decision of the arbitrators shall be final and binding and may be enforced by any judicial tribunal having jurisdiction thereof. Throughout the pendency of any dispute, the parties shall continue to perform their respective obligations under this Agreement except for matters in dispute.

11.3 This Agreement shall be governed by and interpreted in accordance with the laws of Hong Kong.

## 12. ASSIGNMENT

It is mutually agreed between the parties hereto that the Manager may assign or appoint any other entities or individuals to perform all duties and obligations set forth in this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized signatories of the day and year first above written.

SIGNED by     Zhang Jinglu              )
For and on behalf of                    )
ZHANGGANG SHIPPING LIMITED              )


SIGNED BY     Bi Min                    )
For and on behalf of                    )
SPOT ON (HONG KONG) GROUP               )
CORPORATION LIMITED                     )

# EXHIBIT 4

Zhanggang Shipping Limited

## Your instructions:

We were provide information on Zhanggang Shipping Limited. The main focus should be to name its past and present shareholders, directors and management, and we were also expected to provide some historical information on the company.

## Research:

Lloyd's MIU has been asked to report on Zhanggang Shipping Limited once before. That was on 16 June 2006 when we wrote a standard credit report on the company. These are the main extracts from that report:

*Operating Address:*

*Unit 5*
*31F Office Tower*
*Convention Plaza*
*1 Harbour Road*
*Wanchai*
*Hong Kong*

*Phone:* *+852 21113866*
*Fax:* *+852 21113606*
*Email:* *shipping@spoton-hk.com*
*Website:* *Not Available*

*Incorporation Style:* *Private limited company*

*Incorporation Date:* *27 February 2006*

*Place Incorporated:* *Hong Kong*

*Ownership:* *A joint venture between Spot On (Hong Kong) Group Corporation Ltd and Zhangdian Steel Mill of China.*

*Directors:* *Mdm Wei-Lu Zhang - President*
*Managers:* *Ms Sammy Yu - Chartering Manager*

*Affiliate Offices:* *Spot On (Hong Kong) Group Corporation Ltd of the same address. Also an office in Qingdao, China.*

*Bankers:* *HSBC*

# EXHIBIT 5

存案 Filed

**CR**

公司註冊處
**Companies Registry**

周年申報表
**Annual Return**

(公司條例第 107(1)條)
(Companies Ordinance s. 107(1))

表格
**Form** **AR1**

重要事項 **Important Notes**

- 填表前請參閱《填表須知》。
  請用黑色墨水列印。
- Please read the accompanying notes before completing this form.
  Please print in black ink.

公司編號 **Company Number**

794937

**1** 公司名稱 **Company Name**

**SPOT ON (HONG KONG) GROUP CORPORATION LIMITED**
**華熹 (香港) 集團股份有限公司**

(註 Note 8) **2** 商業名稱 **Business Name**

**3** 公司類別 **Type of Company**

*請在有關空格內加 ✓ 號 Please tick the relevant box*

☑ 有股本的私人公司
Private Company having a share capital

☐ 其他
Others

**4** 本申報表日期 **Date of this Return**
本申報表列載公司截至右列日期為止的資料
The information in this Return is made up to

| 24 | 04 | 2007 |
|---|---|---|
| 日 DD | 月 MM | 年 YYYY |

*(如屬有股本的私人公司，本申報表應列載截至公司成立為法團的周年日期的資料。如屬其他公司，所列載的資料則應截至公司周年大會日期或以替周年大會的書面決議的日期為止。*
*For a private company having a share capital, the information in this Return should be made up to the anniversary of the date of incorporation. For other companies, the information should be made up to the date of the annual general meeting (AGM) or the date of written resolution passed in lieu of AGM.)*

(註 Note 9) **5** 註冊辦事處地址 **Address of Registered Office**

Suites 1818-1823, 18/F, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong

(註 Note 10) **6** 電郵地址 **E-mail Address**

(註 Note 3) 提交人的資料 **Presentor's Reference**

姓名 Name: Acctax Company Secretary Limited

地址 Address: Suite 6307, 63/F, Central Plaza
18 Harbour Road, Wanchai, Hong Kong

電話 Tel: 2246 6828    傳真 Fax: 2246 8448

電郵地址 E-mail Address:

檔號 Reference:

指明編號 2/2004 (修訂) (2004 年 2 月)
Specification No. 2/2004 (Revision) (Feb. 2004)

請勿填寫本欄 **For Official Use**



23400224768
AR1L          0794937
26/04/2007

表格 **AR1**
Form

公司編號 **Company Number**

794937

12  董事 **Director**

A. 個人董事 **Individual Director**
(如超過兩名個人董事，請用續頁 C 填報  Use Continuation Sheet C if more than 2 individual directors)

(註 Note 19)  1  身份
Capacity

☑ 董事
Director

☐ 候補董事
Alternate Director

代替 Alternate to

中文姓名
Name in Chinese

張瑋璐

英文姓名
Name in English

| ZHANG | Wei-lu |
|---|---|
| 姓氏 Surname | 名字 Other Names |

前用姓名
Previous Names

別名
Alias

(註 Note 20)  住址
Residential
Address

| Suites 1818-1823, 18/F, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong | China |
|---|---|
| | 國家 Country |

(註 Note 21)  電郵地址
E-mail Address

(註 Note 22)  身份證明 **Identification**

a  香港身份證號碼
Hong Kong Identity Card Number

b  海外護照
Overseas Passport

| The People's Republic of China | G06090087 |
|---|---|
| 簽發國家 Issuing Country | 號碼 Number |

指明編號 2/2004 (修訂) (2004 年 2 月)
Specification No. 2/2004 (Revision) (Feb. 2004)

C600

# EXHIBIT 6

**Mitsou Pinelopi**

| | |
|---|---|
| From: | Dryfreight [dryfreight@icap.com] |
| Sent: | Thursday, May 10, 2007 12:18 PM |
| To: | Mitsou Pinelopi |
| Subject: | Spot On email from 30/03/2007 |

Please find below an email from Spot On which we originally sent to you on 30th March 2007, as requested.

Kind regards,


Paul Ingram
Dry FFA Desk



Direct Line: +44 20 7000 5357
Fax:        +44 20 7000 5942
Email:       paul.ingram@icap.com

ICAP Hyde Derivatives Limited
2 Broadgate
London
EC2M 7UR
United Kingdom

-----Original Message-----
From: SPOT ON - SAMMY [mailto:shipping@spoton-hk.com]
Sent: 30 March 2007 09:49
To: Sander Bots
Cc: dryfreight; shipping
Subject: re: SANDER / SAMMY

TO: ICAPHYDE / SANDER

PLS NOTE BLW THE IMPORTANT NOTICE WE GOT FROM "PEHW FUND LIMITED".

QTE

TO ALL:

Spot On Shipping Limited ("The Company") has been acquired at 100% equity by PEHW Fund Limited ("PEHW Fund"). So the operation of The Company will be under "PEHW Fund" afterwards and the official name for the purpose of ffa contract is "PEHW Asset Management Limited", which is a subsidiary company under "PEHW Fund Limited".

Although the ownership of The Company is separated from Spot On Group, Spot On Group will provide assistance to PEHW Fund in managing their FFA business.

UNQTE

ACCORDING TO THIS, PLS ICAPHYDE CHANGE THE SELLER'S NAME TO "PEHW ASSET MANAGEMENT LIMITED" IN ALL THE FFA CONTRACTS (THREE HALF Q2) CONCLUDED BY "SPOT ON SHIPPING LIMITED" BEFORE AND DELETE THE DETAILS REGARDING "SPOT ON SHIPPING LIMITED". AND SEND US THE REVISED THREE ORIGINAL CONTRACTS FOR SIGNATURE/STAMP.

B.RGDS
SAMMY YU




***********************************************************************

# EXHIBIT 7

|SEARCH BLOG|| FLAG BLOG| Next Blog»          Create Blog | Sign In

# SHIP CHARTERING

THIS SITE AIMS TO INFORM READERS ON THE SHIPPING INDUSTRY WITH EMPHASIS ON SHIP CHARTERING, SALE AND PURCHASE OF VESSELS, BUNKER COST FOR SHIP OWNERS, SHIP BROKERS, CHARTERERS AND TRADERS AS WELL AS THE BALTIC INDEX

[                              ]   Google Search

⦿ Web ○ shipchartering.blogspot.com

· Ads by Google ·     Ship Agents  ·  Dry Cargo Ship    General Cargo    Dredging Ship

FRIDAY, JULY 06, 2007

## The Baltic Dry Index Dry cargo fixture summary - 05 July

Dry cargo fixture summary - 05 July 2007

============================

BDI Baltic Dry Index 6251 DOWN 42

BCI Baltic Capesize Index 8001 DOWN 292

BPI Baltic Panamax Index 6878 UP 129

BSI Baltic Supramax Index 4092 UP 15

BHSI Baltic Handysize Index 1994 UP 8

Timecharter

----------

'Kassos Warrior' 1986 194744 dwt dely Kwangyang 10/15 July trip via West

Australia redel China $75000 daily - Zhanggang Shipping (Spot On)

'Alina II' 1986 179802 dwt dely Bayuquan 8/15 July 12 months trading

floating rate 14% below daily BCI 4 timecharter average - Oldendorff

'Pioneer' 2004 171861 dwt dely Nantong 16/18 July trip via West Australia

redel China $87000 daily - BHP Billiton

'China Fortune' 1992 152011 dwt dely Zhoushan 5/20 Aug 12 months trading

Generate revenue from your site with Google AdSense.

LABELS

Baltic Dry Index (242)

Bunker Prices (65)

Chartering Terms Definition (1)

Shipping Terms (2)

**Baltic Index**   Bunker
Bulk Shipping

Baltic dry sea freight index hits record high
Reuters UK
The Baltic index has been regularly breaking records in the last month on surging global raw materials demand and port congestion. ...

Polish press review - Companies & Business
Wirtualna Polska
OIL & GAS: Pipeline Construction Specialist Saipem to Build Baltic Sea Stretch of Nord Stream Pipeline - Italian pipeline construction specialist Saipem ...

Danish shares close lower, led down by financials; FLS, DFDS ...
CNNMoney.com

redel worldwide $75000 daily - North China Shipping

'Formosabulk Allstar' 1995 150395 dwt dely ex drydock China 15/30 Sept 12

months trading redel worldwide $75000 daily - Kleimar

'Medi Hong Kong' 2006 82790 dwt dely Kawasaki 13/15 July trip via

Australia redel Japan $59250 daily - MOSK

'Iron Brooke' Deiulemar relet 2007 82594 dwt dely Worldwide 2nd quarter

2008 2 years trading redel worldwide $40500 daily nett - Daiichi

'Filomena L' 2003 76629 dwt dely Rotterdam 8/12 July 3/4 months trading

redel worldwide $60500 daily - Transfield - <corrects the 04/07 report of

the Filomena Lembo fixing the business>

'CMB Italia' 2005 76620 dwt dely Fangcheng 12/13 July trip via EC

Australia redel EC India $57500 daily - cnr

'Pansolar' 2005 76343 dwt dely Stade 6/10 July trip via Ventspils redel

China $62000 daily - Noble

'Pansolar' 2005 76343 dwt dely Worldwide March/April 2008 3 years trading

redel worldwide $32000 daily - Japanese chrtr - <fixed last week>

'Perla Bulker' J.Lauritzen relet 2006 75949 dwt dely Tsuneishi 20/30 July

35/37 months trading redel worldwide $40000 daily gross - Alfred

C.Toepfer

'North Prince' 1999 75542 dwt dely Dunkirk 8/12 July trip via Bolivar

redel Spain $60000 daily - Ark

'Anangel Enosis' 1995 75464 dwt - <reported 04/07 redel should read Jorf

Lasfar>

'Nordmosel' 2001 75323 dwt dely Qingdao 5/9 July trip via EC Australia

redel Singapore-Japan rge int coal $58500 daily - cnr

The Baltic Dry Index over bulk transport rates hit a new all-time high today, they added. AP Moller-Maersk A fell 1300 to 68400 and the B-shares were 1100 ...

Thai Hot Stocks - Shipping firms, NNCL, Seafco up, TWZ down
Reuters UK
The Baltic Dry Index (.BADI: Quote, Profile, Research), which covers dry bulk shipping rates, was up 1.4 percent at 8429 at 0338 GMT. ...

powered by Google™

Ads by Google

International Shipping
Packaging, Crating & Transport Request a Quote Today
www.CratersAndFreighter

Small Ship, Barge Experts
Over 50 vessels worldwide Save on small ship & barge cruises
www.WorldWaterways.cor

Mississippi Admiralty Law
Onshore Drilling Rig Accidents And Offshore Platform Accidents.
www.usagulf.com

Maritime Institute
Your one-stop location for maritime professional training & simulation
www.mitags.org

BLOG ARCHIVE

'Nordems' 2001 75253 dwt dely Worldwide 1 Jan/30 Feb 2008 2 years trading

redel worldwide $39500 daily - Augustea

'Tian Du Feng' 2001 74201 dwt dely Cape Passero 11/14 July 5/7 months

trading redel worldwide $56000 daily - United

'Riruccia' 1997 74002 dwt - <reported 04/07 the charterer is Deiulemar>

'Carl Mesem' 1999 74001 dwt dely Sete 10/20 July trip via EC South

America redel China $59000 daily - Noble

'Beauty Donor' Worldlink relet 1999 73700 dwt dely Antwerp ely Aug

balance of period 3/4 months trading redel worldwide $55000 daily -

Oldendorff

'Pacific Paradise' 1993 73645 dwt dely Lumut 8/13 July trip via Indonesia

redel Taiwan $58500 daily - Ta-Ho

'Dimitris L' STX Pan Ocean relet 2001 73193 dwt dely Barcelona 20/30 July

9/10.5 months trading redel worldwide $49500 daily - GMI

'Proteus' 1999 73018 dwt dely Phu My 11/13 July 6/8 months trading redel

worldwide $52000 - Daebo

'Silver One' STX Pan Ocean relet 2000 72917 dwt dely Beilun 7/9 July trip

via NoPac redel Singapore-Japan rge $54000 daily - Dreyfus

'Giovanni' Crownland relet 1996 72394 dwt dely Dunkirk 28/30 July balance

of period 28 Jan/28 Feb 2008 redel worldwide $53750 daily - Brittania

Bulk

'C.Iris' 1996 71393 dwt dely Nanao 15/22 July 5.5/7 months trading redel

worldwide $51500 daily - Atlas Bulk Shipping

'Quesa Uno' 1993 70312 dwt dely Maizuru 14/19 July trip via NoPac redel

▼ 2007 (308)

  ▼ September (33)

    The Baltic dry index as of 14.sept.07

    Today's Bunker Prices 14/09/2007

    THE BALTIC DRY INDEX DAILY FIXTURES REPORT 14/09/...

    Today's Bunker Prices 13/09/07

    The Baltic Dry Index T/C report 13/09/07

    The Baltic Dry index as of 13.sept.07

    THE BALTIC DRY INDEX THE DAILY FIXTURES REPORT 13...

    The Baltic dry index as of 12.sept.07

    Today's Bunker Prices 12/09/2007

    Today's Bunker Prices 11/09/2007

    Today's Bunker Prices 10/09/2007

    The Baltic Dry Index TC 12/09/2007

    THE BALTIC DRY INDEX 12/09/2007

    The Baltic Dry Index T/C report 11/09/07

    THE BALTIC DRY INDEX THE DAILY FIXTURES REPORT 11/...

    THE BALTIC DRY INDEX AS OF 10.Sept.07

    The Baltic Dry Index Daily Panamax Report 10th Sep...

    The Baltic Dry index as of 11.sept.07

    THE BALTIC DRY INDEX THE DAILY FIXTURES REPORT 10/...

    Today's Bunker Prices

Singapore-Japan rge $53500 daily - Dreyfus

'Powerful' 1993 70083 dwt dely Tilbury ppt 2 years trading redel

worldwide $39000 daily - Alfred C.Toepfer

'Hellenic Breeze' 1993 69601 dwt dely Sparrows Point 18/20 July 6/8

months trading redel worldwide $53000 daily + $700000 bb - cnr

'Mass Wits' 1988 69356 dwt dely US Gulf 27/29 July redel Far East $54000

daily + $1.00 million bb - Dreyfus

'Citrawati' 1990 69332 dwt dely Kalimantan spot trip via Indonesia redel

Taiwan $54000 daily - Daebo

'Yun Tong Hai' 1990 68788 dwt dely Worldwide 1/30 Sept period up to 25

Sept-10 Oct min 2008/max 10 Nov/21 Dec 2008 redel worldwide $43000 daily

- cnr

'Hebei Diamond' relet 1984 66786 dwt dely Kaohsiung 20/25 July balance of

period 8 Nov/7 Dec redel worldwide $43000 daily - Armada

'Trust Jakarta' Industrial Carriers relet 1984 64873 dwt - <reported

04/07 the charterer is Azure>

'Navios Astra' 2006 53468 dwt dely China 1/10 August 2 years trading

redel worldwide approx $36000 daily - Dreyfus USA

'Frontier Angel' SK Shipping relet 2001 52478 dwt dely worldwide 1/15

September 14/16 months trading redel worldwide $40000 daily - Wylex

'D Duckling' 2001 52068 dwt dely dop ARA 17/25 July about 2/about 4

months trading redel worldwide $46100 daily - cnr

'Harrier' 2001 50296 dwt dely Longkou spot trip via Indonesia redel China

approx $37500 daily - cnr

Ore

07/09/07

Today's Bunker Prices 06/09/07

Today's Bunker Prices 05/09/07

THE BALTIC INDEX THE DAILY FIXTURES REPORT 07/09/0...

The Baltic Dry cargo fixture summary - 06 Sept

The Baltic Dry index as of 6.sept.07

THE BALTIC DRY INDEX THE DAILY FIXTURES REPORT 06/...

The Baltic Dry index as of 5.sept.07

The Baltic Dry Index Dry cargo fixture summary - 0...

THE BALTIC DRY INDEX THE DAILY FIXTURES REPORT 05...

Today's Bunker Prices 4th September 2007

The Baltic Dry index as of 3.sept.07

THE BALTIC DRY INDEX DAILY FIXTURES REPORT 03/09/...

Today's Bunker Prices 03/09/07

► August (53)

► July (58)

► June (44)

► May (45)

► April (75)

► 2006 (24)

ABOUT ME

SHIPBROKER

I am involved in the buying and selling of existing or new ships as well as used ships. brokers discuss

Page 4 of 6

Case 2:07-cv-04546-CM    Document 18-8    Filed 09/20/2007    Page 6 of 7

'Mineral London' Cosco 2006 160000/10 Sepetiba/<u>Qingdao</u> 20/30 July $52.00

(done direct) fio scale/30000sc - Transfield

'Alpha Effort' EdF relet 1999 70000/10 Port Cartier/Gijon 13/23 July $21.50 fio 4 days - Mittal

POSTED BY SHIPBROKER AT 2:30 PM

LABELS: BALTIC DRY INDEX

## LINKS TO THIS POST

Create a Link

Newer Post          Home          Older Post

opportunities and market trends with shipowners, report on sales, value vessels, calculate freight earnings, advise on finance and try to find ships for specific employment opportunities. When a ship is sold brokers usually negotiate on behalf of the buyer and seller on price and terms and also provide a route to resolving any disputes which might arise. I also do Cargo Brokering as part of my job acting as intermediary between a charterer, who owns the cargo, and a shipowner. I assist charterers and shipowners in negotiating the terms and conditions of the movement of cargo.

VIEW MY COMPLETE PROFILE



Lloyd's Maritime Atlas of World Port...
**Lloyd's Register**

Buy New



Privacy Information



Maritime Economics Second Edition
M. Stopford
Best Price $48.70
or Buy New $59.68



Privacy Information

Case 2:07-cv-04546-CM     Document 18-8     Filed 09/20/2007     Page 7 of 7



Marine Environment Law
John H. Bates, Cha...
Best Price $638.00
or Buy New $638.00



Privacy Information

**Overseas Shipping**
Reliable & Competitive Shipping USA to
Worldwide Ph: 1800 631 6881

**Small Ship, Barge Experts**
Over 50 vessels worldwide Save on small
ship & barge cruises

Ads by Google

· Ads by Google·    Dry Cargo Shipping        Dry Bulk        Cargo Vessel        Cargo Container Home        Dry Duck