UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
BRAVE BULK TRANSPORT LTD.,                          :

            Plaintiff,                               :          07 CV 4546 (CM)

      - against -                                      :          ECF CASE

SPOT ON SHIPPING LTD., a.k.a. SPOT ON          :
SHIPPING LTD. BVI., a.k.a. SPOT ON,
a.k.a CLAYTON STAR COMPANY LIMITED            :
a.k.a. CLAYTON STAR and PEHW ASSET
MANAGEMENT LIMITED a.k.a. PEHW               :
ASSET MANAGEMENT LTD.
and ZHANGGANG SHIPPING LIMITED,             :

          Defendants.                              :
-------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW
## SHOWING CAUSE IN OPPOSITION TO DEFENDANT ZSL'S
## MOTION TO VACATE AND IN SUPPORT OF PLAINTIFF'S MOTION FOR
## <u>RECONSIDERATION OF ORDER VACATING THE MARITIME ATTACHMENT</u>

TISDALE LAW OFFICES, LLC
11 West 42nd Street, Suite 900
New York, NY 10036
(212) 354-0025 (phone)
(212) 869-0067 (fax)

*Attorneys for Plaintiff*
*Brave Bulk Transport Ltd.*

Lauren C. Davies, Esq.
Thomas L. Tisdale, Esq.

## **INTRODUCTION**

Plaintiff, Brave Bulk Transport Ltd. ("Brave Bulk" or "Plaintiff") by and through its undersigned counsel, Tisdale Law Offices, LLC, respectfully submits this memorandum of law showing cause why this maritime attachment should not be vacated in opposition to Defendant Zhanggang Shipping Ltd.'s ("ZSL" or "Defendant") motion to vacate and in support of Plaintiff's motion for reconsideration of this Court's September 14, 2007 Order vacating the maritime attachment against ZSL. Plaintiff's attachment as against Spot On Shipping Ltd. a.k.a. Spot On a.k.a. Clayton Star Company Limited a.k.a. Clayton Star ("Spot On"), and Pehw Asset Management Limited a.k.a. Pehw Asset Management Ltd. ("Pehw") and ZSL (collectively referred to as the "Defendants") should not be vacated because Forward Freight Agreements are maritime contracts and, as such, Plaintiff has sustained its burden of establishing that it has a maritime claim against the Defendants named in this action. Further, Plaintiff's motion for reconsideration of this Court's vacatur of the attachment as against ZSL should be granted because (1) Plaintiff has a maritime claim, (2) Plaintiff has adequately alleged prima facie alter-ego claims against ZSL and the other alter-ego defendants, and (3) Plaintiff has satisfied the requirements of Supplemental Rule B of the Federal Rules of Civil Procedure for Certain Admiralty Claims ("Rule B") in all other respects.

Defendant ZSL's assertions to the contrary ignore recent case law and are unavailing. In order to maintain a maritime attachment against an alter-ego of the principal defendant at a Rule (E)(4)(f) post-attachment hearing, a plaintiff need only establish that it has sufficiently alleged a prima facie alter ego claim. This burden is met when the plaintiff alleges the nature of its

2

maritime claim and the basis upon which it is claiming alter-ego, e.g. fraud or domination/control. It is not necessary for a plaintiff to show "probable cause" or "reasonable grounds" to support its claim at a Rule (E)(4)(f) post-attachment hearing.

Pursuant to Federal Rule of Civil Procedure 60(b) and United States District Court for the Southern District of New York Local Rule 6.3, Brave Bulk's motion for reconsideration of the Court's September 14, 2007 Order granting the motion to vacate maritime attachment filed by ZSL should be granted. In granting the motion to vacate, the Court did not consider the fact that Judge Batts ultimately granted Setsea's request for an ex parte order for process of maritime attachment and garnishment in *Setsea S.P.A. v. Source Link Shipping Co. Ltd., 07 CV 6320 (DAB)*, overriding her initial refusal to grant same under docket number *07 CV 4147 (DAB)*. Further, this Court did not consider the proper standard a Rule B plaintiff must meet to adequately allege alter-ego allegations against a defendant. Most notably, the Second Circuit's landmark case on the subject, *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.,* 2006 U.S. App. LEXIS 19302 (2d Cir. 2006), and its progeny are all missing from ZSL's motion to vacate this attachment. For these and other reasons, as explained more fully herein and in the accompanying attorney Declaration of Lauren C. Davies dated September 20, 2007 ("Davies Decl."), the Plaintiff's motion for reconsideration should be granted and, as the Plaintiff has met its burden pursuant to Rule B, the attachment should stand and be allowed to proceed.

## STANDARD

"The standard for granting . . . a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that

the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995) (citing *Schonberger v. Serchuk,* 742 F. Supp. 108, 119 (S.D.N.Y. 1990); *Adams v. United States,* 686 F. Supp. 417, 418 (S.D.N.Y. 1988)).  The decision to grant or deny the motion is committed to the sound discretion of the district court.  *Devlin v. Transportation Communications Int'l Union,* 175 F.3d 121, 132 (2d Cir. 1999).  As set forth herein, Plaintiff respectfully submits that this Court overlooked several controlling cases in this district.  If taken into account, these arguments and the evidence Plaintiff submitted would alter the Court's conclusion.  As such, this motion for reconsideration should be granted and the maritime attachment against ZSL should be reinstated.  Further, the maritime attachment against all other defendants should not be vacated. As will be shown herein, Plaintiff has met and adequately pled all the requirements for an attachment under Rule B.

## FACTS

The facts pertaining to the instant motion to vacate the process of maritime attachment and garnishment are more fully set forth in the accompanying Declaration of Lauren C. Davies dated September 20, 2007.  The facts stated in the Declaration are incorporated by reference herein.  In addition, this memorandum of law will make reference to, and discuss as necessary the facts set forth in the Declaration.

4

## ARGUMENT

### POINT I

### AN FFA AGREEMENT IS A MARITIME CONTRACT

Admiralty jurisdiction is afforded this Court under 28 U.S.C. §1333(1), which provides

for original jurisdiction in "any civil case of admiralty or maritime jurisdiction." *See Sea*

*Transport Contractors, Ltd. v. Industries Chemiqes du Senegal,* 411 F. Supp. 2d 386, 2006

A.M.C. 1076, 1082 (S.D.N.Y. January 24, 2006); *see also Stolt-Nielsen S.A. v. Celanese AG,* 430

F. 3d 567, 572 (2d Cir. 2005). To determine the boundaries of admiralty jurisdiction, courts turn

to the purpose of the grant. *See Insurance Co. v. Dunham,* 78 U.S. 1, 11 Wall. 1, 24, 20 L. Ed.

90 (1871). As recently confirmed by the United States Supreme Court in *Exxon Corp. v. Central*

*Gulf Lines, Inc.* 500 U.S. 603, 608 (1991), "the fundamental interest giving rise to maritime

jurisdiction is 'the protection of maritime commerce.'" *Id.; quoting Sisson v. Ruby,* 497 U.S.

358, 367 (1990); *quoting Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 674 (1982). Stated

another way, where "the subject matter of the contract relates to a ship in its use as such, ***or to***

***commerce*** or to navigation on navigable waters, or to transportation by sea or to maritime

employment it is fairly said to constitute a maritime contract." *Ingersoll Milling Mach. Co. v.*

*M/V BODENA,* 829 F.2d 293, 302 (2d Cir. 1987).

Here, the subject matter of the dispute is immersed in the business of maritime

commerce. Forward freight agreements, or FFAs as they are commonly known, are

commitments to perform in the future a shipping service between ship owners, charterers and/or

traders. The parties to the agreement contract to "pay the difference between a price agreed today

and the future price of moving a product from one location to another, or for the future price of hiring a ship over a period of time." Adam Sonin, *Managing Risk with Forward Freight Agreements, Commodities Now,* June 2005, *available online at:* http://www.commodities-now.com/content/market-areas/ags-and-softs/ma-article-7.pdf?PHPSESSID=34967b.

In the shipping industry, FFAs are negotiated with the express purpose of hedging and managing market risks relating to the employment of vessels in today's volatile freight market. For example, in the instant FFA, the parties entered into a Forward Freight Agreement to buy and sell a specified tonnage freight at an agreed price for an agreed route and time span so that both corporations could reliably predict their ocean freight revenues and costs for the duration of the contract for those ocean routes. Thus, Forward Freight Agreements are heavily immersed in the business of maritime commerce.

In an effort to streamline maritime commerce, the industry has seen the number of FFA agreements between owners, charterers, operators and managers explode in volume over the last three years as more and more companies who engage in maritime commerce attempt to manage their risks. In short, forward freight agreements are becoming an increasingly important risk management tool that is greatly affecting the way maritime commerce is carried out.

Forward Freight Agreements have been found to be maritime cases entitled to process of maritime attachment in the following cases: *C. Transport Panamax Ltd. v. North America Steamships Ltd.,* a.k.a. N.A.S.L., 06 CV 13178 (RLC); *Daeyang Shipping Co. Ltd. v. Navitrans Maritime Inc.,* 04 CV 08050 (VM); *Deiulemar v. Source Link Shipping Co. Ltd.,* 07 CV 02983 (SAS)*; Deiulemar v. Spot On Shipping Ltd., et. al.,* 07 CV 03820 (VM); *Eurotrade Inc., Liberia*

*v. Source Link Shipping Co. Ltd.*, BVI, 07 CV 3172 (SAS); *Pan Oceanic Maritime Inc. v. Source Link Shipping Co. Ltd.*, 07 CV 03089 (CM); *Perseveranza Di Navigazione S.P.A. v. Source Link Shipping Co. Ltd.*, 07 CV 03091 (RPP); *Taiwan Maritime Transport Co. Ltd. v. Navitrans Maritime Inc. and Navigation Maritime Inc.*, 06 CV 13564 (RJH), and *Setsea S.P.A. v. Source Link Shipping Co. Ltd.*, 07 CV 6230 (DAB).

Most recently, in *Setsea S.P.A. v. Source Link Shipping Co. Ltd.*, 07 CV 4147 (S.D.N.Y. June 5, 2007), Judge Batts initially denied the plaintiff's application for an ex parte order for process of maritime attachment finding an FFA to be "not so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction" but to fall short of the Second Circuit's requirement that the contract reference "maritime service or maritime transactions." *Setsea S.P.A. v. Source Link Shipping Co. Ltd.*, 07 CV 4147, Order Denying Application for Ex Parte Order (S.D.N.Y. June 5, 2007). Importantly, Judge Batts allowed Setsea leave to replead within thirty days of the date of Her Honor's June 5, 2007 Order. On July 5, 2007, Setsea submitted a Verified Amended Complaint laying out more specifically the nature of forward freight agreements and why they are maritime contracts. This time, the Court granted the Plaintiff's application for an ex parte order for process of maritime attachment finding the FFA to be a maritime contract. Thus, Judge Batts reconsidered and effectively reversed her decision of June 5, 2007. It is of note that the Verified Amended Complaint in *Setsea* was not received by the United States District Court for the Southern District of New York Cashier's Office as the case filed under docket number 07 CV 4147 (DAB) had been dismissed without prejudice. Thus, the Verified Amended Complaint was filed as a

new action under docket number 07 CV 6230 (DAB) on a related case basis. *See Complaint and Ex Parte Order for process of maritime attachment and garnishment in 07 CV 6230 (DAB) annexed hereto as Exhibit "A."* Thus, to date, no fewer than nine maritime attachment actions have been filed in this Court and none of them have been dismissed, vacated or denied on the basis that they are not maritime contracts.

As defined by the Baltic Exchange, Forward Freight Agreements are a "means of hedging exposure to freight market risk through the trading of specified time charter and voyage rates for forward positions. Settlement is against a relevant route assessment published by the Baltic Exchange." The Baltic Exchange is "a membership organization at the heart of the global maritime marketplace" that provides "independent daily shipping market information." *See The Baltic Exchange,* http://www.balticexchange.com. Ocean freight is the charge assessed for the carriage of cargo by a vessel and is one of the most fundamental components of maritime commerce. Freight is considered so integral to the maritime industry that it has been said that "freight earnings are a part of the vessel as much as the ship's tackle." *Rush v. Delaware & Chesapeake S.S. Co.,* 10 Supp. 497, 501 (E.D. Pa. 1935). Most importantly, these contracts to perform in the future a shipping service between ship owners, operators, charterers and managers have become instrumental for managing risks once inherent in dealing with highly volatile ocean freight prices. As such, freight futures have become an essential part of the maritime commerce and are thereby maritime contracts.

Specifically, Brave Bulk and Spot On entered into a maritime contract for the swap of the future value of ocean freight. This contract specified the type of vessel to be used, the routes

upon which said vessels would travel and the duration of the agreement. This agreement, dated February 26, 2007, specifies in paragraph one of the contract that the "contract route" is to be the Baltic Capesize Index Average of Routes (8/9/10/11)." In so stating, the parties have agreed that only particular ocean routes will be used and that such voyages will be carried out by Capesize vessels. *See Forward Freight Agreement annexed to Davies Decl. as Ex. "1."*

The plaintiff has met its burden of demonstrating that the subject matter of this dispute is maritime in nature and that maintaining jurisdiction would protect maritime commerce. In any event, Plaintiff has clearly established that the subject matter of this dispute is not so attenuated from the business of maritime commerce that admiralty jurisdiction should be denied. *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 200 (2d Cir. 1992)(stating that "a federal court must initially determine whether the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction. *Id.*). It cannot be ignored that "the question of whether a dispute falls within admiralty jurisdiction cannot be divorced from the purposes for which admiralty and maritime jurisdiction was granted. *Id.* In contract cases, maritime jurisdiction is conferred where, as here, the contract touches "rights and duties appertaining to commerce and navigation." *S.S. Eclipse,* 135 U.S. 599, 608 (1890). The forward freight agreement between Brave Bulk Transport and Spot On is clearly such a case.

Federal admiralty jurisdiction has been found to exist in comparable cases. For example, courts in the United States have found that federal maritime jurisdiction exists over contracts of all types of marine insurance, including, cargo, hull, P&I, etc., see *Simon v. Intercontinental*

9

*Transport (ICT) B.V.*, 882 F. 2d 1435 (2 d Cir. 1989), *Wilburn Boat Co. v. Fireman's Fund Ins.*

*Co.*, 348 U.S. 310 (1955), as well as to contracts to procure marine insurance, *see, Romen Inc. v.*

*Price-Forbes*, 824 F. Supp. 206 (S.D. Fla. 1992). Contracts for the winter storage of boats, on

land, which cover the period the boats will not be in navigation, have been found to be a

maritime contract. See *Omaha Indemnity v. Whaleneck Harbor Marina*, 610 F. Supp. 154

(E.D.N.Y. 1985). A lease for the use of ocean containers by a vessel owner on any of the

Owner's many vessels, has been found to be maritime even though the containers may have spent

less time on the defendant's vessels than on land at the terminals, or in transport by truck, rail or

air. See *CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F. 2d 377 (2d Cir.

1982).

Further, this case is analogous to the United States Supreme Court's recent finding *Exxon*

*Corp. v. Central Gulf Lines, Inc.* that a marine fuel requirement's contract is maritime. *Exxon,*

500 U.S. 603. In *Exxon,* the Supreme Court reasoned that a contract for the future sale of fuel oil

was maritime in nature because the value of the fuel related to maritime commerce. *Id.* at 613.

Importantly, in *Exxon,* the Supreme Court greatly expanded the scope of admiralty jurisdiction

for contracts by eliminating the "preliminary services" rule that kept contracts such as these from

being conferred admiralty jurisdiction. *Id.* at 608; *citing The Thames,* 10 F. 848 (S.D.N.Y.

1881)(holding that preliminary services leading to a maritime contract are not themselves

maritime contracts).

Following the reasoning in *Exxon,* this Court recently determined that a 'cooperation

contract' is a maritime contract because it provides a "shipping management function [that]

increase[s] the efficiency and decrease[s] the cost of … shipments of large quantities of various materials." *Sea Transport Contractors, Ltd. v. Industries Chemiques du Senegal,* No. 05 Civ. 10271 (RCC), 411 F. Supp. 2d 386, 2006 AMC 1076, 1084 (S.D.N.Y. January 24, 2006). In so finding, this Court reasoned, "it is of no moment in the *Exxon* analysis that STC will seek future charter parties, or act as an agent of ICS in so doing. Indeed STC's contract…. is similar to the maritime contract in *Exxon* where Exxon promised to supply fuel even if by way of a third party." *Id.*

For all of the foregoing reasons, future freight agreements are integral to the protection of maritime commerce. Thus, they are maritime contracts and a breach thereof warrants the conferral of this Court's admiralty jurisdiction. Therefore, Plaintiff has duly shown cause why the maritime attachment granted by this Court should not be vacated for lack of jurisdiction.

## POINT II

### PLAINTIFF HAS SUFFICIENTLY PLED ITS ALTER-EGO ALLEGATIONS AGAINST ZHANGGANG SHIPPING LTD.

Plaintiff has adequately alleged its alter-ego claim against Zhanggang Shipping Ltd. ZSL's arguments to the contrary ignore recent case law and are unavailing. In order to maintain an attachment against an alter-ego of the principal defendant at a Rule (E)(4)(f) post-attachment hearing, a plaintiff need only establish that it has sufficiently alleged a prima facie alter-ego claim. This burden is met when the plaintiff alleges the nature of its maritime claim and the basis upon which it is claiming alter-ego, e.g. fraud or domination/control. It is no longer necessary for a plaintiff to show probable cause or reasonable grounds to support its claim in a Rule (E)(4)(f) post-attachment hearing.

11

The Second Circuit Court of Appeals has recently ruled that it is improper for a court to engage in a fact intensive inquiry regarding the technical requirements of Rule B at a Rule E(4)(f) post-attachment hearing. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 2006 U.S. App. LEXIS 19302, at \*35 (2d Cir. 2006). In addition, within the last year, Chief Judge Wood and Judge Castel both have held that it is unnecessary to examine the factual underpinnings of a plaintiff's alter-ego claims in a Rule (E)(4)(f) post-attachment hearing. *See Order dated August 15, 2006 in Tide Line, Inc. v. Eastrade Commodities Inc. and Transclear, S.A., 06 Civ. 1979 (KMW) annexed hereto as Exhibit "B"; see also Transcript of Rule E(4)(f) hearing dated September 29, 2006 in Route Holding Inc. and Beam Company v. IOOI and Marina World Shipping, 06 Civ. 3428 (PKC) annexed hereto as Exhibit "C."* The facts presented in the *Tide Line* and *Route Holding* cases are strikingly similar to the instant matter, and their respective holdings, denying the defendants' alter-ego based challenges, decisively establish that Plaintiff has met its burden in this case. Even assuming *arguendo* that Plaintiff must make a factual showing at this stage, which is denied, Plaintiff has set forth sufficient evidence showing that ZSL and Spot On are alter-egos of each other.

Nowhere in its motion does ZSL adequately contest the facts that: (1) Plaintiff has a maritime claim against Defendant Spot On; (2) the Defendants are not present within New York; or (3) the funds attached by the garnishee banks belong to ZSL, the alleged alter-ego of Spot On. Thus, all the requirements of Rule B are satisfied, and Plaintiff's motion for reconsideration should be granted. Moreover, Plaintiff has submitted adequate evidence supporting its alter-ego allegations. Spot On and ZSL are not separate entities but rather different pockets in the same

pair of pants. Either way, Plaintiff's motion for reconsideration should be granted.

### A. Plaintiff need only establish that it has met the four technical requirements of Rule B in order to satisfy its burden.

Rule B "permits a plaintiff to attach an absent defendant's property if the plaintiff has an admiralty or maritime claim *in personam*." *Reibor Int'l Limited*, 759 F.2d 262 (2d Cir. 1985). Quasi in rem process can be used to attach or garnish a wide variety of tangible and intangible property. "Rules B(1) and B(3) refer to goods, chattels, debts, credits and effects. The terms "goods," "chattels," and "effects" have been interpreted to apply to virtually all tangible property. . . In addition to tangible property, service of quasi in rem process can also be used to reach a variety of intangible property, such as bank accounts, accounts receivable, and other debts owed to the defendant." *See 29-0705 Moore's Federal Practice- Civil § 705.04.* A party may attach the funds used to pay a debt that is owed or will be owed to a defendant and the court may require such person to pay the debt to the attaching party upon maturity. *See Iran Express Lines v. Sumatrop, A.G.*, 563 F.2d 648 (4th Cir. 1977).

Under Supplemental Rule B, "an order of maritime attachment must issue upon a minimal prima facie showing" provided that the defendant cannot be "found within" the district in which the assets are sought to be attached. But under Supplemental Rule E(4)(f), any person claiming an interest in the attached property shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the attachment should not be vacated or other relief granted consistent with these rules. It is clear from the text of Rule E(4)(f) that the party having

obtained the maritime attachment, bears the burden of showing that the attachment should not be

vacated.

However, as recently confirmed by the Second Circuit Court of Appeals in *Aqua Stoli,*

*supra,* the Rule(E)(4)(f) hearing is not intended to resolve the dispute between the parties, but to

determine if the technical requirements of the Rule were met. Thus, as long as the plaintiff can

establish that it has alleged a prima facie maritime claim, the defendant is not present in the

district, the defendant's property has been restrained in the district and no other statutory bar to

the attachment exists, the attachment should be upheld. *See Aqua Stoli,* at *28-29; *see also*

*Order in Tide Line annexed hereto as Exhibit "B" at 16.*

Once a plaintiff has established the technical requirements stated in Rule B, the burden

shifts to the defendant to prove the limited bases for vacateur. *Aqua Stoli* provides that an

otherwise facially valid Rule B attachment may only be vacated upon three bases none of which

are present here. *See Aqua Stoli,* at *27.

**B. In a Rule B alter-ego case, if all other requirements are satisfied a plaintiff must only allege the nature of its alter-ego claim; particularly whether it is based on domination and control or fraud in order to successfully sustain the attachment.**

*Aqua Stoli's* holding marks a departure from the prior "probable cause/reasonable basis

standard" that certain courts applied before *Aqua Stoli.* As confirmed by Chief Judge Wood in

*Tide Line* and Judge Castel in *Route Holding,* a plaintiff no longer needs to show that it had

"reasonable grounds" or "probable cause" to make alter-ego claims against a defendant in order

to maintain the attachment. Rather, at the Rule E(4)(f) hearing a plaintiff must only show that

has *alleged* a prima facie valid alter-ego claim in order to satisfy Rule B. Both the *Tide Line* and

*Route Holding* cases are instructive on this point and will be briefly summarized below.

In *Tide Line,* as in the instant case, the plaintiff obtained a Rule B order of maritime attachment and garnishment against both Eastrade Commodities Inc. as the named entity in the charter party, and Transclear S.A. as its alter-ego. Transclear moved to vacate the attachment claiming that it was not an alter-ego of Eastrade.

Tide Line then produced evidence that Transclear occasionally paid Eastrade's debts where it had no connection to the underlying contract. Transclear then claimed that is had a legal basis upon which to make the payments on Eastrade's behalf.

Judge Wood found all of these factual arguments unnecessary and irrelevant in the post-attachment hearing. Particularly, she found that in light of the *Aqua Stoli* decision, the Court should exercise a very limited inquiry into the underlying facts. She reasoned that when applying for a Rule B attachment, a plaintiff *need not provide any supporting evidence*; its complaint should suffice. In keeping with this principal, she held that *Aqua Stoli* implies that a plaintiff *is likewise not required to provide evidence showing that it has a claim against defendant*, to carry its burden under Supplemental (E)(4)(f) at the post-attachment hearing. *See Tide Line Order annexed hereto as Exhibit "B," at 13.*

Judge Wood noted that "in seeking to have an attachment vacated, a defendant may argue that a plaintiff does not have a "valid prima facie admiralty claim against the defendant." However, she further clarified that such a challenge must be based on *insufficiency of pleading*. *See Tide Line Order, supra, at 17* ("it does not appear that the basis of defendant's argument may be that plaintiff has not provided sufficient evidence of such a claim"). Thus, the only way for a

defendant to show that a plaintiff does not have a maritime claim against an alter-ego is to prove that the pleadings themselves are insufficient to state such a claim.

In *Route Holding*, following the *Tide Line* precedent, the district court limited its analysis to determining whether the Plaintiffs, Route Holding and Beam Company, has *sufficiently pled* their alter-ego claims against Marina World Shipping. The plaintiffs had alleged that Marina World Shipping was an alter-ego because it dominated and controlled the principal, IOOI. The district court found that plaintiffs' pleadings were enough to uphold the attachment, finding that "the plaintiff alleges that MWS is the alter-ego of IOOI, but it does not simply leave it as a conclusory allegation. It goes on to allege that the reason it believes it is the alter-ego is because IOOI dominates an disregards MWS' corporate form to the extent that MWS is actually carrying on IOOI's business and operations as if the same were its own. It further goes on to allege that MWS, acting as paying agent, acts a paying agent or arranges for other nonparties to satisfy the debts and obligations of IOOI. *It seems to me a sufficient allegation." See Transcript of Route Holding annexed hereto as Exhibit "C," at 12, lines 14-24.*

Further emphasizing the state of the law, on October 11, 2006, Judge Hellerstein denied a near identical alter-ego challenge raised by Defendants' counsel herein in regards to the maritime attachment *Secil Maritima U.E.E. v. Malev Shipping Co. Ltd., Evalend Shipping Co. S.A. and Plumfield Shipping Corp., 06 CV 6345 (AKH)*(denying defendants' motion to vacate an attachment under Rule B based on the relaxed post-*Aqua Stoli* standard). Thus, in light of the decisions in *Aqua Stoli, Tide Line, Route Holding* and *Secil,* the current state of the law is that a plaintiff need only allege a prima facie maritime claim against the principal defendant, and a

prima facie alter-ego claim against the alleged alter-ego entity in order to satisfy its burden in this regard.

As indicated above, the Second Circuit Court of Appeals held in *Aqua Stoli* that it is *inappropriate* for a court to conduct a fact-intensive inquiry regarding the specifics of a plaintiff's claim at a post-attachment hearing. Rule E(4)(f) does not afford a defendant the opportunity to challenge the sufficiency of the plaintiff's pleadings or challenge the evidence supporting plaintiff's admiralty claim. A defendant may, if it wishes, raise such issues by way of a Rule 12(b)(6) motion to dismiss or Rule 56 motion for summary judgment but it may not do so in the context of an emergency hearing pursuant to Supplemental Rule E(4)(f). *Maersk, Inc. v. Neewra, Inc.*, 2006 U.S. Dist. LEXIS 53395 (S.D.N.Y. 2006) (refusing to apply the higher pleading standard used in a motion to dismiss in a post-attachment hearing "lest Rule 12(b)(6) be completely subsumed by Supplemental Rule E(4)(f)").

Defendant ZSL brought a motion to vacate under Rule E(4)(f), thus, the limited question presented to the Court is, "has Plaintiff adequately pled a prima facie alter-ego claim?" The answer is an unqualified yes.

### C. **Plaintiff has adequately alleged a maritime claim against ZSL.**

Plaintiff has met its pleading burden. Plaintiff has properly alleged a maritime claim against ZSL. *See Verified Amended Complaint, ¶¶ 22-28 annexed to the Declaration of Lauren C. Davies as Exhibit "2."* In addition, Plaintiff has repeatedly alleged in its Verified Amended Complaint, this memorandum, and its accompanying Declaration, that Spot On and ZSL are alter-egos and that ZSL is therefore liable for Spot On's breach of the maritime contract with

17

Plaintiff.  Particularly, Plaintiff made the following allegations in its Verified Amended

Complaint:

<p style="text-align:center">*     *     *</p>

22. Upon information and belief, Zhanggang is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Zhanggang is actually carrying on Spot On's business and operations as if same were its own.

23. Upon information and belief, Defendant Zhanggang is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Zhanggang.

24. Upon information and belief, Defendants Zhanggang and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, including Mrs. Wei-Lu Zhang and Ms. Sammy Yu, and used to carry on such individuals' own business.

25. Upon information and belief, Defendant Zhanggang has no separate, independent identity from Defendant Spot On as they use their names interchangeably with design to fraudulently avoid payment of just debts to their creditors.

26. In the alternative, Defendant Zhanggang is merely a shell corporation through which Spot On conducts its business.

27. In the further alternative, Defendants Zhanggang and Spot On are partners and/or are joint venturers.

28. In the further alternative, Defendants Zhanggang and Spot On are affiliated companies such that the Defendant Zhanggang is now, or will soon be, holding assets belonging to Defendant Spot On and vice versa.

*See Verified Amended Complaint, ¶¶22-28, Davies Decl. Ex. "1."*

    As shown above, Plaintiff has not only alleged the basis of its alter-ego claim, domination

and control, but it has set forth facts upon which its claim is based.  Judge Castel has recently

found that allegations such as these satisfy the plaintiff's burden to allege a claim sufficient to

withstand a challenge such as the one ZSL has made here.  *See Transcript of Route Holding*

*annexed hereto as Exhibit "B," at 12, lines 15-24.*

    Further, at the request of this Court, Plaintiff has also provided the basis upon which the

"information and belief" allegations in the Verified Amended Complaint were formed.  These

<p style="text-align:center">18</p>

bases, which are laid out in the accompanying Declaration of Lauren C. Davies are as follows:

<p style="text-align:center">*        *        *</p>

23.    ZSL and Spot On have a common address and place of business at: Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong. *See Commercial Services Agreement at page 1 annexed hereto as Exhibit "3" and Exhibit "1."*

24.    This is also the address of "Spot On (Hong Kong) Group Corporation Limited" which ("Spot On HK GCL") is another alter ego of "Spot On Shipping Ltd." ("Spot On").

   a.    Upon information and belief, Spot On HK GCL is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Spot On HK GCL is actually carrying on Spot On's business and operations as if same were its own.

   b.    Upon information and belief, Defendant Spot On HK GCL is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Spot On HK GCL.

   c.    Upon information and belief, Defendants Spot On HK GCL and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, and used to carry on such individuals' own business. Further, the Defendants share the same offices, employees, telephone numbers, fax numbers and/or email addresses.

   d.    Upon information and belief, Mrs. Wei-lu Zhang is a primary controller of Spot On and Spot On HK GCL.

   e.    Upon information and belief, Defendant Spot On HK GCL has no separate, independent identity from Defendant Spot On as they are separately incorporated for the purpose of fraudulently avoid payment of just debts to their creditors.

   f.    In the alternative, Defendant Spot On HK GCL is merely a shell corporation through which Spot On conducts its business.

   g.    In the further alternative, Defendants Spot On HK GCL and Spot On are partners and/or are joint venturers.

   h.    In the further alternative, Defendants Spot On HK GCL and Spot On are affiliated companies such that the Defendant Spot On HK GCL is now, or will soon be, holding assets belonging to Defendant Spot On and vice versa.

25.    ZSL and Spot On share a common email address: shipping@spoton-hk.com. *See Lloyd's MIU Investigation Report on ZSL at page 2 annexed hereto as Exhibit "4" and Exhibit "1."*

26.    The corporate research conducted on these companies includes an Infospectrum Report and a Lloyd's MIU report. No information was uncovered that shows that ZSL is owned by an entity which is a Chinese government-owned enterprise.

27.    On the contrary, ZSL is a joint venture between Spot On and Zhangdian Steel

Mill of China. *See Exhibit "4."*

28.     Further, we have been informed by Lloyd's MIU that they telephoned ZSL and were told that ZSL is a "ship charterer."

29.     Contrary to the false assertions made by ZSL, Spot On and ZSL do share common ownership. Specifically, upon information and belief, both Spot On (Hong Kong) Group Corporation Limited and ZSL are owned and run by the Zhang family. Madam Wei-Lu Zhang reported to be the president of ZSL and she is also a principal director of Spot On (Hong Kong) Group Corporation Limited. *See excerpt from Spot On's Annual Return annexed hereto as Exhibit "5" and compare with Exhibit "4."*

30.     Further, ZSL's chartering manager is Ms. Sammy Yu. Ms. Sammy Yu was also the contact between ICAP Hyde Derivaties Limited and Spot On in drafting the February 26, 2007 FFA. *See Email correspondence between ICAP and Spot On annexed hereto as Exhibit "6," see further Exhibit "4" which indicates that Sammy Yu is the manager of ZSL.*

31.     Sammy Yu's name appears on the first page of the FFA between Spot On and Brave Bulk as the "contact" for Spot On. *See February 26, 2007 FFA annexed hereto as Exhibit "1."*

32.     Upon information and belief, Spot On and ZSL's names are used interchangeably in the industry. *See Baltic Dry Index Dry Cargo Fixture Summary annexed hereto as Exhibit "7."*

33.     By conducting business through shell or pass through corporations, i.e. the multitude of related entities exposed in this action i.e. Spot On Shipping Ltd. a.k.a. Spot On Shipping Ltd. BVI a.k.a. Spot On, a.k.a. Clayton Star Company Limited a.k.a. Clayton Star and Pehw Asset Management Limited a.k.a. Pehw Asset Management Ltd. and Zhanggang Shipping Ltd. can effectively insulate themselves from liability.

34.     ZSL has submitted only an alleged Commercial Services Agreement, the validity of which is not ascertainable without the benefit of discovery.

35.     Aside from this single document, ZSL has made no showing that these companies are in fact separate and distinct entities other than the bald assertions of an alleged director.

36.     With the benefit of discovery, Plaintiff has no doubt that numerous other connections between ZSL and Spot On will be revealed.

*See Declaration of Lauren C. Davies ¶¶ 23-36.*

Plaintiff has more than sufficiently alleged a valid prima facie admiralty claim against all of the defendants, ZSL included. In addition to the pleadings, plaintiff has provided the available

extrinsic evidence in the accompanying Declaration of Lauren C. Davies to support its alter-ego allegations, despite the fact that, pursuant to Rule B, it is not required to provide such proof at this early stage of the case.

In conclusion, Plaintiff has shown by way of its Verified Amended Complaint, Memorandum, and Declaration, that it has a valid prima facie admiralty claim and that ZSL is an alter-ego of Spot On such that it is liable for Spot On's debts to Plaintiff. Also, Defendant effectively concedes that it is not present in the District, and acknowledges that its property in the form of EFTs was attached in the District. *See Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002). Additionally, the Defendant, ZSL, has failed to cite any statutory or maritime law bar to the attachment. As such, this Court's issuance of the maritime attachment pursuant to Rule B was proper. ZSL's insistence that the Plaintiff must prove its entire alter-ego case in a Rule E(4)(f) motion is based entirely on outdated case law and is in disregard of the purpose of the emergency Rule E(4)(f) hearing. Based on all the foregoing, Defendants' motion to vacate attachment was improper, Plaintiff's motion for reconsideration should be granted and this case should be allowed to proceed in the normal course, with the attachment remaining in place for the reasons set forth herein.

## POINT III

### IN THE ALTERNATIVE, PLAINTIFF HAS ESTABLISHED THAT IT HAS A PRIMA FACIE ALTER-EGO CLAIM AGAINST ZSL

In the alternative, even assuming *arguendo* that the standard put forth by the Defendant is correct, which is denied, Plaintiff has submitted sufficient evidence to show probable cause that ZSL is an alter-ego of Spot On.

## A. **Defining an Alter-ego.**

Under federal common law, the corporate form will be ignored and liability imposed on another corporate entity or the principals, if it is shown that the interconnected organization was utilized to perpetrate a fraud *or* where one entity or individual(s) so dominated another that it was, in effect, carrying on the principal's business. *See Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980). In a maritime case, it is sufficient to allege that the parent or controlling principal so dominated the subsidiary or other units within the group such that they were mere tools of instrumentalities to carry on the overall business of the principal. *See Kirno Hill,* 618 F.2d at 985 *and Matter of Holburn,* 774 F. Supp. at 844 (S.D.N.Y. 1991).

While there is no precise test to determine whether an entity is an alter-ego of another, in general, the corporate veil may be pierced where it can be demonstrated that the parent or controlling entity was the 'true' or prime mover behind the subsidiary. *See Carte Blanche (Singapore) v. Diners Club Intern*, 758 F. Supp. 908, 918 (S.D.N.Y. 1991). In *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F. 2d 131, 139 (2d Cir. 1991) the Second Circuit listed a number of factors that should be considered in determining whether to pierce the corporate veil:

> 1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issues of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms' length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and 10) whether the corporation in question had property that was used by the other of the

22

corporations as if it were its own. *See generally,* Barber, *Piercing the Corporate Veil*, 17 Willamette L. Rev. 371, 398 (1981); *Directors Guild of America v. Garrison Prod.,* 733 F.Supp. 755, 760-61 (S.D.N.Y. 1990); *United States Barite Corp. v. M/V Haris*, 534 F. Supp. 328, 330 (S.D.N.Y. 1982).

*Id.*

Obviously, many of the documents required to establish some of these elements are solely in the control of the Defendants and discovery on these issues will be necessary. However, the accompanying Declaration of Lauren C. Davies sets forth considerable evidence which establishes the alter-ego relationship between ZSL and Spot On.

At this stage in the proceeding, Plaintiff need not establish an alter-ego relationship to the degree expected at trial. Evidence of corporate domination or fraud is seldom available to the public, and a claimant is not expected, at this early stage, to produce fully documented alter-ego claims. Otherwise, a corporation that held their records tightly would be immune from suits based on alter-ego relationships. *See Maryland Tuna Corp. v. MS Benaries*, 429 F.2d 307 (2d Cir. 1970). Plaintiff has submitted sufficient evidence to show that there is cause to believe that Defendants ZSL and Spot On are alter-egos in order to sustain the attachment at an (E)(4)(f) post-attachment hearing. as will be further illustrated below. Further, with the benefit of discovery, Plaintiff will easily reveal the alter ego relationship between these companies, which is observable even on the evidence Plaintiff has collected so far.

## POINT IV

## PLAINTIFF'S MOTION FOR RECONSIDERATION SHOULD BE GRANTED

In its opposition to ZSL's motion to vacate the Attachment, Plaintiff argues that it validly obtained the order of maritime attachment and garnishment, that it has a valid maritime claim

and that ZSL has been adequately alleged to be an alter-ego of Spot On. In granting ZSL's motion to vacate, the Court did not consider the fact that Judge Batts granted Setsea's request for an ex parte order for process of maritime attachment and garnishment after originally denying said application. Further, this Court did not consider the proper standard a Rule B plaintiff must meet to sustain a motion to vacate an attachment on alter-ego grounds. The cases cited to by ZSL in support of it's arguments that Plaintiff's does not have a maritime claim and that ZSL is not an alter ego of Spot On are outdated and have been superseded. Further, defendant ZSL failed to adequately apprise the Court of the proper standards and recent controlling case law on both points. The case law and data contained herein merits the reconsideration of this court. When these decisions and the facts presented herein are taken into consideration, it is plain that Plaintiff has met and adequately pled all the requirements for an attachment pursuant to Rule B as to all defendants, including ZSL. As such, this motion for reconsideration should be granted and the maritime attachment against ZSL should be reinstated in the interests of justice, to avoid an error of law and to avoid an unnecessary and costly appeal.

## CONCLUSION

For all of the foregoing reasons, the plaintiff has shown cause why the maritime

attachment against the Defendants should not be vacated and demonstrated that its motion for

reconsideration of this Court's September 14, 2007 Order vacating the maritime attachment as

against Zhanggang Shipping Ltd. only.

Dated:        September 20, 2007
              New York, NY


                            Respectfully submitted,

                            The Plaintiff,
                            BRAVE BULK TRANSPORT LTD.,


               By:    _____
                            Lauren C. Davies (LD 1980)
                            Thomas L. Tisdale (TT 5263)
                            TISDALE LAW OFFICES, LLC
                            11 West 42nd Street, Suite 900
                            New York, NY 10006
                            (212) 354-0025 (p)
                            (212) 869-0067 (f)
                            ldavies@tisdale-law.com
                            ttisdale@tisdale-law.com

## CERTIFICATION OF SERVICE

I hereby certify that on September 20, 2007, a copy of the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF SHOW CAUSE MOTION, MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO VACATE, OR IN THE ALTERNATIVE, MOTION FOR RECONSIDERATION OF ORDER VACATING THE MARITIME ATTACHMENT was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

_____/s/_____
Lauren C. Davies

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SETSEA SPA,                                              :   **'07 CIV 6230**
                                                        :   07 CV
                        Plaintiff,                      :   ECF CASE
                                                        :
        - against -                                     :
                                                        :
SOURCE LINK SHIPPING CO. LTD.,                          :
                                                        :   JUL 0 5 2007
                        Defendant.                      :   U.S.D.C. S.D. N.Y.
-----------------------------------------------------------------X   CASHIERS

## VERIFIED COMPLAINT

        Plaintiff, SETSEA SPA (hereinafter referred to as "Setsea" or "Plaintiff") by and through

its attorneys, Tisdale Law Offices LLC, as and for its Verified Complaint against the Defendant,

SOURCE LINK SHIPPING CO. LTD. (hereinafter referred to as "Source Link" or

"Defendant"), alleges, upon information and belief, as follows:

        1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.

        2.      At all times material to this action, Plaintiff was, and still is, a foreign company

duly organized and operating under foreign law with a principle place of business in Torre del

Greco, Naples, Italy.

        3.      Upon information and belief, Defendant was, and still is, a foreign corporation, or

other business entity, organized under, and existing by virtue of foreign law with places of

business in the British Virgin Islands and China.

        4.      Pursuant to two Forward Freight "Swap" Agreements respectively dated

December 13, 2006 and January 22, 2007 (hereinafter referred to as the "Agreements") Source

Link agreed to buy and sell Freight Futures with Setsea.

5.    As defined by the Baltic Exchange, Forward Freight Agreements are a "means of hedging exposure to freight market risk through the trading of specified time charter and voyage rates for forward positions. Settlement is against a relevant route assessment published by the Baltic Exchange." The Baltic Exchange is "a membership organization at the heart of the global maritime marketplace" that provides "independent daily shipping market information." *See The Baltic Exchange,* http://www.balticexchange.com. Ocean freight is the charge assessed for the carriage of cargo by a vessel and is one of the most fundamental components of maritime commerce. Freight is considered so integral to the maritime industry that it has been said that "freight earnings are a part of the vessel as much as the ship's tackle." *Rush v. Delaware & Chesapeake S.S. Co.,* 10 Supp. 497, 501 (E.D. Pa. 1935).

6.    Specifically, Setsea and Source link entered into two maritime contracts for the swap of the future value of ocean freight. Both of these contracts specify the type of vessel to be used, the routes upon which said vessels would travel and the duration of the Agreement. The first of these Agreements, dated December 13, 2006, specifies in paragraph one of the contract that the "contract route" is to be the Baltic Panamax Index average of Routes (1A/2A/3A/4)." The second contract, dated January 22, 2007, specifies that the contract route will be the average of "Routes 8, 9, 10 and 11 of the Baltic Capesize Index." In so stating the parties have agreed that only particular ocean routes will be used and that such voyages will be carried out by Panamax and Capesize vessels.

7.    Forward Freight Agreements have been found to be maritime cases entitled to process of maritime attachment in the following cases: Brave Bulk Transport, Ltd. v. Spot On Shipping, Ltd, et al., 07 CV 04546 (CM); C. Transport Panamax Ltd. v. North America Steamships Ltd., a.k.a. N.A.S.L., 06 CV 13178 (RLC); Daeyang Shipping Co. Ltd. v. Navitrans

Maritime Inc., 04 CV 08050 (VM); Deiulemar v. Source Link Shipping Co. Ltd., 07 CV 02983

(SAS); Deiulemar v. Spot On Shipping Ltd., 07 CV 03820 (VM); Eurotrade Inc., Liberia v.

Source Link Shipping Co. Ltd., BVI, 07 CV 3172 (SAS); Pan Oceanic Maritime Inc. v. Source

Link Shipping Co. Ltd., 07 CV 03089 (CM); Perseveranza Di Navigazione S.P.A. v. Source

Link Shipping Co. Ltd., 07 CV 03091 (RPP); Taiwan Maritime Transport Co. Ltd. v. Navitrans

Maritime Inc. and Navigation Maritime Inc., 06 CV 13564 (RJH).

8.     Maritime Jurisdiction is conferred where the contract has "reference to maritime

service or maritime transactions." *Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.,* 542 U.S. 14,

24(2004) quoting *North Pacific S.S. Co. v. Hall Brothers Marine Railway & Shipbuilding Co.,*

249 U.S. 119, 125 (1919). Where "the subject matter of the contract relates to a ship in its use as

such, *or to commerce* or to navigation on navigable waters, or to transportation by sea or to

maritime employment it is fairly said to constitute a maritime contract." *Ingersoll Milling Mach.*

*Co. v. M/V BODENA,* 829 F.2d 293, 302 (2d Cir. 1987). There is no requirement that a specific

cargo or a specific vessel be referenced to meet this definition.

9.     Federal Admiralty jurisdiction has been found to exist in comparable cases. For

example, courts in the United States have found that federal maritime jurisdiction exists over

contracts of all types of marine insurance, including, cargo, hull, P&I, etc., see *Simon v.*

*Intercontinental Transport (ICT) B.V.,* 882 F. 2d 1435 (2 d Cir. 1989), *Wilburn Boat Co. v.*

*Fireman's Fund Ins. Co.,* 348 U.S. 310 (1955), as well as to contracts to procure marine

insurance, See, *Romen Inc. v. Price-Forbes,* 824 F. Supp. 206 (S.D. Fla. 1992). Contracts for the

winter storage of boat, on land, which cover the period the boats will not be in navigation, have

been found to be a maritime contract. See *Omaha Indemnity v. Whaleneck Harbor Marina*, 610

F. Supp. 154 (E.D.N.Y. 1985). A lease for the use of ocean containers by a vessel owner on any

of the Owner's many vessels, has been found to be maritime even though the containers may

have spent less time on the defendant's vessels than on land at the terminals, or in transport by

truck, rail or air. See *CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F. 2d 377

(2d Cir. 1982).

10.    This case is analogous to the United States Supreme Court's recent finding in

*Exxon Corp v. Central Gulf Lines,* 500 U.S. 603, that a marine fuel requirement's contract is

maritime. *Id.* In *Exxon,* the Court reasoned that a contract for the future sale of fuel oil was

maritime in nature because the value of the fuel related to maritime commerce. *Id.* at 613.

Importantly, in *Exxon,* the Supreme Court greatly expanded the scope of admiralty jurisdiction

for contracts by eliminating the "preliminary services" rule that kept contracts such as these from

being conferred admiralty jurisdiction. *Id.* at 608; citing *The Thames,* 10 F. 848 (S.D.N.Y.

1881). In *Exxon Corp.*, the Court found that, not only did admiralty jurisdiction apply to those

supplies where Exxon was the physical supplier of the fuel, but also to those contracts where the

fuel was provided and delivered by a third party at the request of Exxon. In that case, and as

later reiterated by the Supreme Court in *Kirby,* the Court stated: "The 'fundamental interest

giving rise to maritime jurisdiction is 'the protection of maritime commerce.' (citing *Exxon,*

*supra*). The conceptual approach vindicates that interest by focusing the court's inquiry on

whether the principal objective of a contract is maritime commerce." *Kirby,* at 25. In *Kirby,* the

Supreme Court recognized the changes in maritime transportation and commerce which have

occurred in recent times from traditional ocean carriage.

11.    Following the reasoning set out in *Exxon,* this Court recently determined that a

'cooperation contract' is a maritime contract because it provides a "shipping management

function [that] increase[s] the efficiency and decrease[s] the cost of… shipments of large

quantities of various metals." *See Sea Transport Contractors, Ltd. v. Industries Chemiques du Senegal,* No. 05 Civ. 10271 (RCC), 411 F. Supp.2d 386, 2006 AMC 1076, 1084 (S.D.N.Y. January 24, 2006). In so finding, this Court reasoned, "it is of no moment in the Exxon analysis that STC will seek future charter parties, or act as an agent of ICS in so doing. Indeed STC's contract… is similar to the maritime contract in *Exxon* where Exxon promised to supply fuel even if by way of a third party." *Id.*

12.    While FFAs do seek to minimize financial risk, the risk they seek to minimize is of fluctuating ocean freight rates for specific groups of vessels traveling identified and agreed to ocean routes. The financial nature of these transactions does not compromise their maritime status. As indicated above, maritime jurisdiction explicitly includes maritime "transactions" that relate to maritime "commerce."

13.    During the course of the Agreements, a dispute arose between the parties regarding Defendant's failure to pay the losses sustained by it in breach of the Agreements.

14.    As a result of Defendant's breach of the Agreements, Plaintiff has sustained damages in the total principal amount of $1,602,691.50, exclusive of interest, arbitration costs and attorneys fees.

15.    Pursuant to clause 16 of both Agreements, all disputes arising thereunder are to be construed in accordance with English law and subject to the non-exclusive jurisdiction of the High Court of Justice in London, England, and Plaintiff will soon commence court proceedings pursuant to the Agreements.

16.    Despite due demand, Defendant has failed to pay the amounts due and owing under the Agreements.

17.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party

under English Law.  As best as can now be estimated, Plaintiff expects to recover the following

amounts:

| | | |
|---|---|---|
| A. | Principal claim: | $1,602,691.50 |
| B. | Estimated interest on claim:<br>3 years at 6.5% | $333,613.15 |
| C. | Estimated Attorneys' Fees and Expenses: | $200,000.00 |

**Total**                                                                **$2,136,304.65**

18.    The Defendant cannot be found within this District within the meaning of

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal

Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during

the pendency of this action, assets within this District and subject to the jurisdiction of this Court,

held in the hands of garnishees including, but not limited to, ABN Amro, American Express

Bank, Bank of America, Bank of New York, Citibank, Deutsche Bank A.G., HSBC Bank USA

Bank, J.P. Morgan Chase, Standard Chartered Bank, and/or Wachovia Bank N.A., which are

believed to be due and owing to the Defendant.

19.    The Plaintiff seeks an order from this court directing the Clerk of Court to

issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental

Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the

Defendant held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over

the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear

and answer under oath all and singular the matters alleged in the Complaint;

6

B.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee, including, but not limited to, ABN Amro, American Express Bank, Bank of America, Bank of New York, Citibank, Deutsche Bank A.G., HSBC Bank USA Bank, J.P. Morgan Chase, Standard Chartered Bank, and/or Wachovia Bank N.A., which are due and owing to the Defendant, in the amount of **$2,136,304.65** calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That this Court recognize and confirm any arbitration awards or judgments rendered on the claims had herein as Judgments of this Court;

D.    That this Court retain jurisdiction over this matter through the entry of any judgments or awards associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

7

E.     That the Plaintiffs have such other, further and different relief as the Court

may deem just and proper.

Dated: New York, New York
       July 5, 2007

<div style="margin-left: 40%;">

The Plaintiff,
SETSEA SPA,

By: _____
Lauren C. Davies (LD 1980)
Thomas L. Tisdale (TT 5263)
TISDALE LAW OFFICES LLC
11 West 42nd Street, Suite 900
New York, NY 10036
(212) 354-0025 – phone
(212) 869-0067 – fax
ldavies@tisdale-law.com
ttisdale@tisdale-law.com

</div>

8

## ATTORNEY'S VERIFICATION

State of Connecticut )
                     )    ss.:    Town of Southport
County of Fairfield  )

1.    My name is Lauren C. Davies.

2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney with the firm of Tisdale Law Offices LLC, attorneys for the Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    Southport, CT
          July 5, 2007

                                    _____
                                    Lauren C. Davies

9

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
SETSEA S.P.A.,

                     Plaintiff,

        -against-

                                                                                                                                     07 Civ. 4147 (DAB)
                                                                                                    <u>ORDER</u>

SOURCE LINK SHIPPING CO. LTD.,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
DEBORAH A. BATTS, United States District Judge.

      Plaintiff Setsea S.p.A. brings this action against Defendant

Source Link Shipping Co. Ltd. for damages and costs it sustained

as a result of Defendant's alleged breach of two Forward Freight

"Swap" Agreements.  Plaintiff seeks an Order from the Court

"directing the Clerk of Court to issue Process of Maritime

Attachment and Garnishment pursuant to Rule B of the Supplemental

Rules for Certain Admiralty and Maritime Claims" against

Defendant to secure Plaintiff's claims and so that the Court may

obtain personal jurisdiction over Defendant.  (Complaint ¶ 11.)

Plaintiff alleges that the Court has subject matter jurisdiction

over this matter because its claim regarding the alleged breach

of the Forward Freight "Swap" Agreements constitutes "an

admiralty and maritime claim within the meaning of Rule 9(h) of

the Federal Rules of Civil Procedure and 28 United States Code §

1333."  (<u>Id.</u> ¶ 1.)  Plaintiff submitted a cover-letter dated May

29, 2007 in support of its application for an Ex Parte Order For
Process of Maritime Attachment against Defendant in which it
argued that "[w]hile there are no decisions in this or any other
Circuit that speak directly on whether a Forward Freight 'Swap'
Agreement or any other Freight Futures Contract is maritime,
these agreements have all the hallmarks of a maritime contract."[1]

Having considered Plaintiff's Complaint, the two Forward
Freight "Swap" Agreements that are the subject of the Complaint
and Plaintiff's application for an Ex Parte Order For Process of
Maritime Attachment, for the reasons set forth below, the Court
DENIES Plaintiff's application.  The Court finds that the Forward
Freight "Swap" Agreements that Defendant allegedly breached are
not maritime contracts and that therefore the Complaint alleging
their breach does not fall within the Court's original
jurisdiction over "[a]ny civil case of admiralty or maritime
jurisdiction," as provided by 28 U.S.C. § 1333(1).  Accordingly,
the Complaint is DISMISSED WITHOUT PREJUDICE.  See Fed. R. Civ.
P. 12(h)(3) ("[w]henever it appears by suggestion of the parties
or otherwise that the court lacks jurisdiction of the subject
matter, the court shall dismiss the action"); Steel Co. v.

---

[1]    At the Court's request, Plaintiff submitted copies of the
two Forward Freight "Swap" Agreements to Chambers.

Citizens for Better Environment, 523 U.S. 83, 94 (1998)

("'[w]ithout jurisdiction the court cannot proceed at all in any

cause'") (quoting Ex parte McCardle, 74 U.S. 506, 514 (1868)).[2]

## BACKGROUND

Plaintiff alleges that Defendant agreed to "buy and sell

Freight Futures" with it pursuant to the two Forward Freight

"Swap" Agreements, dated December 13, 2006 and January 22, 2007

(the "Agreements").  (Complaint ¶ 4.)  Plaintiff alleges that "a

dispute arose between the parties regarding Defendant's failure

to pay the losses sustained by it in breach of the Agreements"

and that it was thereby damaged "in the total principal amount of

$1,602,691.50."  (Id. ¶¶ 5-6.)

The Complaint otherwise contains scant allegations regarding

the terms of the Agreements and of their subject matter.  In

particular, the Complaint is vague as to the Agreements'

connection to maritime commerce.  Plaintiff explains in its

cover-letter dated May 29, 2007, however, that the Agreements

"are commitments to perform in the future a shipping service

---

[2]    While it would appear, based on the Complaint's allegations,
that the Court might have subject matter jurisdiction over this
matter pursuant to 28 U.S.C. § 1332, the lack of any allegations
regarding the Court's personal jurisdiction over Defendant
counsels in favor of dismissal without prejudice.

between ship owners, charterers and/or traders." Such agreements, according to Plaintiff's letter, are "negotiated with the express purpose of hedging and managing market risks relating to the employment of vessels in today's volatile freight market" and that the specific Agreements that Defendants allegedly breached were to "buy and sell a specified tonnage freight at an agreed price for an agreed route and time span so that both [Parties] could reliably predict their ocean freight revenues and costs for the duration of the contract for those ocean routes."

Having examined both Agreements, the Court notes that they are tied to maritime commerce in that they are dependant on averaged freight rates on international commercial freight routes, as assessed and published by the London-based Baltic Exchange in a variety of indices. The Agreements, for instance, contain provisions specifying "contract routes" which are defined as the to averaged routes of specified indices published by the Baltic Exchange. The Agreements do not, however, provide for the physical shipping or delivery of any specific freight tonnage or of any specific cargoes. Nor do they relate to the transportation of goods of any kind or to any specific vessels.

The Agreements specify a "contract rate" of several thousand dollars per day, along with a "contract quantity" term of ninety-one days on both Agreements, between April 2007 and June 2007. A

4

"settlement rate" which is also tied to Baltic Exchange indices

is provided in each Agreement.  The main obligation of the

Parties to the Agreements is described in identical provisions

entitled "Settlement Sum":

> The "Settlement Sum" is the difference between the
> Contract Rate and the Settlement Rate multiplied by the
> Contract Quantity.  If the Settlement Rate is greater
> than the Contract Rate, the Seller shall pay the Buyer
> the Settlement Sum.  If the Settlement Rate is less
> than the Contract Rate, the Buyer shall pay the Seller
> the Settlement Sum.

In both Agreements, Plaintiff was the buyer and Defendant was the

seller.  It is clear that the Parties agreed to settle their

obligations under the Agreements in cash.


## DISCUSSION

Rule 12(h)(3) of the Federal Rules of Civil Procedure

provides that "[w]henever it appears by suggestion of the parties

or otherwise that the court lacks jurisdiction of the subject

matter, the court shall dismiss the action."  Fed. R. Civ. P.

12(h)(3).  When resolving issues surrounding subject matter

jurisdiction, a district court is not confined to the complaint

and may refer to evidence outside the pleadings.  Makarova v.

United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Kamen v.

American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)).

Furthermore, "jurisdiction must be shown affirmatively, and that

5

showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Shipping Financial Services Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998).

Title 28 U.S.C. § 1333(1) confers subject matter jurisdiction over actions between "[a]ny civil case of admiralty or maritime jurisdiction. . . ." 28 U.S.C. § 1333(1). Determining whether a contract is maritime and therefore gives rise to admiralty jurisdiction is difficult however. The Supreme Court has observed that federal case law has not drawn "clean lines between maritime and non-maritime contracts." Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd., 543 U.S. 14, 23 (2004); Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961) ("[t]he boundaries of admiralty jurisdiction over contracts - as opposed to torts or crimes - being conceptual rather than spatial, have always been difficult to draw"); see also Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 301 (2d Cir. 1987) ("[t]he precise categorization of the contracts that warrant invocation of the federal courts' admiralty jurisdiction has proven particularly elusive" (quoting CTI-Container Leasing Corp. v. Oceanic Operations Corp., 682 F.2d 377, 379 (2d Cir. 1982)).

A court must look to "the subject matter of the . . . contract" and "the services performed under the contract" to determine whether it a maritime contract. Exxon Corp. v. Central

6

Gulf Lines, Inc., 500 U.S. 603, 612 (1991). "[T]he true

criterion is whether [the contract] has 'reference to maritime

service or maritime transactions.'" Norfolk S. Ry. Co., 543 U.S.

at 24 (quoting North Pacific S.S. Co. v. Hall Brothers Marine

Railway & Shipbuilding Co., 249 U.S. 119, 125 (1919)). In

addition, the Second Circuit has held that, as a threshold

matter, "[b]efore attempting to categorize contractual rights as

maritime or non-maritime, a federal court must first consider

whether an issue related to maritime interests has been raised."

Atlantic Mut. Ins. Co. v. Balfour Maclaine Intern. Ltd., 968 F.2d

196, 199 (2d Cir. 1992).[3]  To grant an Ex Parte Order For Process

of Maritime Attachment, a court must first determine that "the

plaintiff's claim [is] one which will support a finding of

admiralty jurisdiction under 28 U.S.C. § 1333." Winter Storm

Shipping, Ltd. v. TPI, 310 F.3d 236, 268 (2d Cir. 2002) (citation

omitted).

Turning to the Agreements presently before the Court, it is

clear that their subject matter is not "so attenuated from the

business of maritime commerce that it does not implicate the

---

[3]     The Second Circuit has, however, recently noted "some
uncertainty as to the extent to which this Court's 'threshold
inquiry' test survives the Supreme Court's most recent admiralty
decision, Norfolk Southern Railway Co. v. James N. Kirby Pty
Ltd.." Folksamerica Reinsurance Co. v. Clean Water of New York,
Inc., 413 F.3d 307, 313 (2d Cir. 2005).

concerns underlying admiralty and maritime jurisdiction."
Atlantic Mut. Ins. Co., 968 F.2d at 200.  But while the
Agreements may pass the Second Circuit's "threshold inquiry" the
Court finds that they do not constitute maritime contracts
because, in their specific provisions, they lack "'reference to
maritime service or maritime transactions.'"  Norfolk S. Ry. Co.,
543 U.S. at 24 (citation omitted).  The Court finds that the
Agreements, when signed, related to reciprocal future promises of
payment in cash and that they do not address maritime services or
transactions such as the transportation of specific cargoes or
the involvement of specific vessels.  The Agreements merely seek
to establish a means of minimizing financial risk and
establishing a formula to make future costs and revenues more
predictable.  Plaintiff has therefore failed to establish that
this Court has admiralty jurisdiction over the alleged breach of
the Agreements.  The Court accordingly DENIES Plaintiff's
application for an Ex Parte Order For Process of Maritime
Attachment and DISMISSES this action for lack of subject matter
jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3).

## LEAVE TO REPLEAD

Should Plaintiff seek to set out a sufficient basis for the
Court's exercise of jurisdiction in this action, it shall file an

8

Amended Complaint within thirty (30) days of the date of this Order.  Plaintiff's failure to do so shall be deemed a waiver of its right to amend the Complaint.

## CONCLUSION

Plaintiff's application for an Ex Parte Order For Process of Maritime Attachment is DENIED because the contracts at issue in this matter are not maritime contracts and therefore do not fall within the Court's admiralty jurisdiction under 28 U.S.C. § 1333(1).  As the Court lacks subject matter jurisdiction over this matter, pursuant to  Fed. R. Civ. P. 12(h)(3), the Complaint is DISMISSED WITHOUT PREJUDICE.

SO ORDERED.

Dated:     New York, New York
           June 5, 2007

_Deborah A. Batts_
Deborah A. Batts
United States District Judge

# EXHIBIT 2



FFABA 2005 (TM)

### FORWARD FREIGHT AGREEMENT BROKERS ASSOCIATION ('FFABA')

### FORWARD FREIGHT 'SWAP' AGREEMENT

**Trade Ref**            517710

**Contract Date**        13 December 2006

The purpose of this confirmation is to state the terms and conditions of the forward freight swap agreement entered into between:

**Seller**

### SOURCE LINK SHIPPING CO. LTD BVI

15d Deji Mansion
188 Changjiang Road
Nanjing
210018
P.R China

Contact: Tony Tao
Phone: +86 2586816517
Fax: +86 2586816522
Email: chartering@sourcelink.cn

and

**Buyer**

### SETSEA SPA SOCIETA UNIPERSONALE

Via G.Marconi,58
80059 Torre Del Greco(Naples), Italy
Contact: Filippo Lembo
Phone: +390818817829

**Trade Ref**    517710

ICAPHYDE LTD, has arranged the above trade for you as name-passing or introducing broker  ICAPHYDE LTD is not responsible for documentation of the transaction between the parties, nor are we, or have we been, responsible for the provision of advice to any person in connection with the above trade. We are also not responsible for the exercise of any options. Please notify us immediately if you disagree with any

Fax: +390818829004

This agreement between the parties as constituted by this confirmation is referred to as the "Agreement"

Until superseded by notice information in subsequent confirmation or other communication, the above addresses are hereby recognized as the correct addresses to which any notification under this Agreement may properly be served.

### 1. Contract Route

As per BPI TC - Baltic Panamax Index Average of Routes (1A/2A/3A/4) as defined on the Contract Date including any relevant official forthcoming amendments published at the Contract Date which will become effective prior to the settlement of this Agreement.

### 2. Contract Rate

USD 28000.00 per Day

### 3. Contract Quantity

91 Days

### 4. Contract Months

April 2007, May 2007, June 2007

### 5. Contract Period

Average of All BPI Index days of the contract month(s) up to and including the Settlement date(s)

### 6. Settlement Date

The last Baltic Exchange Index publication day of each Contract Month

### 7. Settlement Rate

(a) The Settlement Rate shall be the average of the rates for the Contract Route(s) published by the Baltic Panamax Index over the Settlement Period defined as All of the Baltic Panamax Index publication days of the Contract Month(s) up to and including the Settlement Date.

(b) If for any reason the Baltic Panamax Index cannot provide any rate required for establishing the Settlement Rate, then the current chairman of the FFABA may be instructed by either party to form a panel comprising of a minimum of three independent brokers (the "Panel") to determine an appropriate rate, which determination will be final and binding on both parties.

Trade Ref    517710

2 BROADGATE, LONDON EC2M 7UR. TEL: +44(0)20 7532 4934  FAX: +44(0)20 7000 5942
ICAPHYDE LTD, has arranged the above trade for you as name-passing or introducing broker. ICAPHYDE LTD is not responsible for documentation of the transaction between the parties, nor are we, or have we been, responsible for the provision of advice to any person in connection with the above trade. We are also not responsible for the exercise of any options. Please notify us immediately if you disagree with any

(c) Each party shall bear its own costs and expenses in connection with any determination made pursuant to this clause 7.

(d) The parties shall severally indemnify and hold harmless each of the members of the Panel, the Baltic Panamax Index and its members and the FFABA and its members (the "Indemnified Persons") against all liabilities, actions, demands, costs and expenses incurred by any of them arising directly out of or in connection with the formation of the Panel and any determination made by the Panel.

(e) As between the parties, each party shall have a right of contribution against the other party in respect of any indemnity payment made pursuant to the preceding paragraph so that their respective liabilities pursuant to that paragraph shall be equal.

## 8. Settlement Sum
The "Settlement Sum" is the difference between the Contract Rate and the Settlement Rate multiplied by the Contract Quantity. If the Settlement Rate is greater than the Contract Rate, the Seller shall pay the Buyer the Settlement Sum. If the Settlement Rate is less than the Contract Rate, the Buyer shall pay the Seller the Settlement Sum.

## 9. Payment Procedure and Obligations

(a) Payment of the Settlement Sum is due on the later of two (2) London business days after presentation of payee's invoice (with complete payment instructions) or (5) London business days after the Settlement Date and for this purpose a "London business day" means a day (other than Saturday or Sunday) on which commercial banks are open for business in London). The Settlement Sum will be deemed "paid" when it has been received into the bank account designated by the payee.

(b) Payment of the Settlement Sum shall be made telegraphically, in full, in United States dollars. The cost incurred in effecting payment shall be for the account of the payer. Payment may only be affected directly between parties. The Settlement Sum shall be paid without any deduction or set off unless agreed by the Buyer and Seller in writing.

## 10. ISDA Master Agreement
This Agreement incorporates by reference the 1992 ISDA Master Agreement (Multicurrency - Cross Border) (without Schedule) as if it were fully set out in this Agreement and with only the following specific modifications and elections:

(a) Section 2(c)(ii) shall not apply so that a net amount due will be determined in respect of all amounts payable on the same date in the same currency in respect of two or more Transactions;

(b) Seller is the Calculation Agent;

(c) The most current published set of ISDA ® Commodity Definitions and ISDA Definitions shall apply;

(d) Credit Event Upon Merger is applicable to both parties;

(e) For the purposes of payments on Early Termination, Loss will apply and the Second Method will apply:

Trade Ref    517710

ICAPHYDE LTD, has arranged the above trade for you as name-passing or introducing broker. ICAPHYDE LTD is not responsible for documentation of the transaction between the parties, nor are we, or have we been, responsible for the provision of advice to any person in connection with the above trade. We are also not responsible for the exercise of any options. Please notify us immediately if you disagree with any

(f)  The Termination Currency is United States dollars;

(g)  The Applicable Rate shall mean the one month USD-LIBOR plus 2%, reset daily and compounded monthly ; and

(h)  Local Business Day or banking day shall each refer to such a day in London,

(such form, as modified, the "Standard Agreement" and this Agreement, including the incorporated Standard Agreement, shall govern the transaction referred to in and constituted by this Agreement except as expressly modified by this Agreement.

## 11. Capacity and Good Standing

In addition to the representations contained in Section 3 of the Standard Agreement, each party warrants that:

(a)  It is duly organized and validly exists under the jurisdiction of its organization or incorporation, and is solvent and in good standing;

(b)  It has the power to execute, deliver and perform this Agreement;

(c)  All governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(d)  In the event that either party to this Agreement is a person organized under, domiciled in, or having principle place of business in, the United States, each party represents to the other party that it is an "eligible contract participant" as defined in paragraph 1a(12) of the Commodity Exchange Act (7 U.S.C. paragraph 1a(12), as amended).

## 12. Telephone Recording

Each party consents to the recording of telephone conversations in connection with this Agreement.

## 13. Commission

Each of the parties agrees to pay brokers' commission to any broker (a "Broker") as agreed with any Broker.

## 14. Non-Assignability

Except as provided in Section 7 of the Standard Agreement, this Agreement is non-assignable unless otherwise agreed in writing between the parties to this Agreement.

## 15. Principal To Principal

This is a principal to principal contract with settlement directly between the two parties. Both parties agree that any Broker shall be under no obligation or liability in relation to this Agreement. Both parties agree jointly and severally to indemnify and hold harmless any Broker against all actions, including but not limited to all claims, demands, liabilities, damages, costs and expenses both from the two parties and any third party. Claims, demands, liabilities, damages,

Trade Ref   517710

ICAPHYDE LTD, has arranged the above trade for you as name-passing or introducing broker. ICAPHYDE LTD is not responsible for documentation of the transaction between the parties, nor are we, or have we been, responsible for the provision of advice to any person in connection with the above trade. We are also not responsible for the exercise of any options. Please notify us immediately if you disagree with any

costs and expenses suffered or incurred are to be settled directly by or between the two parties.

## 16. Law and Jurisdiction

Pursuant to Section 13(b) of the Standard Agreement, this Agreement shall be governed by and construed in accordance with English law and subject to the non-exclusive jurisdiction of the High Court of Justice in London, England. The terms of Section 12(a) of the Standard Agreement notwithstanding, proceedings may be validly served upon either party by sending the same by ordinary post and/or by fax to the addresses and/or fax numbers for each party given above.

## 17. Entire Agreement

This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

## 18. Payment Account Information

For Seller:                                        For Buyer:
Bank Address:                                      Bank Address:


Swift Address:                                     Swift Address:
Account No:                                        Account No:
Sort Code:                                         Sort Code:
Beneficiary:                                       Beneficiary:

## 19. Third party rights

(a) Unless provided to the contrary in this Agreement, a person who is not a party to this Agreement has no rights under the contract (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Agreement.

(b) Any Indemnified Person and any Broker shall have the right to enjoy the benefit of and enforce the terms of clause 7(d) in the case of any Indemnified Person and clause 13 in case of any Broker.

(c) Notwithstanding any term of this Agreement, the consent of any person who is not a party to this Agreement is not required to rescind or vary this Agreement.

## 20. Inclusion of historical FFAs under Master Agreement

(a) Unless the parties to this Agreement specifically agree otherwise in writing, this clause 20 shall apply in accordance with its terms.

**Trade Ref** 517710

2 BROADGATE, LONDON EC2M 7UR. TEL: +44(0)20 7532 4934  FAX: +44(0)20 7000 5942

ICAPHYDE LTD, has arranged the above trade for you as name-passing or introducing broker. ICAPHYDE LTD is not responsible for documentation of the transaction between the parties, nor are we, or have we been, responsible for the provision of advice to any person in connection with the above trade. We are also not responsible for the exercise of any options. Please notify us immediately if you disagree with any

(b) This clause 20 applies to this Agreement and every other agreement entered into between parties to this Agreement (and no other persons) before the date of this Agreement:

(i) that expressly stated to be subject to, or is subject to substantially the same terms as, either the FFABA 2000 terms or the FFABA 2005 terms, (excluding for the avoidance of doubt terms as to the Contract Route(s), Contract Rate, Contract Quantity, Contract Month(s), Contract Period and Settlement Date), with or without amendment; and

(ii) that does not incorporate a clause substantially in the same form as this clause 20.


(c) Each agreement to which this clause 20 applies shall be treated as a confirmation (each a "Confirmation") under a master agreement (the "Master Agreement") constituted by the Standard Agreement as modified by, and in the form as incorporated in, the Agreement pursuant to clause 10 as if such an agreement has been entered into between parties on the terms of the Master Agreement on the date of the first such Confirmation.

(d) If there is any inconsistency between the provisions of any agreement constituted pursuant to paragraph (c) above and the agreement constituting a transaction to which this clause 20 applies, the provisions of the agreement constituting the transaction to which this clause 20 applies will prevail for the purposes of the transaction under such agreement.

(e) This clause 20 shall not affect the rights or obligations of the parties under any transaction accrued before the date of this Agreement.

(f) This clause 20 is effective notwithstanding any entire agreement clause or similar provision in any such agreement relevant to any such transaction.


## 21. Inclusion of subsequent FFAs under Master Agreement

(a) Unless the parties to this Agreement specifically agree otherwise in writing, this clause 21 shall apply in accordance with its terms.

(b) This clause 21 applies to every agreement entered into between the parties to this Agreement (and no other persons) after an agreement incorporating a Master Agreement (as defined in and pursuant to a clause substantially in the same form as and equivalent to clause 20) has been entered into by them.

(c) This Agreement shall constitute a Confirmation under the Master Agreement on the terms of clauses 20 (a), (d), (e) and (f) as if they were incorporated and fully set out in this clause 21 with appropriate and necessary modifications for such incorporation.


Trade Ref    517710

2 BROADGATE, LONDON EC2M 7UR. TEL: +44(0)20 7532 4934  FAX: +44(0)20 7000 5942

ICAPHYDE LTD, has arranged the above trade for you as name-passing or introducing broker. ICAPHYDE LTD is not responsible for documentation of the transaction between the parties, nor are we, or have we been, responsible for the provision of advice to any person in connection with the above trade. We are also not responsible for the exercise of any options. Please notify us immediately if you disagree with any of the trade details above. ICAPHYDE LTD is regulated by FSA

Signed for the Buyer by
[printed name]

Duly authorised signatory

Date ......................

[Company Seal or Stamp]


**Trade Ref**    517710

Signed for the Seller by
[printed name]

Duly authorised signatory

Date ......................

[Company Seal or Stamp]

**2 BROADGATE, LONDON EC2M 7UR. TEL: +44(0)20 7532 4934  FAX: +44(0)20 7000 5942**

ICAPHYDE LTD, has arranged the above trade for you as name-passing or introducing broker. ICAPHYDE LTD is not responsible for documentation of the transaction between the parties, nor are we, or have we been, responsible for the provision of advice to any person in connection with the above trade. We are also not responsible for the exercise of any options  Please notify us immediately if you disagree with any



# IFCHOR S.A.

SHIPBROKERS & CHARTERING AGENTS

SECURITIES & FFA DIVISION
PLACE PÉPINET 1 - CH-1003 LAUSANNE, SWITZERLAND
TEL. +41 21 310 3131 - TELEX 450351 IFC CH
FAX +41 21 310 3100 - e-mail: securities@ifchor.ch



# FORWARD FREIGHT SWAP AGREEMENT (DRY)

**Trade Ref:**            **7.1022.6.NkEa.CT/Ifchor**
**Contract Date:**        **Monday, January 22, 2007**

The purpose of this confirmation is to state the terms and conditions of the forward freight swap agreement entered into between:

**Seller**
**Source Link Shipping Co. Ltd., BVI**
15 D, Deji Manson no 188
Changjiang Road
Nanjing 210018
China, People's Republic Of
Tel N. +8625 8681 6500
Fax N. + 8625 8681 6522
Email. chartering@sourcelink.cn
P.I.C. Tony Tao

        and

**Buyer**
**Setsea SpA Societa Unipersonale, Torre del Greco**
Via G. Marconi 58
80059 Torre del Greco – Italy
Tel N. + 39 081 881 78 29
Fax N. + 39 081 882 90 04
Email. info@setsea.com
P.I.C. Michele Martucci

This agreement between the parties as constituted by this confirmation is referred to as the **"Agreement"**.

Until superseded by notice information in a subsequent confirmation or other communication, the above addresses are hereby recognized as the correct addresses to which any notification under this Agreement may be properly served.

The terms of this Agreement are as follows:

**1)    Contract Route(s):**

As per the arithmetical average of the **Routes 8, 9, 10 and 11** of the **Baltic Capesize Index** as defined on the Contract Date including any relevant official forthcoming amendments published at the Contract Date which will become effective prior to the settlement of this Agreement.

2)  **Contract Rate:**        USD. 59'500.00 per day

3)  **Contract Quantity:**   **91** days (see below)

4)  **Contract Months:**     **April 2007 (30 days)**
                             **May 2007 (31 days)**
                             **June 2007 (30 days)**

5)  **Contract Period:**     **April 2007 to June 2007**

6)  **Settlement Date:**

The last Baltic Exchange Index publication day of each Contract Month.

7)  **Settlement Rate:**

(a)  The Settlement Rate shall be the average of the rates for the Contract Routes published by the Baltic Exchange over each Settlement Period defined as all Baltic Exchange Index publication days of the Contract Months up to and including each Settlement Date.

(b)  If for any reason the Baltic Exchange cannot provide any rate required for establishing the Settlement Rate, then the current chairman of the FFABA may be instructed by either party to form a panel comprising of a minimum of three independent brokers (the **"Panel"**) to determine an appropriate rate, which determination will be final and binding on both parties.

(c)  Each party shall bear its own costs and expenses in connection with any determination made pursuant to this clause 7.

(d)  The parties shall severally indemnify and hold harmless each of the members of the Panel, the Baltic Exchange and its members and the FFABA and its members (the **"Indemnified Persons"**) against all liabilities, actions, demands, costs and expenses incurred by any of them arising directly or indirectly out of or in connection with the formation of the Panel and any determination made by the Panel.

(e)  As between the parties, each party shall have a right of contribution against the other party in respect of any indemnity payment made pursuant to the preceding paragraph so that their respective liabilities pursuant to that paragraph shall be equal.

8)  **Settlement Sum:**

The **"Settlement Sum"** is the difference between the Contract Rate and the Settlement Rate multiplied by the Contract Quantity. If the Settlement Rate is greater than the Contract Rate, the Seller shall pay the Buyer the Settlement Sum. If the Settlement Rate is less than the Contract Rate, the Buyer shall pay the Seller the Settlement Sum.

*15*

9) **Payment Procedure and Obligations:**

    (a)    Payment of the Settlement Sum is due on the later of two (2) London business days after presentation of payee's invoice (with complete payment instructions) or five (5) London business days after the Settlement Date and for this purpose a **"London business day"** means a day (other than a Saturday or Sunday) on which commercial banks are open for business in London) . The Settlement Sum will be deemed "paid" when it has been received into the bank account designated by the payee.

    (b)    Payment of the Settlement Sum shall be made telegraphically, in full, in United States dollars.  The costs incurred in effecting payment shall be for the account of the payer.  Payment may only be effected directly between the parties.  The Settlement Sum shall be paid without any deduction or set off unless agreed by the Buyer and the Seller in writing.

10) **ISDA Master Agreement:**

This Agreement incorporates by reference the 1992 ISDA® Master Agreement (Multicurrency – Cross Border) (without Schedule) as if it were fully set out in this Agreement and with only the following specific modifications and elections:

    (a)    Section 2(c)(ii) shall not apply so that a net amount due will be determined in respect of all amounts payable on the same date in the same currency in respect of two or more Transactions;

    (b)    Seller is the Calculation Agent;

    (c)    the most current published set of ISDA® Commodity Definitions and ISDA® Definitions shall apply;

    (d)    Credit Event Upon Merger is applicable to both parties;

    (e)    for the purposes of payments on Early Termination, Loss will apply and the Second Method will apply;

    (f)    the Termination Currency is United States dollars;

    (g)    the Applicable Rate shall mean the one month USD-LIBOR plus 2%, reset daily and compounded monthly; and

    (h)    Local Business Day or banking day shall each refer to such a day in London,

(such form, as modified, the **"Standard Agreement"**) and this Agreement, including the incorporated Standard Agreement, shall govern the transaction referred to in and constituted by this Agreement except as expressly modified by this Agreement.

11) **Capacity and Good Standing:**

In addition to the representations contained in Section 3 of the Standard Agreement, each party warrants that:

    (a)    it is duly organized and validly existing under the jurisdiction of its organization or incorporation, and is solvent and in good standing;

    (b)    it has the power to execute, deliver, and perform this Agreement;

    (c)    all governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(d) in the event that a party to this Agreement is a person organized under, domiciled in, or having its principal place of business in, the United States, each party represents to the other party that it is an "eligible contract participant" as defined in § 1a(12) of the Commodity Exchange Act (7 U.S.C. § 1a(12), as amended).

**12) Telephone Recording:**

Each party consents to the recording of telephone conversations in connection with this Agreement.

**13) Commission:**

Each of the parties agrees to pay brokers' commission to any broker as agreed with any Broker.

**14) Non-Assignability:**

Except as provided in Section 7 of the Standard Agreement, this Agreement is non-assignable unless otherwise agreed in writing between the parties to this Agreement.

**15) Principal To Principal:**

This is a principal to principal agreement with settlement directly between the two parties. Both parties agree that Ifchor S.A. shall be under no obligation or liability in relation to this Agreement. Both parties agree jointly and severally to indemnify and hold harmless Ifchor S.A. against all actions, including but not limited to all claims, demands, liabilities, damages, costs and expenses both from the two parties and any third party. Claims, demands, liabilities, damages, costs and expenses suffered or incurred are to be settled directly by or between the two parties.

**16) Law and Jurisdiction:**

Pursuant to Section 13(b) of the Standard Agreement, this Agreement shall be governed by and construed in accordance with English law and shall be subject to the exclusive jurisdiction of the High Court of Justice in London, England. The terms of Section 12(a) of the Standard Agreement notwithstanding, proceedings may be validly served upon either party by sending the same by ordinary post and/or by fax to the addresses and/or fax numbers for each party given above.

**17) Entire Agreement:**

This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.



18) **Payment Account Information:**

**For Seller:**
Bank address:

Standard Chartered Bank, Shenzhen Branch
Account : Source Link Shipping Co., Ltd.
Swift : SCBLCNSXSHZ
A/C NO : 3703950411

**For Buyer:**
Bank address:

BANCA POPOLARE DELL'ETRURIA E DEL LAZIO
IBAN : IT06 W053 9001 6000 0007 8000 060
Codice Bic / Swift filiale : ARBAIT33137
Beneficiary : SETSEA SRL

19) **Third party rights**

(a)    Unless provided to the contrary in this Agreement, a person who is not a party to this Agreement has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Agreement.

(b)    Any Indemnified Person and any Broker shall have the right to enjoy the benefit of and enforce the terms of clause 7(d) in the case of any Indemnified Person and clause 13 in the case of any Broker.

(c)    Notwithstanding any term of this Agreement, the consent of any person who is not a party to this Agreement is not required to rescind or vary this Agreement.

20) **Inclusion of historical FFAs under Master Agreement**

(a)    **Unless the parties to this Agreement specifically agree otherwise in writing, this clause 20 shall apply in accordance with its terms.**

(b)    This clause 20 applies to this Agreement and to every agreement entered into between the parties to this Agreement (and no other persons) before the date of this Agreement:

    (i)    that is expressly stated to be subject to, or is subject to substantially the same terms as, either the FFABA 2000 terms or the FFABA 2005 terms, (excluding for the avoidance of doubt terms as to the Contract Route(s), Contract Rate, Contract Quantity, Contract Month(s), Contract Period and Settlement Date), with or without amendment; and

    (ii)    that does not incorporate a clause substantially in the same form as this clause 20.

(c)    Each agreement to which this clause 20 applies shall be treated as a confirmation (each a "**Confirmation**") under a master agreement (the "**Master Agreement**") constituted by the Standard Agreement as modified by, and in the form as incorporated in, this Agreement pursuant to clause 10 as if such agreement had been entered into between the parties on the terms of the Master Agreement on the date of the first such Confirmation.

(d)    If there is any inconsistency between the provisions of any agreement constituted pursuant to paragraph (c) above and the agreement constituting a transaction to which this clause 20 applies, the provisions of the agreement constituting the transaction to which this clause 20 applies will prevail for the purposes of the transaction under such agreement.

(e)    This clause 20 shall not affect any rights or obligations of the parties under any transaction accrued before the date of this Agreement.



(f)    This clause 20 is effective notwithstanding any entire agreement clause or similar provision in any such agreement relevant to any such transaction.

21)    **Inclusion of subsequent FFAs under Master Agreement**

(a)    **Unless the parties to this Agreement specifically agree otherwise in writing, this clause 21 shall apply in accordance with its terms.**

(b)    This clause 21 applies to every agreement entered into between the parties to this Agreement (and no other persons) after an agreement incorporating a Master Agreement (as defined in and pursuant to a clause substantially in the same form as and equivalent to clause 20) has been entered into by them.

(c)    This Agreement shall constitute a Confirmation under the Master Agreement on the terms of clauses 20 (c), (d), (e) and (f) as if they were incorporated and fully set out in this clause 21 with appropriate and necessary modifications for such incorporation.


**Signed for the Seller by**                    **Signed for the Buyer by**


............................................    ............................................
**Duly Authorized Signatory**                    **Duly Authorized Signatory**

---

Note:    ISDA is a registered trademark of the International Swaps and Derivatives Association, Inc.

**19**

UNITED STATES DISTRICT COURT    ORIGINAL
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

SETSEA SPA,                                    07 CV _____

                           Plaintiff,          ECF CASE

        - against -                            **EX PARTE ORDER FOR**
                                               **PROCESS OF MARITIME**
SOURCE LINK SHIPPING CO. LTD.,                 **ATTACHMENT**

                           Defendant.

-------------------------------------------------------------------X

**07 CIV 6230**

**WHEREAS**, on July 5, 2007 Plaintiff, SETSEA SPA, filed a Verified Complaint herein

for damages amounting to **$2,136,304.65** inclusive of interest, costs and reasonable attorney's

fees, and praying for the issuance of Process of Maritime Attachment and Garnishment pursuant

to Rule B of the Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims of

the Federal Rules and Civil Procedure; and

        **WHEREAS**, the Process of Maritime Attachment and Garnishment would command that

the United States Marshal or other designated process server attach any and all of the

Defendants' property within the District of this Court; and

        **WHEREAS**, the Court has reviewed the Verified Complaint and the Supporting

Affidavit, and the conditions of Supplemental Admiralty Rule B appearing to exist, it is hereby

        **ORDERED**, that Process of Maritime Attachment and Garnishment shall issue against all

tangible or intangible property belonging to, claimed by or being held for the Defendants by any

garnishees within this District, including but not limited to, ABN Amro, American Express Bank,

Bank of America, Bank of New York, Citibank, Deutsche Bank, HSBC (USA) Bank, JP Morgan

Chase, Standard Chartered Bank, and/or Wachovia Bank, in an amount up to and including

**$2,136,304.65**, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime

Claims of the Federal Rules of Civil Procedure; and it is further

**ORDERED** that any person claiming an interest in the property attached or garnished pursuant to said order shall, upon application to the Court, be entitled to a prompt hearing at which the Plaintiff shall be required to show cause why the attachment and garnishment should not be vacated or other relief granted; and it is further

**ORDERED** that supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further Order of the Court; and it is further

**ORDERED** that following initial service by the United States Marshal or other designated process server upon each garnishee, that supplemental service of the Process of Maritime Attachment and Garnishment, as well as this Order, may be made by way of facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee; and it is further

**ORDERED** that service on any garnishee as described above is deemed effective continuous service throughout the day from the time of such service through the opening of the garnishee's business the next business day; and it is further

**ORDERED** that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) each garnishee may consent, in writing, to accept service by any other means; and it is further

**ORDERED** that a copy of this Order be attached to and served with said Process of Maritime Attachment and Garnishment.

Dated: July **5**, 2007

<div align="center">

**SO ORDERED:**

*Deborah A. Batts*

**U. S. D. J.**

2

</div>

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

TIDE LINE, INC.,

              Plaintiff,

                                06 CV 1979 (KMW)
                                 ORDER

      -against-

EASTRADE COMMODITIES, INC., and
TRANSCLEAR, S.A.,

              Defendants.
------------------------------------x

WOOD, U.S.D.J.:

I. Overview

     Defendant Transclear, S.A. ("Transclear") moves to vacate this Court's March 14, 2006, Ex Parte Order for Process of Maritime Attachment, as to Transclear only. For the reasons given below, the Court grants Defendant Transclear, S.A.'s motion to vacate this Court's March 14, 2006, Ex Parte Order for Process of Maritime Attachment, as to Transclear only, grants Tide Line's request for leave to file an Amended Verified Complaint with a new request for an Attachment Order so long as no objections are filed by August 23, 2006, directs that Tide Line file the Amended Verified Complaint with a new request for an Attachment Order by August 25, 2006, and stays the release of the attached funds pending the issuance of a new Attachment Order in connection with the Amended Verified Complaint and the serving of a new writ of

1

attachment on the bank, so long as the writ of attachment is served by August 30, 2006.[1]

## II. Background

On March 14, 2006, Tide Line Inc. ("Tide Line") filed a Verified Complaint (the "Complaint"), against Eastrade Commodities Inc. ("Eastrade Inc.") and Transclear, seeking an ex parte order for process of maritime attachment and garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Supplemental Rule B") and to the Federal Arbitration Act (originally the United States Arbitration Act), 9 U.S.C. §§ 1 and 8. The Complaint alleges that: 1) Tide Line, "a foreign company duly organized and operating under the laws of Greece," Compl. ¶ 2, chartered a vessel it owns, the M/V "Levantes A" (the "Vessel"), to Eastrade Inc., which is, upon information and belief, "a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law, with principal place of business in Panama," Compl. ¶ 5; 2) disputes arose during the course of the charter party contract; 3)

---

[1] Transclear has also filed an Answer and Counterclaims against Tide Line Inc. ("Tide Line"), seeking damages for the attachment; Tide Line has moved to dismiss those counterclaims. Transclear's counterclaims and Tide Line's motion to dismiss those counterclaims will be addressed in a separate order.

Eastrade Inc. breached the contract, resulting in damages to Tide
Line for a total sum of $193,198.15; and 4) Tide Line was
therefore preparing to initiate arbitration proceedings against
Eastrade Inc. (but not Transclear) in London, and expected to
recover a total sum of $292,636.28 (including the principal
claim, interest, attorneys' fees and costs, and arbitration
costs). The Complaint also alleges, upon information and belief,
that Transclear "was, and still is, a foreign corporation, or
other business entity, organized under, and existing by virtue of
foreign law, with principal place of business in Nyon,
Switzerland," Compl. ¶ 4, and that: "Upon information and belief,
Defendant Transclear acts as paying agent, or arranges for other
non-parties to satisfy the debts and obligations of Defendant
Eastrade," Compl. ¶ 13. This is the only allegation in the
Complaint as to Transclear's alleged involvement in the matter.
Finally, the Complaint alleges that defendants Eastrade Inc. and
Transclear cannot be found within this District within the
meaning of Supplemental Rule B but have assets within the
district.

On March 14, 2006, based on the Verified Complaint, and the
Affidavit in Support of Prayer for Maritime Attachment of Thomas
L. Tisdale, Tide Line's counsel ("Tisdale Aff."), and pursuant to
Supplemental Rule B, the Court granted Tide Line an <u>Ex Parte</u>

<div style="text-align: center">3</div>

Order for Process of Maritime Attachment ("Ex Parte Attachment Order") against the defendants, for the amount of damages stated in the Verified Complaint. On March 22, 2006, Tide Line, pursuant to the Ex Parte Attachment Order, attached the sum of $270,000, belonging to Transclear, at Citibank. See Letter from Thomas L. Tisdale to Transclear S.A. (Mar. 22, 2006), attached as Ex. A to Affidavit of Service, which is attached as Ex. 1 to Tide Line's Proof of Service, dated May 11, 2006. An exchange of correspondence between counsel for Tide Line and Transclear followed; ultimately, Tide Line did not release the attachment.

On June 22, 2006, Transclear moved to vacate the Ex Parte Attachment Order as to Transclear. Judge William H. Pauley III, sitting in Part I, signed an Order to Show Cause, ordering Tide Line to show cause why an order should not be issued, pursuant to Rules B and E of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, vacating this Court's March 14, 2006, Ex Parte Attachment Order as to Transclear, and setting an inquest for assessment of damages against Tide Line for attaching and failing to voluntarily release funds belonging to Transclear.[2] A hearing as to

---

[2] In addition to moving to have the Ex Parte Attachment Order vacated as to it, Transclear filed an Answer and Counterclaims (for "wrongful attachment and abuse of process related to the attachment" and "wrongful attachment and abuse of process related to Plaintiff's refusal to release the funds that are the subject

Transclear's motion to vacate was held on July 14, 2006.[3]

## III. Discussion

### A. Legal Standard

Supplemental Rule B provides, in relevant part:

> If a defendant is not found within the
> district . . . ., a verified complaint may
> contain a prayer for process to attach the
> defendant's tangible or intangible personal
> property -- up to the amount sued for -- in
> the hands of garnishees named in the process.
> The plaintiff or the plaintiff's attorney
> must sign and file with the complaint an

---

of the attachment"), seeking damages against Tide Line, and
requesting that Tide Line post counter-security in the amount of
$2 million, pursuant to Rule E(7)(a) of the Supplemental Rules
for Certain Admiralty and Maritime Claims of the Federal Rules of
Civil Procedure. See Defendant Transclear, S.A.'s Answer and
Counterclaims ("Answer and Countercl."). Tide Line has filed
Cross-Motion to Dismiss Counterclaims. Transclear's
counterclaims, and Tide Line's motion to dismiss them, will be
addressed in a separate order.

[3] Under Rule E(4)(f) of the Supplemental Rules for Certain
Admiralty and Maritime Claims ("Supplemental Rule E(4)(f)"),
"[w]henever property is arrested or attached, any person claiming
an interest in it shall be entitled to a prompt hearing at which
the plaintiff shall be required to show why the arrest or
attachment should not be vacated or other relief granted
consistent with these rules." According to this Court's Local
Rules, "[t]he adversary hearing following arrest or attachment or
garnishment that is called for in Supplemental Rule E(4)(f) shall
be conducted by a judicial officer within three court days,
unless otherwise ordered." Local Admiralty Rule E.1. In this
case, Judge William H. Pauley III, sitting in Part I, signed the
Order to Show Cause, setting the date of the hearing for July 11,
2006. As explained in this Court's Order dated July 11, 2006,
the Court adjourned the hearing for further submissions to be
made.

> affidavit stating that, to the affiant's
> knowledge, or on information and belief, the
> defendant cannot be found within the
> district.  The court must review the
> complaint and affidavit and, if the
> conditions of this Rule B appear to exist,
> enter an order so stating and authorizing
> process of attachment and garnishment.  The
> clerk may issue supplemental process
> enforcing the court"s order upon application
> without further court order.

Fed. R. Civ. P. Supp. Rule B(1).  As recently summarized by the

Court of Appeals for the Second Circuit:

> To begin the process, a plaintiff must file a
> verified complaint praying for an attachment
> and an affidavit stating that, to the best of
> the plaintiff's knowledge, the defendant
> cannot be found within the judicial district.
> [Fed.R.Civ.P. Supp. Rule B(1).]  If the
> plaintiff's filings comply with these
> conditions, the court must enter an order
> authorizing the attachment, which the
> plaintiff may then serve on any persons in
> possession of the defendant's property
> located within the district.  The order of
> attachment may be requested and granted <u>ex</u>
> <u>parte</u>, though notice of the attachment to the
> defendant via appropriate service is
> required.  <u>Id.</u> Supp. Rules B(2), E(3).

<u>Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.</u>, No. 05 Civ.

5385, 2006 WL 2129336, at *3, 2006 U.S. App. LEXIS 19302, at *8-

*9 (2d Cir. July 31, 2006).  <u>See also</u> Fed. R. Civ. P. Supp. R. B

advisory committee's note to 1985 Amendment ("[Supplemental Rule

B(1)] envisions that the order will issue when the plaintiff

makes a prima facie showing that he has a maritime claim against

the defendant in the amount sued for and the defendant is not

6

present in the district."). "The power to grant attachments in admiralty is an inherent component of the admiralty jurisdiction given to the federal courts under Article III of the Constitution," and its "historical purpose has been two-fold: first, to gain jurisdiction over an absent defendant; and second, to assure satisfaction of a judgment." Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *2, 2006 U.S. App. LEXIS 19302, at *6-*7. Accord Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 268 (2d Cir. 2002).

Furthermore, "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Supplemental Rule E(4)(f)"). The Court of Appeals for the Second Circuit has recently, for the first time,[4] spoken "directly on the showing necessary to vacate a maritime attachment under Rule E," Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *4, 2006 U.S. App. LEXIS

---

[4] Because the Court of Appeals' Aqua Stoli decision was issued on July 31, 2006, and this Court asked the parties for some further short letter briefs on a specific point in light of Aqua Stoli, this Court's issuance of an order in this action was accordingly delayed.

7

19302, at *12 – holding that "once a plaintiff has carried his
burden to show that his attachment satisfies the requirements of
Supplemental Rule B, a district court may vacate an attachment
only upon [certain] circumstances," which "can occur where 1) the
defendant is present in a convenient adjacent jurisdiction; 2)
the defendant is present in the district where the plaintiff is
located; or 3) the plaintiff has already obtained sufficient
security for a judgment," id., 2006 WL 2129336, at *1, 2006 U.S.
App. LEXIS 19302, at *2-*3.[5]  The Court of Appeals stated, at
greater length:

> We therefore hold that, in addition to having
> to meet the filing and service requirements
> of Rules B and E, an attachment should issue
> if the plaintiff shows that 1) it has a valid
> prima facie admiralty claim against the
> defendant; 2) the defendant cannot be found
> within the district; 3) the defendant's
> property may be found within the district;
> and 4) there is no statutory or maritime law
> bar to the attachment.  Conversely, a
> district court must vacate an attachment if
> the plaintiff fails to sustain his burden of
> showing that he has satisfied the
> requirements of Rules B and E.  We also
> believe vacatur is appropriate in other
> limited circumstances.  While, as we have

_____

[5] "Rule E(4)(f) clearly places the burden on the plaintiff to
show that an attachment was properly ordered and complied with
the requirements of Rules B and E." Aqua Stoli Shipping Ltd.,
2006 WL 2129336, at *11 n.5, 2006 U.S. App. LEXIS 19302, at *30
n.5.  However, the Court of Appeals believes that, under these
Supplemental Rules, defendant bears the burden of "establish[ing]
any equitable grounds for vacatur." Id.

> noted, the exact scope of a district court's
> vacatur power is not before us, we believe
> that a district court may vacate the
> attachment if the defendant shows at the Rule
> E hearing that 1) the defendant is subject to
> suit in a convenient adjacent jurisdiction;
> 2) the plaintiff could obtain in personam
> jurisdiction over the defendant in the
> district where the plaintiff is located; or
> 3) the plaintiff has already obtained
> sufficient security for the potential
> judgment, by attachment or otherwise.

Id., 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28-

*29 (footnotes omitted).  The Court emphasized that "Rule B

specifies the sum total of what must be shown for a valid

maritime attachment."  Id., 2006 WL 2129336, at *11, 2006 U.S.

App. LEXIS 19302, at *35.

In so holding, the Court of Appeals "reject[ed] the

reasoning of the more recent district court decisions that have

engaged in a broader Rule E(4)(f) inquiry," id., 2006 WL 2129336,

at *10, 2006 U.S. App. LEXIS 19302, at *30 -- including those

that adopted "a needs test, requiring the plaintiff to show that,

even if the defendant cannot be found within the district, the

attachment is necessary to obtain jurisdiction over a defendant

or to secure a potential judgment," id., 2006 WL 2129336, at *10

& n.8, 2006 U.S. App. LEXIS 19302, at *32 & n.8 (citing Ullises

Shipping Corp. v. FAL Shipping Co., 415 F. Supp. 2d 318 (S.D.N.Y.

2006); T & O Shipping, Ltd. v. Lydia Mar Shipping Co., 415 F.

Supp. 2d 310 (S.D.N.Y. 2006); Erne Shipping Inc. v. HBC Hamburg

Bulk Carriers GmbH & Co., 409 F. Supp. 2d 427 (S.D.N.Y. 2006);

Seaplus Line Co. Ltd. v. Bulkhandling Handymax, 409 F. Supp. 2d

316, 319-20 (S.D.N.Y. 2005); Allied Mar., Inc. v. Rice Corp., No.

04 Civ. 7029, 2004 WL 2284389, 2004 U.S. Dist. LEXIS 20353

(S.D.N.Y. Oct. 12, 2004)).[6]  The Court "also reject[ed] the

approach taken by the district court in Royal Swan Navigation Co.

v. Global Container Lines, Ltd., 868 F. Supp. 599 (S.D.N.Y.

1994)," which "would impose a fact-intensive inquiry into the

substantiality and nature of a defendant's presence in an

adjacent district before deciding whether an attachment should be

vacated."  Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *11,

2006 U.S. App. LEXIS 19302, at *34-*35.

   The Court of Appeals' holding and rationale in Aqua Stoli

Shipping Ltd. also strongly undermine the standard, stated in a

number of cases, that the hearing pursuant to Supplemental Rule

E(4)(f) is intended to "'make a preliminary determination whether

there were reasonable grounds for issuing the warrant,'" Ullises

---

[6] In vacating the judgment of the district court below, the Court
of Appeals also rejected what it characterized as the "needs-
plus-balancing test," Aqua Stoli Shipping Ltd., 2006 WL 2129336,
at *4, 2006 U.S. App. LEXIS 19302, at *10, adopted by the
district court, under which, even if the plaintiff meets its
burden of showing a need for the attachment, a court may vacate
the attachment if the defendant shows that "the hardship the
attachment order imposes on it or others substantially outweighs
any benefit to the plaintiff," Aqua Stoli Shipping Ltd. v.
Gardner Smith Pty Ltd., 384 F. Supp. 2d 726, 729 (S.D.N.Y. 2005).

10

Shipping Corp., 415 F. Supp. 2d at 322 & n.37 (quoting Salazar v.
Atlantic Sun, 881 F.2d 73, 79-80 (3d Cir. 1989)), or the
attachment, see Ullises Shipping Corp., 415 F. Supp. 2d at 323
n.37 (noting that "[t]he standard applies to post-attachment
cases as well as post-arrest cases").  "This standard has been
defined as 'probable cause' or 'reasonable grounds.'"  Id. at 323
n.37 (quoting Linea Navira De Cabotaje, C.A. v. Mar Caribe De
Navegacion, C.A., 169 F. Supp. 2d 1341, 1359 (M.D. Fla. 2001)).
Under this standard, in order to justify the maintenance of an
attachment under Supplemental Rule E(4)(f), a plaintiff bears a
higher burden than that imposed by Supplemental Rule B: as a
decision adopting this standard states, "although a minimal prima
facie showing is sufficient to justify an attachment under Rule
B, under Rule E(4)(f), [plaintiff] has the burden of presenting
some evidence showing reasonable grounds for the attachment."
Id. at 325.  Although Aqua Stoli does not explicitly address this
"probable cause" or "reasonable grounds" standard, the decision's
emphasis that "Rule B specifies the sum total of what must be
shown for a valid maritime attachment," id., 2006 WL 2129336, at
*11, 2006 U.S. App. LEXIS 19302, at *35 -- including a "valid
prima facie admiralty claim against the defendant," id., 2006 WL
2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28 -- implies
that the "probable cause" or "reasonable grounds" standard is

improper insofar as it purports to go beyond this limited inquiry.

For a plaintiff to show that "it has a valid prima facie admiralty claim against the defendant," id., 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28, in the context of maritime attachment, it appears that a plaintiff need not provide anything beyond its Verified Complaint, pursuant to Supplemental Rules B and E.  A court relies only on a plaintiff's complaint to determine if the plaintiff has shown that it has such a claim against the defendant (and on a plaintiff's affidavit to determine whether it appears that the defendant cannot be found within the district).  See Fed. R. Civ. P. Supp. Rule B(1) ("The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment."); see also Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *3, 2006 U.S. App. LEXIS 19302, at *8-*9 ("a plaintiff must file a verified complaint praying for an attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district" and "[i]f the plaintiff's filings comply with these conditions, the court must enter an order authorizing the attachment").  Thus, to show that it has a prima facie claim, a plaintiff seeking a maritime

12

attachment need not provide any supporting evidence; its
complaint should suffice.[7]  Furthermore, Aqua Stoli implies that
a plaintiff is likewise not required to provide evidence showing
that it has a claim against defendant, to carry its burden under
Supplemental Rule E(4)(f).  See Aqua Stoli Shipping Ltd., 2006 WL
2129336, at *4, 2006 U.S. App. LEXIS 19302, at *12 (holding that
"once a plaintiff has carried his burden to show that his
attachment satisfies the requirements of Supplemental Rule B, a
district court may vacate an attachment only upon [certain]
circumstances," which are very limited, as discussed above).

    But the reverse issue is less clear: when a defendant seeks

---

[7] In this sense, the use of the phrase "prima facie claim," in
the maritime attachment context, differs from the use of that
phrase in other contexts, where it implies an evidentiary
standard, see, e.g., Pittston Coal Group v. Sebben, 488 U.S. 105,
117 (1988); Zuckerbraun v. General Dynamics Corp., 935 F.2d 544,
547 (2d Cir. 1991) - particularly, the context of employment
discrimination claims, see Swierkiewicz v. Sorema N. A., 534 U.S.
506, 510 (2002) ("The prima facie case [of employment
discrimination] under McDonnell Douglas [Corp. v. Green, 411 U.S.
792 (1973)], however, is an evidentiary standard, not a pleading
requirement.") (The phrase "prima facie case" - which "not only
may denote the establishment of a legally mandatory, rebuttable
presumption, but also may be used by courts to describe the
plaintiff's burden of producing enough evidence to permit the
trier of fact to infer the fact at issue," Texas Dept. of
Community Affairs v. Burdine,  450 U.S. 248, 254 (1981) - is
sometimes used interchangeably with "prima facie claim." See,
e.g., Furnco Const. Corp. v. Waters, 438 U.S. 567, 575 (1978);
Guo v. U.S. Dept. of Justice, 422 F.3d 61, 64 (2d Cir. 2005);
Tsombanidis v. West Haven Fire Dept., 352 F.3d 565, 575 (2d Cir.
2003); Mitchell v. Washingtonville Cent. School Dist., 190 F.3d
1, 6 (2d Cir. 1999); Chere Amie, Inc. v. Windstar Apparel, Corp.,
191 F. Supp. 2d 343, 349 (S.D.N.Y. 2001).)

to have an attachment order vacated, may a plaintiff provide and rely on other submissions, beyond the complaint, to show that plaintiff indeed has a prima facie claim against the defendant, if the plaintiff's complaint is not sufficient in and of itself? One recent case suggests that a plaintiff may rely on other submissions to justify the maintenance of an attachment.  See Maersk, Inc. v. Neewra, Inc., No. 05 Civ. 4356, 2006 WL 2168452, at *10, 2006 U.S. Dist. LEXIS 53395, at *30 (S.D.N.Y. Aug. 1, 2006) (noting that "[t]he current motion to vacate [plaintiffs' maritime attachment], however, is not a motion to dismiss; it is a specialized maritime proceeding with the singular purpose of determining the ongoing propriety of a maritime attachment"; further stating that, "[a]ccordingly, the Court's review of whether reasonable grounds exist for the attachment is not limited to allegations in the Complaint"; and concluding that "[t]he totality of Plaintiffs' allegations, including those offered in their opposition briefs, their affidavits, and at the hearing, provide reasonable grounds to believe that [the movant] was intricately involved in events alleged in the Complaint, whether as [a named defendant] or other individuals identified therein").  That case adopts the "reasonable grounds" standard implicitly rejected by Aqua Stoli.  But, as discussed above, Aqua Stoli's implicit rejection of that standard is based on the

14

assumption that the standard places a higher burden on a

plaintiff, to show more than what is required by Supplemental

Rule B; it is not clear that Aqua Stoli implicitly rejects the

possibility that a plaintiff could reply on other submissions to

bolster its complaint.  At least one case, however, suggests that

an attachment must be vacated insofar as it pertains to a claim

not made in plaintiff's complaint.  See T & O Shipping, Ltd. v.

Lydia Mar Shipping Co. S.A., 415 F. Supp. 2d 310, 316-17

(S.D.N.Y. 2006) (vacating the attachment insofar as it pertained

to security for plaintiff's direct losses, because plaintiff made

no claim for direct damages in its complaint, even though

plaintiff claimed that the complaint sufficiently alleged direct

damages, and plaintiff also pointed to his opposition papers and

other submissions).  But this case also adopts an approach

explicitly rejected by Aqua Stoli, insofar as it focuses on the

need for security as a requirement to maintain the attachment;

furthermore, the claim it refers to is not the plaintiff's main

claim against the defendant but rather a specific claim for a

particular category of relief.  These cases, and what Aqua Stoli

appears to imply, suggest two possible approaches: first, if a

plaintiff's complaint does not, after all, state a prima facie

claim in and of itself, the maritime attachment must generally be

vacated, because the attachment order should not have been issued

15

under Supplemental Rule B, which focuses only on the complaint

(and a plaintiff's affidavit for the separate question of whether

the defendant cannot be found in the district); or, second,

insofar as the main concern is whether a plaintiff has a "valid

prima facie admiralty claim against the defendant," a court must

not vacate the attachment on the sole basis that the complaint

does not, in and of itself, sufficiently state a prima facie

claim, if plaintiff can show that it has such a claim based on a

combination of its complaint and any other allegations in other

submissions plaintiff provides at that point.  Rather than

attempting to set forth a general conclusion, the Court will

examine this issue further in the specific context of this case,

in the next section.

    Independently of whether a plaintiff may rely on allegations

in submissions other than the complaint, the Court believes that,

for the complaint to show a prima facie claim, the complaint must

comply with the relevant federal pleading requirements.  Tide

Line argues that "Rule E(4)(f) does not afford a defendant the

opportunity to challenge the sufficiency of the plaintiff's

pleadings."  Letter from Tide Line to the Court 1 (Aug. 4, 2006).

Tide Line, id. at 5, points to Maersk, Inc., 2006 WL 2168452, at

*10, 2006 U.S. Dist. LEXIS 53395, at *30 (noting the argument,

advanced by the movant seeking to vacate the attachment, "that

16

the Complaint does not sufficiently allege any claim against him,
much less a maritime claim . . . because it does not plead fraud
with particularity as required by Rule 9(b) of the Federal Rules
of Civil Procedure," but refusing to address this argument
because the movant filed a motion to vacate a maritime attachment
order and not a motion to dismiss, and therefore "the Court will
not consider such an argument lest Rule 12(b)(6) be completely
subsumed by Supplemental Rule E(4)(f)").  The Court recognizes
that a motion to vacate a maritime attachment is different from a
motion to dismiss a complaint.  But the Court of Appeals
recognized, in Aqua Stoli, that "[w]ithout doubt the Rule E(4)(f)
hearing provides defendants with an opportunity to argue that the
requirements of Rule B were not in fact met – for example, that
the defendant turned out to be 'found within the district.'"
Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *3, 2006 U.S. App.
LEXIS 19302, at *9.  Thus, in seeking to have an attachment
vacated, a defendant may argue that a plaintiff does not have a
"valid prima facie admiralty claim against the defendant."  For
the reasons discussed above, it does not appear that the basis of
defendant's argument may be that plaintiff has not provided
sufficient evidence of such a claim.  But it seems that defendant
may, under Supplemental Rule E(4)(f), argue that plaintiff's
pleadings are themselves insufficient to state such a claim;

17

otherwise, it is not clear how a defendant could argue that the "prima facie claim" requirement of Supplemental Rule B has not actually been met.

Generally, when an action is brought in federal court, a complaint must contain, _inter alia_, only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" _Swierkiewicz v. Sorema N. A._, 534 U.S. 506, 512 (2002) (quoting _Conley v. Gibson_, 355 U.S. 41, 47 (1957)). _See also_ _Pelman v. McDonald's Corp._, 396 F.3d 508, 511 (2d Cir. 2005) (referring to the "bare-bones notice-pleading requirements of Rule 8(a)"). "The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim." _Swierkiewicz_, 534 U.S. at 514. "Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions. Rule 9(b), for example, provides for greater particularity in all averments of fraud or mistake. [The Supreme] Court, however, has declined to extend such exceptions to other contexts." _Id._ at 513.

Rule E(2)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rule E(2)(a)"), however,

18

this case presents any of the limited circumstances under which
the Court of Appeals found, in <u>Aqua Stoli Shipping Ltd.</u>, that a
court could equitably vacate a maritime attachment.

### 1. Requirements Other than Prima Facie Claim

The main issue presented here is whether Tide Line has a
"prima facie admiralty claim" against Transclear.  Tide Line has
met the other requirements necessary for the maritime attachment
to be maintained: the defendant cannot be found within the
district; the defendant's property may be found within the
district; there is no statutory or maritime law bar to the
attachment.

The second factor - that Transclear cannot be found within
this district - is undisputed.  Letter from Transclear to the
Court 3 (Aug. 3, 2006).

As for the third factor - that Transclear's property may be
found within this district - it is shown by the very fact of the
attachment.  But Transclear argues that the Court of Appeals'
<u>Aqua Stoli</u> decision raises a "serious question as to whom
Electronic Funds Transfers ("EFTs") belong while in transit,"
Letter from Transclear to the Court 3 (Aug. 3, 2006); the funds
attached here are EFTs.[9]  "Under the law of this circuit, EFTs to

---

[9] EFTs function in the following way:

20

or from a party are attachable by a court as they pass through banks located in that court's jurisdiction." Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *1, 2006 U.S. App. LEXIS 19302, at *4 (citing Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002)).[10]  In Aqua Stoli, the Court of Appeals questioned Winter

> When a customer wants to commence an EFT, its bank sends a message to the transfer system's central computer, indicating the amount of money to be transferred, the sending bank, the receiving bank, and the intended beneficiary. The central computer then adjusts the account balances of the sending and receiving banks and generates a printout of a debit ticket at the sending bank and a credit ticket at the receiving bank. After the receiving bank gets the credit ticket, it notifies the beneficiary of the transfer. If the originating bank and the destination bank belong to the same wire transfer system, then they are the only sending and receiving banks, and the transfer can be completed in one transaction. However, if the originating bank and the destination bank are not members of the same wire transfer system, which is often the case with international transfers, it is necessary to transfer the funds by a series of transactions through one or more intermediary banks.

Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *11 n.1, 2006 U.S. App. LEXIS 19302, at *4 n.1 (quoting United States v. Daccarett, 6 F.3d 37, 43-44 (2d Cir. 1993)).  "Because of the international nature of maritime transactions, intermediary banks are frequently used."  Id.

[10] See also Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *11 n.1, 2006 U.S. App. LEXIS 19302, at *4 n.1 ("Winter Storm, 310 F.3d at 274-78, permitted the attachment of funds while those funds are in an intermediary bank temporarily as a credit before being passed through to the beneficiary of the transaction or

Storm, "especially its reliance on [United States v.] Daccarett,

6 F.3d [37,] 55 [(2d Cir. 1993)], to hold that EFTs are property

of the beneficiary or sender of an EFT." Aqua Stoli Shipping

Ltd., 2006 WL 2129336, at *11 n.6, 2006 U.S. App. LEXIS 19302, at

*31 n.6.[11] Nevertheless, the Court of Appeals has not overturned

Winter Storm; this Court therefore continues to be bound by that

decision.

As for the fourth element – whether there is no statutory or

maritime law bar to the attachment – Transclear argues that this

"presents the most compelling argument for vacating the

attachment," Letter from Transclear to the Court 2 (Aug. 3,

2006), but Transclear does not point to an actual statutory or

---

another intermediary bank.").

[11] The Court of Appeals noted, specifically:

> Because Daccarett was a forfeiture case, its
> holding that EFTs are attachable assets does
> not answer the more salient question of whose
> assets they are while in transit. In the
> absence of a federal rule, we would normally
> look to state law, which in this case would
> be the New York codification of the Uniform
> Commercial Code, N.Y. U.C.C. Law §§ 4-A-502
> to 504. Under state law, the EFT could not be
> attached because EFTs are property of neither
> the sender nor the beneficiary while present
> in an intermediary bank. Id. §§ 4-A-502 cmt.
> 4, 4-A-504 cmt. 1.

Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *11 n.6, 2006 U.S.
App. LEXIS 19302, at *31 n.6.

22

maritime law bar to the attachment: rather, Transclear argues

that "Tide Line failed to present evidence to support a finding

of alter ego," id.[12] This issue is discussed below in connection

with the question of whether Tide Line has shown that it has a

"prima facie admiralty claim."


## 2. Valid Prima Facie Admiralty Claim

As noted earlier, Tide Line's sole allegation against

Transclear, in its Verified Complaint,[13] is that: "Defendant

Transclear acts as paying agent, or arranges for other non-

parties to satisfy the debts and obligations of Defendant

Eastrade." Compl. ¶ 13. In its submissions opposing

Transclear's motion to vacate the attachment, Tide Line argues

that it has a valid in personam maritime claim against

Transclear, on the sole basis that Transclear is, allegedly, the

alter ego of Eastrade Inc., against whom it is undisputed that

---

[12] Although the factor of a "statutory or maritime law bar" is
not discussed in Aqua Stoli Shipping Ltd., Transclear's argument
pertains to whether or not Tide Line has met its burden of
showing that it has a valid maritime claim against Transclear,
not to whether there is a proscription to the attachment even if
Tide Line has such a claim.

[13] That is, its sole allegation apart from the claim, upon
information and belief, that Transclear "was, and still is, a
foreign corporation, or other business entity, organized under,
and existing by virtue of foreign law, with principal place of
business in Nyon, Switzerland." Compl. ¶ 4.

Tide Line has a valid maritime claim. Pl. Mem. 8-9. Tide Line
argues that its Complaint adequately alleges a claim against
Transclear based on alter ego liability, and that its other
submissions (and its oral argument) in connection with the motion
to vacate the attachment further allege and support such an alter
ego claim. Pl. Mem. at 10-12. Furthermore, Tide Line asks that,
if the Court finds that the Verified Complaint does not
adequately allege that Transclear and Eastrade Inc. are alter
egos, the Court allow Tide Line to submit an amended complaint
containing additional allegations as to Transclear's status as an
alter ego of Eastrade Inc., based on new information discovered
since the filing of the Complaint; Tide Line also requests that
the release of the attached funds be stayed until the Complaint
is amended and a new writ is served upon the garnishee bank,
because Tide Line claims it will suffer great prejudice if the
funds are released. Pl. Mem. 11-12; see also Letter from Tide
Line to the Court 1-2 (July 11, 2006) (with attached Proposed
Amended Verified Complaint); Letter from Tide Line to the Court 2
(July 12, 2006). Transclear argues that Tide Line did not
allege, in its Complaint, that Transclear is an alter ego of
Eastrade Inc., and Tide Line may therefore not present such a
claim at this point, or present evidence in support of it.[14] See

---

[14] Transclear does not argue that an admiralty claim, and a
related maritime attachment, cannot be based on alter ego

Transclear S.A.'s Memorandum of Law in Support of its Motion to Vacate Maritime Attachment and Garnishment ("Def. Mem.") 10, 12; Transclear S.A.'s Reply Memorandum of Law in Further Support of its Motion to Vacate Maritime Attachment ("Def. Reply Mem.") 5-7; Letter from Transclear to the Court 3 (July 12, 2006) (arguing that, "[a]t a Rule E hearing, the court should not consider any legal theories that were not pled in the complaint on which the attachment was based").[15]  Furthermore, Transclear argues that, even if the Court does consider Tide Line's alter ego allegations and evidence, Tide Line has failed to prove that Transclear is the alter ego of Eastrade Inc.  Def. Reply Mem. 7-9; Letter from Transclear to the Court 2 (Aug. 3, 2006).

a. Alter Ego Liability

"The prerequisites for piercing the corporate veil are as clear in federal maritime law as in shoreside law"[16]: the veil

---

liability.

[15] At oral argument, counsel for Transclear stated that he had not seen Tide Line's motion to amend its complaint, due to a "mix-up in the fax number" which was due to a mistake on the part of Transclear, not Tide Line.  See Transcript of July 14 Oral Argument at 43-44.  Transclear's counsel added that Transclear "would appreciate the opportunity to respond to that."  Id. at 44.  To date, Transclear has not submitted any response to Tide Line's request to amend its complaint, and has not made a written request to be able to file such a response.

[16] "Federal maritime law . . . is the law we apply in an admiralty case."  Kirno Hill, 618 F. 2d at 985.  Cf. Matter of Arbitration between Holborn Oil Trading Ltd. and Interpol Bermuda

will be pierced only if a corporation was used by another entity
or individual to "perpetrate a fraud" or was "so dominated" and
its corporate form "disregarded" such that it primarily
transacted the other entity's or individual's business. Kirno
Hill Corp., 618 F.2d 982, 985 (2d Cir. 1980). Accord Matter of
Arbitration between Holborn Oil Trading Ltd. and Interpol Bermuda
Ltd., 774 F. Supp. 840, 844 (S.D.N.Y. 1991) ("Federal common law
in the Second Circuit involves a two pronged test for piercing
the corporate veil: the party sought to be charged must have used
its alter ego 'to perpetrate a fraud or have so dominated and
disregarded [its alter ego's] corporate form' that the alter ego
was actually carrying on the controlling party's business instead
of its own.") (quoting Kirno Hill Corp., 618 F.2d at 985);
Ullises Shipping Corp. v. FAL Shipping Co. Ltd., 415 F. Supp. 2d
318, 323 (S.D.N.Y. 2006) ("Federal common law allows piercing of
the corporate veil where (1) a corporation uses its alter ego to
perpetrate a fraud or (2) where it so dominates and disregards
its alter ego's corporate form that the alter ego was actually
carrying on the controlling corporation's business instead of its
own.") (internal quotation marks omitted). "Under that standard,
'. . . [a]ctual domination, rather than the opportunity to

Ltd., 774 F.Supp. 840, 844 (S.D.N.Y. 1991) ("Federal courts
sitting in admiralty must apply federal common law when examining
corporate identity."); accord Ullises Shipping Corp. v. FAL
Shipping Co. Ltd.,  415 F.Supp.2d 318, 323 (S.D.N.Y. 2006).

exercise control, must be shown.'" <u>Ullises Shipping Corp.</u>, 415

F. Supp. 2d at 323 (quoting <u>De Jesus v. Sears, Roebuck & Co.</u>, 87

F.3d 65, 69 (2d Cir. 1996)).[17]

    The Court of Appeals for the Second Circuit has enumerated

ten factors that would "tend to show that defendant was a

dominated corporation," <u>Wm. Passalacqua Builders, Inc. v. Resnick</u>

<u>Developers South, Inc.</u>, 933 F.2d 131, 139 (2d Cir. 1991):

> (1) the absence of the formalities and
> paraphernalia that are part and parcel of the
> corporate existence, i.e., issuance of stock,
> election of directors, keeping of corporate
> records and the like, (2) inadequate
> capitalization, (3) whether funds are put in
> and taken out of the corporation for personal
> rather than corporate purposes, (4) overlap
> in ownership, officers, directors, and
> personnel, (5) common office space, address
> and telephone numbers of corporate entities,
> (6) the amount of business discretion
> displayed by the allegedly dominated
> corporation, (7) whether the related
> corporations deal with the dominated
> corporation at arms length, (8) whether the
> corporations are treated as independent
> profit centers, (9) the payment or guarantee
> of debts of the dominated corporation by
> other corporations in the group, and (10)
> whether the corporation in question had
> property that was used by other of the
> corporations as if it were its own.

---

[17] Even sole ownership of a corporation is not sufficient, by
itself, to pierce the corporate veil. <u>Kirno Hill Corp.</u>, 618 F.2d
at 985. "Because a principal purpose for organizing a
corporation is to permit its owners to limit their liability,
there is a presumption of separateness between a corporation and
its owners, which is entitled to substantial weight." <u>American</u>
<u>Protein Corp. v. AB Volvo</u>, 844 F.2d 56, 60 (2d Cir. 1988).

Id. at 137-39.[18]  "Applying these – or any other pertinent

factors – to the infinite variety of situations that might

warrant disregarding the corporate form is not an easy task

because disregarding corporate separateness is a remedy that

'differs with the circumstances of each case.'"  Id. (quoting

American Protein, 844 F.2d at 60).

      b. Tide Line's Burden

    In their submissions to the Court – which were filed before

the Court of Appeals issued its decision in Aqua Stoli Shipping

Ltd. – the parties both argued that "[a]t a post-attachment

hearing, a plaintiff asserting corporate alter egos need not

definitively establish domination and control, but must present

enough evidence to convince the court that there are reasonable

grounds for piercing the corporate veil," Ullises Shipping Corp.

v. FAL Shipping Co. Ltd., 415 F. Supp. 2d 318, 323 (S.D.N.Y.

2006).  See Pl. Mem. 7, 15 (adopting this standard but citing

other cases); Letter from Transclear to the Court 3 (July 12,

2006) (stating this standard but arguing that it applies only if

---

[18] This decision addressed New York law concerning piercing the
corporate veil.  But "the standards for piercing the veil under
New York and federal common law . . . converge, requiring a
showing of either fraud or domination."  Matter of Arbitration
between Holborn Oil Trading Ltd. and Interpol Bermuda Ltd., 774
F. Supp. at 844.  In that maritime case, the Court looked to the
factors set forth in Wm. Passalacqua Builders, Inc., 933 F.2d at
137-139.

alter ego liability is pled in the complaint). In connection with the motion to vacate the maritime attachment order, the parties provided affirmations and declarations to support their positions as to whether or not there are "reasonable grounds to pierce the corporate veil" here, as to Transclear. See Affirmation of Tina Elliott (Executive Officer of Transclear) in Support of Motion to Vacate Maritime Attachment ("Elliot Aff."); Reply Affirmation of Tina Elliott in Further Support of Motion to Vacate Maritime Attachment ("Elliott Reply Aff."); Declaration of Nancy R. Peterson (counsel to Tide Line) in Support of Plaintiff's Opposition to Motion to Vacate Maritime Attachment and in Support of Cross-Motion to Dismiss Counterclaims ("Peterson Decl.") and attached exhibits; Declaration of Kyriakos Linas (director of Tide Line) in Support of Plaintiff Tide Line Inc.'s Opposition to Motion to Vacate the Maritime Attachment; and the Declaration of Vassiliki Sekrou (third-party employee) in Support of Plaintiff's Opposition to Motion to Vacate Maritime Attachment ("Sekrou Decl."). The oral argument that was held pursuant to Supplemental Rule E(4)(f) (and before the Court of Appeals' Aqua Stoli decision) also focused primarily on the factual record.

However, as discussed above, the holding and overall rationale of Aqua Stoli Shipping Ltd., 2006 WL 2129336, 2006 U.S.

App. LEXIS 19302, imply that the "probable cause" or "reasonable
grounds" standard is generally improper when considering whether
a maritime attachment must be vacated.  Under this logic, the
Court should not engage in a broad inquiry into evidence
presented as to Transclear's relationship with Eastrade Inc.
Rather, the Court must focus on the narrower question of whether
Tide Line has shown that it has a valid prima facie claim against
Transclear on the basis of alleged alter ego status.[19]

### c. Whether Tide Line Has Met this Burden

Tide Line argues that its Verified Complaint sufficiently

---

[19] Transclear argues that the Court of Appeals' decision in Aqua
Stoli "has absolutely no bearing on the standard of proof
regarding Tide Line's belated alter ego allegations because: (i)
there were no alter ego allegations at issue in Aqua Stoli, and
(ii) the Second Circuit in Aqua Stoli did not address or modify
the longstanding Second Circuit authority as to what needs to be
proven to show alter ego liability and pierce the corporate
veil."  Letter from Transclear to the Court 1-2 (Aug. 3, 2006).
The Court finds this argument unconvincing: although Aqua Stoli
did not involve an alter ego claim, and certainly did not address
the factors that tend to show alter ego liability, Aqua Stoli
does, for the reasons already discussed, have ramifications as to
a plaintiff's burden to maintain an attachment -- including when
plaintiff asserts that it has a maritime claim against the
defendant based on alter ego liability; there is no reason why,
for such a claim, plaintiff would be held to a "probable cause"
or "reasonable grounds" standard rather than the "prima facie"
requirement emphasized by the Court of Appeals in Aqua Stoli.
Similarly, therefore, Transclear's assertion that, although Tide
Line has an admiralty claim against Eastrade, Inc., it does not
have a claim against Transclear "absent a finding of alter ego"
or a "prior determination that Transclear is the alter ego of
Eastrade, Inc.," Letter from Transclear to the Court 1 (Aug. 3,
2006), is incorrect.  Such a "finding" or "prior determination"
is not a prerequisite to maintaining the attachment.

alleges that Eastrade Inc. and Transclear are alter egos because "[f]ederal pleading requirements are very liberal," Pl. Mem. at 10,[20] there are "no magic words to allege alter ego," id. at 11, and "[p]aying the debts of another 'independent' company or arranging for others to pay another 'independent' company's debts is one of the main hallmarks of alter ego status," id. Tide Line further states that when it filed the Verified Complaint, it was trying to be "cautious" and to allege only those elements regarding Transclear that it could verify at that time. Id. at 11-12. In response to the Court's Order of July 11, 2006, directing the parties to provide, inter alia, a definition of "paying agent," and analysis of the legal implications to be drawn from such an allegation, Tide Line states that the term "paying agent" "is not specifically defined by statute"[21]; Tide Line offers the definition of "making payments or guaranteeing the debts of the dominated corporation," and argues that its use of the term was intended to refer to aspects of "alter ego" status (including factors 7 through 10 discussed above); Tide Line therefore claims that the "legal consequences of being a

---

[20] Tide Line refers only to Fed. R. Civ. P. 8(a)(2), and does not address Supplemental Rule E(2)(a). Transclear does not address the question of what pleading rule applies here.

[21] Transclear likewise responds that, insofar as it is aware, "paying agent" does not have a technical or specialized meaning and is not a term of art. Letter from Transclear to the Court 1 (July 12, 2006).

31

'paying agent' as defined [here] is [sic] that there are
reasonable grounds to find that an entity is in an alter ego
relationship." Letter from Tide Line to the Court 1-2 (July 12,
2006). Tide Line thus restates its argument that the allegation
in its Complaint was intended to refer to alter ego liability.
Transclear responds that "Tide Line could and should have said
'alter ego,' or 'control' or 'domination,' the hallmarks of
[alter ego] theory," Def. Reply Mem. 6; Transclear contends that
it understood the phrase "paying agent," in the context in which
it was used, "to mean an entity that acts as the 'treasurer' or
agent of another entity, with the agent issuing payments for the
principal out of funds provided by the principal," Letter from
Transclear to the Court 1 (July 12, 2006).

        The Court finds that Tide Line's Verified Complaint does
not, in and of itself, state a prima facie maritime claim against
Transclear on the basis of alter ego liability. First, and most
obviously, Tide Line does not use the phrase "alter ego" in its
Verified Complaint.[22]  Furthermore, although a court may find

---

[22] Cf. Tramp Oil & Marine, Ltd., No. 03 Civ. 5265, 2004 WL
1040701, at *2, 2004 U.S. Dist. LEXIS 7974, at *3 (S.D.N.Y. May
7, 2004) (finding that order of attachment should not be vacated
because plaintiff had a prima facie in personam claim against
defendant, insofar as plaintiff alleged that the defendant was
jointly and severally liable as a partner of another defendant).
In that case, which Tide Line cites, see Pl. Mem. 7, it appears
that the plaintiff specifically alleged, in the complaint, that
the defendant seeking to vacate the attachment was a partner of

32

that, where "alter ego" "is not specifically pled, the factual allegations [in a complaint] may support the maintenance of a claim based on an alter ego theory of liability," Shamis v. Ambassador Factors Corp., 34 F. Supp. 2d 879, 899 (S.D.N.Y. 1999), the sole allegation that an entity is a "paying agent, or arranges for other non-parties to satisfy the debts and obligations of" another entity, does not suffice to allege a prima facie claim of alter ego liability. This statement does not meet the more particularized pleading standard set forth in Supplemental Rule E(2)(a) -- nor even, arguably, the more liberal standard of Rule 8(a), see EED Holdings v. Palmer Johnson Acquisition Corp., 228 F.R.D. 508, 512 (S.D.N.Y. 2005) (stating that "conclusory" allegations regarding veil-piercing "fail to satisfy even the more lenient Rule 8(a) pleading requirements").

However, Tide Line has provided further allegations (and evidence) pertaining to its claim that Transclear is the alter ego of Eastrade Inc. in its submissions in connection with the motion to vacate the attachment. In addition, Tide Line asks that the Court allow Tide Line to submit an amended complaint containing these additional allegations as to Transclear's status as an alter ego of Eastrade Inc.[23] - including that: "Upon

---

the other defendant.

[23] Although Tide Line has not made this request through a formal motion to amend pursuant to Federal Rules of Civil Procedure

33

information and belief, Eastrade Commodities Inc. is merely a
shell-corporation through which Transclear conducts its
business," Proposed Amended Verified Complaint (attached to Tide
Line's letter to the Court dated July 11, 2006) ¶ 13; "Transclear
operates Eastrade Commodities Inc. as its 'chartering arm,' such
that Eastrade has no separate, independent identity from
Transclear," id. ¶ 14; "Furthermore, Transclear is the alter ego
of Eastrade Commodities Inc. because Transclear dominates and
disregards Eastrade Commodities Inc. corporate form to the extent
that Transclear is actually carrying on Eastrade Commodities Inc.
business and operations as if the same were its own," id. ¶ 15;
"Upon information and belief, Eastrade Commodities, Inc. has no
corporate existence of its own.  Eastrade Commodities Inc. has no
identifiable assets, employees or office in Panama," id. ¶ 18;
"Upon information and belief, Transclear makes payments on
Eastrade Commodities, Inc.'s behalf where Transclear has
absolutely no contractual obligation to Eastrade Commodities
Inc.'s creditors; on March 11, 2005, Transclear made a hire
payment to Tide Line on behalf of Eastrade Commodities Inc. even
though Transclear was not referenced in the charter party, and no
evidence of an indemnification agreement has been produced," id.
¶ 21; "In another, independent maritime attachment case against

---

15(a), the Court will consider the request.

Eastrade, Transclear was caught paying Eastrade Commodities Inc.'s debts once again," id. ¶ 23; "The only person to respond to the Notice of Attachment was Ms. Tina Elliott, who indicated, on the actual facsimile sent to *Eastrade Commodities Inc.*, and [sic] that she spoke on Eastrade Commodities Inc.'s behalf," id.; "No representative of Eastrade Commodities Inc., beside Ms. Elliott, has come forward to challenge the attachment of Eastrade Commodities Inc.'s funds. Furthermore, no employee of Eastrade Commodities Inc. can be located or identified," id. ¶ 24; "In addition, even though Transclear had no formal relationship to the LEVANTES A charter, and Eastrade Commodities Inc. was the named charterer, almost all correspondence sent to Tide Line and the charter brokers from the 'charterers' originated from Transclear," id. ¶ 26; and "Transclear performs corporate functions on Eastrade Commodities Inc.'s behalf which should be performed solely by Eastrade Commodities Inc. Transclear appointed an arbitrator on Eastrade Commodities Inc.'s behalf in a 2001 arbitration in which Transclear itself *was not a party*," id. ¶ 27.[24]  With these proposed amended allegations, Tide Line

---

[24] The Proposed Amended Complaint also advances three alternative claims – that Transclear and Eastrade Commodities Inc. are "partners and/or are joint venturers," id. ¶ 28, or that they are "affiliated companies" such that one is or soon will be holding assets belonging to the other, id. ¶ 29, or that "Transclear is an undisclosed or partially disclosed principal in the charter parties entered into by Eastrade Commodities Inc., such that

has shown that it has a prima facie claim against Transclear on the basis of alleged alter ego status.[25]

"A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . . Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).  Rule 15(a) has a "lenient standard." Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000).  "The Second Circuit has held that a Rule 15(a) motion 'should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.'" Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 603-04 (2d Cir. 2005) (quoting Richardson Greenshields Securities, Inc. v. Lau, 825 F.2d 647, 653 n.6 (2d Cir. 1987)).  Although it is true that Tide Line could have brought a motion to amend earlier, the Court does not

---

Transclear is liable for Eastrade Commodities Inc.'s debts related to those transactions," id. ¶ 30.

[25] To re-emphasize, the Court must not decide, at this point, whether Tide Line has advanced sufficient evidence to support this claim, or whether Transclear has rebutted such evidence through its own submissions.  Nor must it decide, for reasons discussed at length above, whether Tide Line has shown "probable cause" to believe that Transclear is the alter ego of Eastrade Commodities Inc.

find that Tide Line's timing rises to "undue delay" in this case. Furthermore, the Court does not find that any of the other factors that would counsel against allowing the amendment are present here.  The Court will therefore grant Tide Line's request to amend its Complaint, so long as no objections are filed by Transclear by August 23, 2006.

The question at this point is whether the Ex Parte Attachment Order should be vacated because the original Verified Complaint does not sufficiently state a prima facie alter ego claim against Transclear, or whether it should not be vacated because Tide Line's proposed amended allegations sufficiently state a prima facie alter ego claim against Transclear; furthermore, if the Attachment Order is vacated, the Court must consider whether the release of the attached funds should be stayed, as requested by Tide Line, until the Complaint is amended, a new Ex Parte Attachment Order is issued, and a new writ is served upon the garnishee bank.  If the Court were to vacate the attachment now, after granting Tide Line's request to amend its Complaint, the entire proceedings would almost certainly be quickly repeated.[26]  It seems that the interests of judicial efficiency would counsel in favor of keeping the

---

[26] Indeed, Tide Line's counsel confirmed as much during the hearing.  Transcript of Oral Argument Heard on July 14, 2006 ("Tr.") 42, 47.

attachment in place, in light of the amendments to the Verified

Complaint.  The parties have not provided any case law

specifically addressing whether or not such a procedure may be

adopted, and the Court has not found cases on point.[27]  But,

insofar as Tide Line has shown that it has a prima facie claim

against Transclear on the basis of its Proposed Amended Verified

Complaint, the Court does not believe that the purposes of

Supplemental Rules B and E would be served by vacating the

Attachment Order as to Transclear.  However, the most appropriate

procedure to follow appears to be the following:  The Court will

vacate the Ex Parte Attachment Order, allow Tide Line to file its

Amended Verified Complaint with a new request for an Attachment

---

[27] Transclear points to T & O Shipping, Ltd. v. Lydia Mar
Shipping Co. S.A., 415 F. Supp. 2d 310, 317 (S.D.N.Y. 2006), in
which, as discussed earlier, the Court vacated the attachment
insofar as it pertained to security for plaintiff's direct
losses, because plaintiff made no claim for direct damages in its
complaint.  In that case, however, the plaintiff had apparently
not made a request to amend its complaint in that case.  The
Court, after vacating the attachment order, stated that if
plaintiff intended to filed an amended complaint, it could do so
within twenty days.  Id. at 317.  Here, Tide Line has already
requested that it be allowed to filed an amended complaint, and
the Court has granted leave to amend.
Tide Line cites Shamis v. Ambassador Factors Corp., 34 F. Supp.
2d 879, 899, which states that even if an allegation of alter ego
"is not specifically pled, the factual allegations contained in
the Second Amended Complaint may support the maintenance of a
claim based on an alter ego theory of liability."  But this is
not a maritime case, and does not involve a maritime attachment;
therefore, it does not provide any guidance as to whether an
attachment may be maintained on the basis of a subsequent amended
complaint.

Order by August 25, 2006 (so long as no objections are filed by
August 23, 2006), and stay the release of the funds pending the
issuance of the new Attachment Order and the serving of a new
writ of attachment on the bank, so long as such service is
accomplished by August 30, 2006.

d. Note on Transclear and Arbitration

The Court notes, however, that there appears to be a larger
issue concerning Tide Line's claim against Transclear -- which,
although it does not in and of itself require that the attachment
be vacated, poses a problem for the unfolding of this action.

The Federal Arbitration Act ("FAA") applies to arbitration
provisions in "maritime transactions." 9 U.S.C. §§ 1, 2.
Section 8 of the FAA, 9 U.S.C. § 8 - invoked by Tide Line in its
Verified Complaint in seeking the maritime attachment order
(along with Section 1 of the FAA and Supplemental Rule B) -
provides:

> If the basis of jurisdiction be a cause of
> action otherwise justiciable in admiralty,
> then, notwithstanding anything herein to the
> contrary, the party claiming to be aggrieved
> may begin his proceeding hereunder by libel
> and seizure of the vessel or other property
> of the other party according to the usual
> course of admiralty proceedings, and the
> court shall then have jurisdiction to direct
> the parties to proceed with the arbitration
> and shall retain jurisdiction to enter its
> decree upon the award.

"Under § 8, the plaintiff may seize the ship in rem, obtain a

39

bond, and proceed with arbitration," <u>Thyssen, Inc. v. Calypso</u>
<u>Shipping Corp., S.A.</u>, 310 F.3d 102, 107 (2d Cir. 2002) – or,
similarly, may attach other property belonging to the defendant,
and proceed to arbitration.

Here, however, Tide Line is not seeking to proceed to
arbitration as against Transclear.  Despite the claim in Tide
Line's Complaint that it sought a maritime order "for the purpose
of obtaining personal jurisdiction over the Defendants,
compelling <u>them</u> to arbitrate the claims asserted by Tide Line,"
Compl. ¶ 15 (emphasis added), Tide Line has not sought, and
apparently does not intend to seek, to join Transclear to the
arbitration proceedings that Tide Line has initiated against
Eastrade Inc.  Tide Line's Verified Complaint refers to
initiating arbitration only as against Eastrade Inc.  Compl. ¶ 9.
Furthermore, Tide Line's submissions to the Court in connection
with Transclear's motion to vacate the attachment nowhere state
that Tide Line has attempted, or will seek, to involve Transclear
in the arbitration proceedings.

It is not clear why Tide Line has not named Transclear in
the arbitration proceedings.  At the post-attachment hearing,
when questioned by the Court regarding why Transclear is not
involved in the arbitration proceeding, if Tide Line claims that
Transclear is the alleged alter ego of Eastrade Inc., counsel for

Tide Line stated that, although "that would be better answered by
the London solicitor," he presumed that Transclear was not named
in the arbitration proceeding because "arbitration is by
contract" and "the only two parties named in the contract [at
issue here] were Tide Line Inc. and Eastrade Commodities, Inc."
Tr. 25.  In response to the Court's suggestion that an alter ego
could nonetheless be brought in, Tide Line's counsel replied: "In
London arbitration, I don't expect that anybody would have
allowed Transclear to come in when they claimed they're not a
party to the contract.  That's why we have Transclear here in New
York."  Id.

    Tide Line has not sought to have this Court compel
Transclear to participate in the arbitration proceedings;
therefore, the Court need not decide whether Transclear could be
so compelled.[28]  But the Court notes that the Court of Appeals
for the Second Circuit "has recognized a number of theories under
which nonsignatories may be bound to the arbitration agreements
of others," including that of "veil-piercing/alter ego."

---

[28] "Under the [Federal Arbitration Act], as interpreted by the
Supreme Court, the general presumption is that the issue of
arbitrability should be resolved by the courts."  Alliance
Bernstein Inv. Research & Mgmt., 445 F.3d 121, 125 (citing First
Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995);
AT&T Technologies, Inc. v. Communications Workers of America, 475
U.S. 643, 649 (1986)); accord Contec Corp. v. Remote Solution
Co., Ltd., 398 F.3d 205, 208 (2d Cir. 2005).

41

Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776
(2d Cir. 1995); accord Sarhank Group v. Oracle Corp., 404 F.3d
657, 662 (2d Cir. 2005). It is possible that, in this case,
English law applies under the arbitration agreement, and would
bar compelling Transclear to appear in the arbitration. But,
again, this need not be resolved here.

Even if Transclear cannot be compelled to join in the
arbitration proceedings against Eastrade Inc., Tide Line has
provided no support for its position that it may, instead,
litigate against Transclear in this Court, see Letter from Tide
Line to the Court at 4 (July 11, 2006), on the basis of an alter
ego theory, as the arbitration proceeds against Eastrade Inc.
Indeed, nothing in the framework set out by Sections 1 and 8 of
the FAA, and Supplemental Rule B, suggests that a plaintiff may
attach a defendant's property, and litigate the liability of the
defendant in federal court, rather than proceeding to
arbitration. Although this does not suggest that Tide Line does
not have a prima facie claim against Transclear, it does indicate
that, at this point, it is unclear how Tide Line may proceed with
that claim in this Court. This will need to be addressed
further.

IV. Conclusion

42

43

For the reasons given above, the Court grants Defendant
Transclear, S.A.'s motion to vacate this Court's March 14, 2006,
Ex Parte Order for Process of Maritime Attachment, as to
Transclear only, grants Tide Line's request for leave to file an
Amended Verified Complaint with a new request for an Attachment
Order so long as no objections are filed by August 23, 2006,
directs that Tide Line file the Amended Verified Complaint with a
new request for an Attachment Order by August 25, 2006, and stays
the release of the attached funds pending the issuance of a new
Attachment Order in connection with the Amended Verified
Complaint and the serving of a new writ of attachment on the
bank, so long as the writ of attachment is served by August 30,
2006.

      SO ORDERED.

Dated:    New York, New York
          August 15, 2006

                              Kimba M. Wood
                      United States District Judge

# EXHIBIT "C"

1

69TVROUA                        Argument

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ROUTE HOLDING INC., BEAM
COMPANY INC.,

                Plaintiffs,

        v.                              06 CV 03428 (PKC)

INTERNATIONAL OIL OVERSEAS
INC. a/k/a IOOI, MARINA WORLD
SHIPPING CORP.,

                Defendants.

------------------------------x
                                    New York, N.Y.
                                    September 29, 2006
                                    11:30 a.m.

Before:

                    HON. P. KEVIN CASTEL,

                                    District Judge

                        APPEARANCES

TISDALE & LENNON LLC
        Attorneys for Plaintiffs
NANCY R. PETERSON
PATRICK F. LENNON

FREEHILL HOGAN & MAHAR LLP
        Attorneys for Defendants
MICHAEL E. UNGER
LAWRENCE J. KAHN

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

2

69TVROUA                    Argument

1              (In open court)
2              (Case called)
3              THE COURT:  This is Route Holding, Inc. v.
4    International Oil Overseas, Inc.
5              Is the plaintiff ready?
6         MS. PETERSON:  Yes, your Honor.
7              THE COURT:  State your appearance please.
8              MS. PETERSON:  My name is Nancy Peterson from the firm
9    Tisdale & Lennon, representing the plaintiffs Route Holding and
10   Beam Company.
11             THE COURT:  All right.  And for the defendant?
12             MR. UNGER:  Good morning, your Honor.  Michael Unger
13   from Freehill, Hogan & Mahar on behalf of the defendant Marina
14   World Shipping.  With me is my associate Larry Kahn.
15             THE COURT:  Good to see you.  Good to see you again,
16   Mr. Kahn.
17             MR. KAHN:  Good morning, your Honor.
18             THE COURT:  Good morning.  All right.  We are here on
19   the defendant's motion to vacate the maritime attachment.
20   Since the issuance of the maritime attachment in this case, we
21   now all have the benefit of the Second Circuit's decision in
22   Aqua Stoli, 460 F.3d 434, and also Judge Wood's very clear and
23   helpful decision in Tide Line, Inc. against the Eastrade
24   Commodities, Inc., and Transclear, S.A.  That was an opinion
25   issued by Judge Wood on August 15 -- I'm sorry, August 5th,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

69TVROUA                    Argument
1   2006; docket number is 06 CV 1979. And as of seven minutes
2   ago, it had not yet appeared on Westlaw.
3           It does seem clear to me that we know what we're doing
4   here this morning in that the attachment was issued pursuant to
5   Supplemental Rule B.
6           We're now at the hearing under Rule E(4)(f), and it is
7   the party who obtained the ex parte attachment's burden to show
8   why the arrest or attachment should not be vacated or other
9   relief granted consistent with these rules. So the party
10  obtaining the attachment may proceed.
11          MS. PETERSON: Your Honor, Aqua Stoli set forth the
12  burden that plaintiff needs to satisfy in order to maintain the
13  attachment.
14          In order for Rule B attachment to issue, a plaintiff
15  must show that it has met the following four technical
16  requirements:
17          That it has alleged a maritime claim; that the
18  defendant is not found in the district; that the plaintiff has
19  attached defendant's funds within the district; and that no
20  other statutory bar to maritime attachment exists.
21          In addition, Aqua Stoli stands for the proposition
22  that the plaintiff's burden does not change at the Rule E
23  hearing. The burden to obtain an attachment is the same as the
24  burden to maintain an attachment. Judge Wood further clarifies
25  that.

4

69TVROUA                          Argument

1          THE COURT:  Well, let's back up for a second.  I'm not
2   sure that I agree with your statement of what Aqua Stoli held.
3   If you look at -- well, I'm not going to be able to give you an
4   exact page number; I don't have an F.3d version of it.  But the
5   text preceding Footnote 5, it recites that the plaintiff has to
6   show that it "has," not alleges, has a valid prima facie
7   admiralty claim against the defendant.  That's slightly
8   different than -- and maybe more than slightly different than
9   alleges a claim.
10         MS. PETERSON:  Right.  But Judge Wood clarifies in her
11  opinion that what having a prima facie claim amounts to is
12  properly alleging the elements of a maritime claim, and then an
13  alter ego claim.
14         She expressly stated that it is inappropriate to
15  engage in a fact-intensive inquiry as to the facts underlying
16  either the maritime claim or the alter ego allegations.
17         THE COURT:  But she points out that there is a
18  heightened pleading standard in a case brought, I guess
19  invoking maritime or admiralty jurisdiction, is that correct?
20         MS. PETERSON:  The heightened standard is to make the
21  defendant aware what he is pleading.
22         In the case of Tide Line, there was no alter ego
23  allegation made.  The only allegation that was made was that
24  the defendant was a paying agent of the interconnected entity.
25         In the case here, the plaintiff has alleged all the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

5

69TVROUA                    Argument

1   elements of federal common-law alter ego claim; namely, that
2   IOOI is an alter ego of Marina World Shipping; and that IOOI
3   dominates and controls Marina World Shipping to the extent that
4   it actually conducts business through Marina World Shipping.
5   It's completely separate factual -- it's distinguishable from
6   that case.
7            After we had satisfied our burden, the defendant has
8   three basis upon which it can vacate the attachment according
9   to Aqua Stoli; namely, that the defendant can be found in a
10  convenient adjacent jurisdiction that the defendant can obtain
11  personal jurisdiction in a district where the plaintiff is
12  located or that the plaintiff has obtained sufficient security.
13           Aqua Stoli explicitly listed the three bases upon
14  which the defendant may vacate an attachment.  It left the door
15  open for some equitable concerns; however, those equitable
16  concerns are not here today.  Defendant is a debtor who's not
17  paying its debts.  And if our case is borne out, as we suggest
18  it will be, it will turn out that IOOI and Marina World
19  Shipping are the same company who are avoiding paying their
20  debts to the plaintiffs.
21           Defendant is relying on outdated case law when it
22  suggests that we must prove a probable cause or a reasonable
23  basis, reasonable grounds standard for making our alter ego
24  allegations.  Once we have satisfied the basic elements of a
25  maritime claim and an alter ego claim, we have satisfied our

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

69TVROUA                        Argument

1    burden in that regard.
2          Plaintiff has alleged a maritime claim against IOOI
3    that it has breached the maritime contract, and it has alleged
4    the alter ego claim against Marina World Shipping.
5          Furthermore, in subsequent submissions, we have submitted a
6    raft of evidence showing a relationship between IOOI and Marina
7    World Shipping, which, according to both Judge Casey, in the
8    recent case of Maersk v. Neewra, is you can review in order to
9    determine if we had made adequate allegations.  In addition,
10   Judge Kaplan, in a recent case of Metalinvest v. Burwil
11   Resources also held that you review the entire record to
12   determine if we have met our basic pleading allegations.
13         As the plaintiff has satisfied its burden to show that
14   it has a prima facie claim, and defendant has not met its
15   burden to show the three reasons for vacatur, the attachment
16   should be upheld and the motion to vacate denied.
17         THE COURT:  Thank you, Ms. Peterson.  Let me hear from
18   Mr. Unger.
19         MR. UNGER:  Good morning, your Honor.  Let me begin by
20   referring the Court to the advisory committee notes of Rule B.
21   Under those notes, it says contrary to whatever interpretation
22   plaintiffs want to put on Aqua Stoli, the defendant can attack
23   the pleadings for insufficiency or any other defect in terms of
24   the process.
25         Here, the defect is that the complaint is plainly
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

7

69TVROUA                          Argument

1   insufficient to meet the standards required under Rule 8(a),
2   let alone the higher standard required under Rule 9(b).
3           The case law is such, and, in particular, I refer the
4   Court to In Re:  Currency Conversion Fee Anti --
5           THE COURT:  If I may just have you pause for a second.
6   Why do you invoke Rule 9(b)?
7           MR. UNGER:  Rule 9(b) is the specificity of pleading
8   rule, your Honor.
9           THE COURT:  I'm familiar with that.
10          MR. UNGER:  And here, the courts have said that
11  veil-piercing claims are generally subject to the pleading
12  requirements imposed by Rule 8(a), which requires only a short
13  and plain statement of the claim, showing that the pleader is
14  entitled to relief.
15          However, when a veil-piercing claim is based on
16  allegations of fraud, the heightened pleading standard Rule B
17  is the lens through which those allegations have to be
18  examined.  Okay.
19          Here, they haven't alleged fraud.
20          THE COURT:  So that goes back to my question.  Why are
21  you talking to me about Rule 9(b)?
22          MR. UNGER:  I just refer to Rule 9(b), but what I'm
23  saying is it doesn't even reach the lower standard of Rule 8.
24          THE COURT:  But we're in agreement Rule 9(b) does not
25  control in this case?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

69TVROUA                    Argument

1           MR. UNGER:  That's correct, your Honor.
2           THE COURT:  Okay.  Thank you.
3           MR. UNGER:  I apologize if it was confusing.  But the
4   case I was referring to, In Re:  Currency Conversion Fee
5   Antitrust Litigation, which is 265 F. Supp. 2d 385 Second
6   Circuit -- I'm sorry, Southern District 2003.
7           The Court stated in that case that purely conclusory
8   allegations cannot suffice to state a claim based on veil
9   piercing or alter ego liability, even under the liberal notice
10  pleading standard under Rule 8(a).
11          The plaintiff has to come in, and the plaintiff has to
12  demonstrate with proof, credible proof, that there is an alter
13  ego relationship between the two defendants that they've named.
14  Plaintiff only has a real cause of action and a real gripe with
15  IOOI with whom it had its contract, because IOOI didn't pay up
16  or hasn't agreed to post security, and I don't know exactly
17  where plaintiff and IOOI are in terms of their arbitration.
18          Plaintiff in this action decided that they were going
19  to come into court and add MWS, Marina World, as a defendant,
20  and that's a tactic that they are using in order to try to
21  strongarm either a settlement or the posting of security by
22  IOOI in connection with the London arbitration and the merits
23  of that dispute.
24          Turning back to the Aqua Stoli case.  It's incorrect
25  to say that there were only three bases on which to challenge

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

9

69TVROUA                         Argument

1    an attachment.  The Second Circuit specifically said in Aqua
2    Stoli that among the bases to challenge are, and it proceeds to
3    list the three examples that counsel for the plaintiff cited.
4            THE COURT:  And then they go on to further define the
5    universe by saying, "We also believe vacatur is appropriate in
6    other limited circumstances," which are well-described in the
7    opinion.  And they also describe what circumstances do not
8    qualify for vacating the attachment.  Go ahead.
9            MR. UNGER:  Here, your Honor, what we're challenging,
10   effectively, is that there is no maritime claim.  And,
11   therefore, the Court lacks subject-matter jurisdiction in
12   respect to the claims against Marina World.  And the reason the
13   Court lacks subject-matter jurisdiction is because there is no
14   alter-ego relationship between the two named defendants.
15           THE COURT:  Where do I find your subject-matter
16   jurisdiction argument laid out?
17           MR. UNGER:  It's not specifically set forth as such in
18   our papers, your Honor; but what we do argue is that there is a
19   defect in the pleadings.  And that's the defect.  The defect is
20   that there is a lack of jurisdiction here.  And there's a lack
21   of jurisdiction because there is no, in fact, alter-ego
22   relationship between the companies; and there is no -- the way
23   that it's pled in the complaint, that doesn't suffice under
24   Rule 8(a) to state a maritime claim.
25           The Aqua Stoli case says, in effect, that plaintiff

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

69TVROUA                    Argument

1   has to show that it has a valid maritime claim, okay.  And if
2   that's the case, you're allowed to test the validity of whether
3   that claim that they are alleging is valid.
4           Here, this Court has the right to look at the
5   evidence.  And plaintiff having the burden of proof, they
6   haven't shown a maritime claim against Marina World.  And the
7   reason they haven't is that the evidence that they have put
8   forth, and let's look at what they put forth, before they ever
9   filed the claim, all they knew was there were a couple of
10  payments that had been made over eight years by Marina World on
11  behalf of IOOI.  And Mr. Bakri from Marina World explains in
12  his several declarations why that was done.  That's been
13  unchallenged.  And I don't believe that that gave a good-faith
14  basis to file this complaint in the first place.
15          But even if you get past that and you look at the rest
16  of the evidence, what do we have?  A couple more payments we
17  learn have been made.  But that's it.  Then you get into all
18  the plaintiff's smoke-and-mirrors in terms of trying to tie
19  Marina World and IOOI together.  And, quite frankly, your
20  Honor, they don't even come close.
21          The evidence that they show at best is based on
22  speculation, rumor, innuendo, hearsay from unnamed "market
23  sources" and investigations that were commenced.  They give you
24  a four-year old report in connection with IOOI and its supposed
25  relationship with the Bakri group, which Mr. Bakri explains is

69TVROUA                    Argument

1   basically a loose association of companies that try to
2   capitalize on the goodwill of one another.
3           You have, in addition to that, plaintiff coming in
4   with all kinds of suggestions in terms of the fact that there
5   are shared addresses, IT information that's shared.  None of
6   this adds up to putting Marina World being so dominated or
7   controlled by IOOI or the converse, that they can meet the
8   ten-point tests that are set out in terms of what you have to
9   show in order to have an alter-ego claim.
10          At best, all plaintiff has done is shown, if you want
11  to accept it, that IOOI may have some kind of relationship with
12  the Bakri group, Bakri navigation, and any of the 12 or 13
13  other companies that are named throughout the course of the
14  papers.  But what's not in any of that is Marina World in this
15  web that they've painted.  Marina World is out here.  And
16  there's no evidence which ties Marina World directly to IOOI,
17  or to IOOI through the Bakri group, or any of the Bakri group
18  companies.
19          Effectively, if you follow plaintiff's argument, up on
20  the west side of Manhattan you have the Potamkin Auto Group.
21  And he's got ten different dealerships.  And if I buy a
22  Chrysler from Potamkin Chrysler, and I don't like it, under
23  plaintiff's theory, I could allege that their alter egos and go
24  after Potamkin Chevy.  Why?  Because Mr. Potamkin has his hand
25  in a whole bunch of these dealerships.  Mr. Potamkin may own

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

69TVROUA                    Argument

1   the various buildings or have a company that owns the various
2   buildings the dealerships are in.  That doesn't get you over
3   the hump.
4        There's no good-faith basis to have brought this
5   claim.  And they haven't shown it even when they've had the
6   burden of showing it, that there is an alter ego relationship.
7        Thank you, your Honor.
8        THE COURT:  Thank you, Mr. Unger.  Let me hear from
9   the plaintiff.  And I guess a question I would like answered is
10  does supplemental Rule E(2)(a) apply as to the pleading.  And
11  let me hear as to how does the plaintiff view that rule as
12  affecting its pleading obligation here.
13       MS. PETERSON:  What do you explicitly mean by Rule
14  E(2)(a)?  Do you mean the pleading requirement?
15       THE COURT:  All right.  There is a requirement that,
16  "The complaint state the circumstances from which the claim
17  arises with such particularity that the defendant or claimant
18  will be able, without moving for a more definite statement, to
19  commence an investigation of the facts and to frame a
20  responsive pleading."
21       And Second Circuit has held that this standard is more
22  stringent than the pleading requirements of the Federal Rules
23  of Civil Procedure.  That's what I'm referring to.
24       MS. PETERSON:  Your Honor, first, I believe that we
25  have satisfied that burden; and that we have stated the facts

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

69TVROUA                          Argument

1   and circumstances for having the breach of the contract and the
2   reasons behind us attaching the funds of Marina World Shipping;
3   namely, that they are in an alter ego relationship such that we
4   do not have to move for a more definite statement.
5            And, subsequently, we have submitted considerable
6   evidence in our various submissions and declarations clarifying
7   our pleadings and putting forth more evidence.
8            In addition, I don't believe that the standard -- that
9   we should apply a motion-to-dismiss standard at the Rule E
10  hearing.  We're not judging the sufficiency of the pleadings in
11  terms of a motion to dismiss any set of facts upon which relief
12  can be granted.  We're looking at a Rule E special hearing at
13  which we're seeing if the elements of the claim have been
14  alleged, and if the circumstances has also been alleged,
15  according to Rule B(a)(2).
16           Judge Casey explicitly addressed this in the case of
17  Maersk v. Neewra, where he said you can look at the entire
18  record to determine a pleading burden, unlike a motion to
19  dismiss; and that if we were to apply any set of facts or look
20  at the facts, Rule E would completely subsume Rule 12(b)(6).
21  There would be no difference, included there should be a
22  difference in the standard.
23           If the defendants would like to challenge the facts
24  underlying our pleadings, they should raise a motion to dismiss
25  or a motion for summary judgment.  However, that is the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

69TVROUA                     Argument

1   appropriate form in which to challenge them.  Right now we're
2   looking at the bare bones of the complaint and our supplemental
3   submissions.
4          May I add a few -- address their argument?
5          First of all, as to the subject-matter jurisdiction
6   argument that they have made, the defendant does not dispute
7   that we have alleged a maritime claim against IOOI.  We have
8   alleged an alter-ego claim against Marina World Shipping.
9   Therefore, it's an alter-ego maritime claim.  In the
10  subject-matter jurisdiction, it's not relevant and wasn't
11  briefed by the defendants.
12         THE COURT:  In other words, what you're saying is even
13  if for some reason I accepted everything that the defendants
14  said and tomorrow granted a motion to dismiss Marina World from
15  this case, this Court's subject-matter jurisdiction would not
16  evaporate?
17         MS. PETERSON:  Exactly.
18         THE COURT:  Thank you.  Go ahead.
19         MS. PETERSON:  As to the evidence, where they are
20  attacking the evidence as hearsay and in the declarations, they
21  are holding us to a trial standard.  This is the Rule E
22  hearing.  You can submit any sort of evidence at this stage to
23  support your allegations.  And we can submit case law to
24  support that, if your Honor would like.
25         In addition, there is no case law to suggest that we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

69TVROUA                          Argument

1   have to submit proof at this stage of the hearing to support
2   our allegations.  Aqua Stoli and Judge Wood found that proof at
3   this stage is inappropriate; and that would be going directly
4   against her decision, I feel, to require to submit all facts at
5   this stage prior to discovery or being able to use discovery
6   tools to obtain evidence.
7        And even assuming arguendo that the defendants are
8   correct that we have to make some sort of evidentiary showing,
9   which we vigorously deny, we have shown significant evidence
10  that IOOI and Marina World Shipping are, in fact, alter egos.
11       Even without the benefit of discovery, we have
12  uncovered 15 payments being made by Marina World Shipping on
13  behalf of IOOI.  There's been no evidence submitted to show
14  that there was -- Mr. Bakri claims that there's an assignment
15  of payment.  However, there's absolutely no paper, there's no
16  evidence of a debt being assumed from Marina World Shipping to
17  IOOI, there's no evidence of an assignment actually being made,
18  and the people that received the payments can confirm that they
19  were never informed of an assignment.  The only evidence is a
20  self-serving statement that a payment assignment can be made.
21       And it suspends disbelief to believe that in these 15
22  separate incidences that we know about, they executed
23  assignments of payment.  In addition, IOOI refers to Marina
24  World Shipping's account as its own.  In the two instances
25  where IOOI owed money to a creditor, and it informed them that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

69TVROUA                    Argument

1    it would be sending money from its bank, when the confirmation
2    came through, it was from Marina World Shipping.  It is
3    referring to Marina Shipping as its own account and using it as
4    its piggy bank.  Its role is to sign the maritime documents;
5    Marina World Shipping's job is to pay the debts.  And in this
6    way, it completely insulates IOOI and the Bakri family-at-large
7    from liability.
8            IOOI and Marina World Shipping reside at the same
9    location in Saudi Arabia at the Al Dulas Bakri Building owned
10   by a Bakri corporation.  Mr. Bakri has submitted a lease
11   allegedly showing that this is an arm's length transaction that
12   Marina World Shipping leases from the owner.  However, this
13   lease does not specify an office, a floor.  This is a lease
14   that specifies that they have leased somewhere in the Bakri
15   building.  This has no evidence to show that, in fact, they
16   maintain a separate office or in any way separate from IOOI.
17           In addition, the directors of IOOI are all apparently
18   employed by the Bakri family.  Marina World Shipping directors
19   are made up of all Bakri family members.  IOOI's directors are
20   all apparently employees of the Bakri corporations.  One is in
21   the legal department of a Bakri-owned corporation; one is a
22   member of and works for a self-described company in the Bakri
23   organization; and the other one works in another separate
24   subsidiary of a Bakri corporation.  There's clear ties between
25   these directors.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

69TVROUA                    Argument

1          Marina World Shipping and IOOI are one entity; the two
2     pockets in the same pair of pants.
3          The maritime report, which defendants claim is four
4     years old -- which is four years old, but which is equally
5     relevant today, shows that the Bakri family uses IOOI as their
6     chartering arm.  They use it to enter into transactions.  And,
7     as I said, Marina World Shipping is the piggy bank.  They are
8     almost like two departments; they are the same company.
9          And, finally, the audit that Mr. Bakri submitted
10    allegedly to show that it has above-the-board records, reveals
11    that it enters into related party transactions regarding ship
12    charters.  What these transactions are, I am unsure.  However,
13    upon a minimal amount of discovery, I believe we can find out.
14    However, this in no way establishes that they are separate from
15    IOOI.
16         And, in addition, again, upon a minimal amount of
17    discovery, we believe we can uncover many more payments made on
18    behalf of Marina World Shipping -- made on behalf of IOOI by
19    Marina World Shipping.
20         The owners in this case have approached people in
21    order to find out about more payments; however, they came to
22    them and said we have a confidentiality clause in our charter
23    party.  So they couldn't help even if they wanted to.  Upon
24    being awarded discovery, we can certainly clarify how often
25    Marina World Shipping is certainly paying on behalf of IOOI.

18

69TVROUA                    Argument

1    And, as such, I believe plaintiff has met its burden,
2    either under the defendant's alleged pleading requirements or
3    under whatever Judge Wood's pleading requirements in Tide Line.
4    And for that reason, the attachment should be upheld.
5         THE COURT:  Thank you.  It is the plaintiff's burden,
6    and so the plaintiff gets to go first and last; but, Mr. Unger,
7    I'll give you an opportunity briefly if there's something
8    additional you wanted to say.
9         MR. UNGER:  A couple real quick points, your Honor.
10   We're back to the has versus alleges argument in looking at
11   what they talked about.  The evidence, it doesn't have to be
12   admissible at this stage, but it has to be credible.  And it
13   has to support the allegations.  And, quite frankly, the
14   evidence that they have does neither.
15        The allegation that Marina World hasn't supplied any
16   paper to document the assignments, it's not Marina World who
17   has the burden of proof, it's the plaintiff.  And it was never
18   challenged by the plaintiffs, okay.  The fact that IOOI says we
19   have instructed our bankers, I don't know why, but it certainly
20   is not compelling evidence that there is an alter-ego
21   relationship.  And, in fact, the argument that Marina World is
22   used as IOOI's bank is undermined by the fact that IOOI paid
23   the settlement in the prior case, the Garda Shipping case,
24   which is referred to in the papers, out of its own funds.
25   They're holding the lease to U.S. standards rather than Saudi

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

69TVROUA                    Argument
1    standards; yet they don't have any evidence to show you what
2    the practice is in terms of Saudi leasing of offices.
3    Mr. Bakri is the only evidence that is before the Court, and
4    Mr. Bakri explains what happens.  Okay.
5             They never closed the circle between IOOI, the Bakri
6    group, and Marina World.  The four-year old report is not
7    relevant.
8             In terms of any suggestion as to discovery, discovery
9    has never been asked for prior to today, and it shouldn't be.
10   In terms of the suggestion that the motion should be held only
11   in terms of a summary judgment standard, basically that allows
12   the plaintiff then in any instance, with even the barest
13   whisper of a connection between two companies, to say, A is the
14   alter ego of B; and that alleged alter ego can't challenge it
15   until it's gone through miles and miles of legal hoops and
16   legal proceedings, effectively all the way to trial.
17            If Marina World had not challenged the money being
18   attached in this instance, look at what would have happened.
19   Plaintiff would have had to get a judgment -- I'm sorry, an
20   award in London against IOOI, and then seek to confirm that
21   award.  And then plaintiff would still have the burden of
22   proving down the road that IOOI and MWS are alter egos in order
23   to go ahead and collect a judgment here against MWS.
24            So it goes beyond the realm of common sense to say
25   that they shouldn't have to have that ability to go ahead at

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

```
        69TVROUA                    Argument
 1    this early stage and have some credible evidence that the two
 2    are linked in order to have taken the step that they have done.
 3             MR. KAHN:  Your Honor, if I could be heard on just one
 4    brief point brought up by plaintiffs regarding the Maersk v.
 5    Neewra case, which was recently decided by Judge Casey, and the
 6    dismissal standard that we're also seeking here.
 7             As Mr. Unger said, the Court would still have
 8    jurisdiction over the case generally, but only against IOOI if
 9    the case is dismissed against Marina World.
10             And what occurred in the Maersk v. Neewra case, if you
11    look at it carefully, you'll see that the plaintiffs are
12    expanding what was actually said in that case.  In the Maersk
13    v. Neewra case, what happened was the defendant moved to vacate
14    the attachment on maritime attachment grounds, and then also
15    sought to dismiss a RICO cause of action on the grounds that it
16    was not sufficiently pled.  And the Court held that it was
17    improper at that time to attack the RICO cause of action in an
18    E(4)(f) hearing.  The Court found that there was no basis to do
19    that, particularly where the defendant had not yet appeared.
20             One slightly complicating wrinkle in that case was
21    that the defendant, who appeared only in the guise of garnishee
22    and not as the defendant, it was proven at the E(4)(f) hearing
23    that the garnishee actually was the defendant.  He was playing
24    a name game; he had essentially multiple IDs with slightly
25    different spellings of his name.  And Judge Casey saw through
```

21

69TVROUA                    Argument

1   that and saw this is all the same person.
2           But with respect to the standard for dismissal, Judge
3   Casey held that what was going on in that case was that it was
4   improper in the context of an E(4)(f) maritime hearing
5   concerning whether or not an attachment should be vacated to
6   challenge whether a RICO cause of action was sufficiently pled
7   under 9(b).
8           And so the reading urged by the plaintiffs here I
9   think is over-expansive, goes well beyond what Judge Casey
10  actually decided in the Maersk v. Neewra matter.
11          Thank you.
12          THE COURT:  Thank you.  On May 4th, 2006, I signed an
13  order directing the clerk to issue maritime attachment against
14  property of IGOI and Marina World.  Thereafter, I scheduled an
15  initial pretrial conference in this case, and had a conference
16  held on July 14th.  The defendant indicated a desire to move to
17  vacate the attachment, and I set a schedule for the motion to
18  be made four days later, set a date for replies, responses and
19  replies, and set a date for a hearing of August 1, 2006.
20          And there is certainly nothing unusual or
21  inappropriate about it, but I do want to make it plain for the
22  record, subsequently I received requests to adjourn the
23  hearing, including a letter request by Mr. Unger dated July
24  31st, which caused me to move it till August 28th.  And then a
25  further request from Ms. Peterson that it be adjourned to a

22

69TVROUA                        Argument

1    later date, and it was moved to today.  So that's what brings
2    us here today.
3            This is the hearing required under Rule E(4)(f) of the
4    supplemental rules for certain admiralty and maritime claims.
5    And the rule provides that whenever property is arrested or
6    attached, any person claiming an interest in it shall be
7    entitled to a prompt hearing at which the plaintiff shall be
8    required to show why the arrest or attachment should not be
9    vacated, or other relief granted consistent with these rules.
10            In the very recent decision of the Second Circuit in
11    Aqua Stoli, which is 2006 Westlaw, 2129336, and that is now
12    recorded at 460 F.3d 434 Second Circuit, July 31, 2006, the
13    Court had occasion to examine the historical underpinnings of
14    maritime attachment and the process by which maritime
15    attachment may be vacated.
16            I have spent some time with that opinion in examining
17    it, studying it, and I'm not going to endeavor to summarize it
18    here today.  But I do note that the holding of the Court is
19    that in addition to having to meet the filing and service
20    requirements of Rule B and E, an attachment should issue if the
21    plaintiff shows that, one, it has a valid prima facie admiralty
22    claim against the defendant; two, the defendant cannot be found
23    within the district; three, the defendant's property may be
24    found within the district; and, four, there is no statutory or
25    maritime law bar to the attachment.

23

69TVROUA                          Argument

1              And conversely says, Aqua Stoli, a district court must
2      vacate an attachment if the plaintiff fails to sustain his
3      burden of showing that he has satisfied the requirements of
4      Rule B and E.
5              The Court also outlined certain other limited
6      circumstances which do not appear to be relevant here.
7      Specifically, it outlined a circumstance where the defendant is
8      subject to suit in a "convenient adjacent jurisdiction," and
9      where the plaintiff could obtain in personam jurisdiction over
10     the defendant in the district where the plaintiff is located,
11     or the plaintiff has already obtained sufficient security for
12     the potential judgment by attachment or otherwise."
13             Those circumstances, i.e., the limited circumstances,
14     have no application in this case.
15             I conclude that the plaintiff has met the requirement
16     that the defendant cannot be found within the district; that
17     the defendant's property may be found within the district; and
18     that there is no statutory or maritime law bar to the
19     attachment.  I consider, however, whether a valid prima facie
20     admiralty claim against the defendant has been asserted.
21             Now, there is much discussion, and I suppose it will
22     be a continuing discussion, as to how a district court is to
23     determine whether there is a valid prima facie admiralty claim.
24     I think it is fair to say that after Aqua Stoli, it cannot
25     credibly be argued that there is a probability of success on
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

69TVROUA                    · Argument
1   the merits type standard.  But I really don't, in this case,
2   have to spend too much time with whether it is something to be
3   determined solely from the face of the pleadings or whether
·4  this Court can and should consider matters outside the four
5   corners of the pleading, because under either standard, I find
6   that the plaintiff has alleged a valid prima facie admiralty
7   claim.
8           I'm mindful of the dictates of supplemental Rule
9   E(2)(a), that there must be at least enough particularity so
10  that the plaintiff -- or, rather, the defendant can commence an
11  investigation of the facts and frame a responsive pleading; and
12  that this is a higher pleading requirement than the Rule 8(a)
13  requirement.
14          Here, the plaintiff alleges that MWS is the alter ego
15  of IOOI, but it does not simply leave it as a conclusory
16  allegation.  It goes on to allege that the reason it believes
17  it is the alter ego is because IOOI dominates and disregards
18  MWS's corporate form to the extent that MWS is actually
19  carrying on IOOI's business and operations as if the same were
20  its own.  It further goes on to allege that MWS, acting as
21  paying agent, acts as paying agent or arranges for other·
22· nonparties to satisfy the debts and obligations of IOOI.
23          It seems to me that is a sufficient allegation.  If
24  and to the extent it is not a sufficient allegation, I look to
25  the declaration of Hara Anastasatou.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

69TVROUA                    Argument

1           Now, the declaration referenced goes into the issue of
2      common ownership and control, alleging that the two are a
3      single economic entity.  Some of the facts that are set forth
4      there are consistent with alter ego, but they could also be
5      consistent with one shareholder owning two separate
6      corporations.  There's nothing in law that prohibits a single
7      shareholder from doing business through separate corporations,
8      provided the separate corporate form is maintained.
9           But what I find impressive about the declaration is it
10     gives considerable particularity and description to instances
11     where MWS made a payment on behalf of IOOI, it gives chapter
12     and verse, it gives the details, it gives the time, the place,
13     and the circumstances, and it gives a number of examples.  And
14     so I find paragraphs 20 through 43 of the declaration to be of
15     particular help and utility.
16          The prerequisites for piercing the corporate veil are
17     as clear in federal maritime law as in shoreside law.  That's a
18     point that has been made in the Kirno Hill case; and it's clear
19     that the veil will be pierced only if a corporation is used by
20     another entity or individual to perpetrate a fraud or, the
21     operative word being "or," was so dominated that its corporate
22     form was disregarded and the notion that a way to prove veil
23     piercing is by showing that the alleged alter ego so dominated
24     and disregarded its alter ego's corporate form, that the alter
25     ego is actually carrying on the controlling party's business

26

69TVROUA                    Argument

1    instead of its own, is an extremely well-recognized,
2    well-established means of demonstrating corporate veil
3    piercing.
4            I look specifically to pages 25 to 27 of Judge Wood's
5    well-reasoned and thoughtful opinion in Tide Line, including
6    the citation up to the factors outlined in William Passalacqua
7    Builders v. Resnick.
8            Unlike Tide Line, of course, this is a case where the
9    alter ego allegation is on the face of the complaint.  Whether
10   I look at it in terms of the complaint or I look at it in terms
11   of the complaint taking into account the plaintiff's
12   submissions, as well as the defendant's submissions, and the
13   argument presented here today, I conclude that there is a valid
14   prima facie admiralty claim; that all other requirements of
15   Rule B and E have been met; that there is not a limited
16   circumstance, as outlined in Aqua Stoli, for vacating the
17   attachment under the limited circumstances doctrine.
18           So I conclude that the plaintiff has, at this hearing,
19   met each and every element of the plaintiff's burden; and,
20   therefore, the motion to vacate the attachment is denied.
21           Is there anything further?
22           MS. PETERSON:  No, your Honor.
23           MR. UNGER:  No, your Honor.
24           THE COURT:  Thank you all very much.
25                       *      *      *

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300