TISDALE LAW OFFICES
11 West 42nd Street, Suite 900
New York, NY 10036
Tel:    (212) 354-0025
Fax:    (212) 869-0067
Attorneys for Plaintiff

RECEIVED
OCT 3 1 2007
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

BRAVE BULK TRANSPORT LTD.,

               Plaintiff,

       - against -

SPOT ON SHIPPING LTD., a.k.a. SPOT ON
SHIPPING LTD. BVI, a.k.a. SPOT ON,
a.k.a. CLAYTON STAR COMPANY LIMITED
a.k.a. CLAYTON STAR and PEHW ASSET
MANAGEMENT LIMITED a.k.a. PEHW
ASSET MANAGEMENT LTD.
and ZHANGGANG SHIPPING LIMITED,

               Defendants.

07 CV 4546 (CM)

ECF CASE

---------------------------------------------------------------X

## VERIFIED SECOND AMENDED COMPLAINT

The Plaintiff, BRAVE BULK TRANSPORT LTD. (hereinafter "Plaintiff"), by its

attorneys, Tisdale Law Offices, as and for its Verified Second Amended Complaint pursuant to

this Court's October 30, 2007 Order, annexed hereto as Exhibit "1," granting Plaintiff leave to

file same against the Defendants, SPOT ON SHIPPING LTD. a.k.a. SPOT ON SHIPPING LTD.

BVI a.k.a. SPOT ON (hereinafter "Spot On") a.k.a. CLAYTON STAR COMPANY LIMITED

a.k.a. CLAYTON STAR (hereinafter "Clayton Star"), PEHW ASSET MANAGEMENT

LIMITED a.k.a. PEHW ASSET MANAGEMENT LTD. (hereinafter "Pehw Asset") and

ZHANGGANG SHIPPING LIMITED (hereinafter "Zhanggang")(collectively referred to as the

"Defendants") allege, upon information and belief, as follows:

12

TISDALE LAW OFFICES
11 West 42nd Street, Suite 900
New York, NY 10036
Tel:    (212) 354-0025
Fax:    (212) 869-0067
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BRAVE BULK TRANSPORT LTD.,                          :

           Plaintiff,                        :        07 CV 4546 (CM)

     - against -                             :        ECF CASE

SPOT ON SHIPPING LTD., a.k.a. SPOT ON         :
SHIPPING LTD. BVI., a.k.a. SPOT ON,
a.k.a CLAYTON STAR COMPANY LIMITED            :
a.k.a. CLAYTON STAR and PEHW ASSET
MANAGEMENT LIMITED a.k.a. PEHW               :
ASSET MANAGEMENT LTD.
and ZHANGGANG SHIPPING LIMITED,            . :

          Defendants.                      :
------------------------------------------------------------X

## VERIFIED SECOND AMENDED COMPLAINT

     The Plaintiff, BRAVE BULK TRANSPORT LTD. (hereinafter "Plaintiff"), by its

attorneys, Tisdale Law Offices, as and for its Verified Second Amended Complaint pursuant to

this Court's October 30, 2007 Order, annexed hereto as Exhibit "1," granting Plaintiff leave to

file same against the Defendants, SPOT ON SHIPPING LTD. a.k.a. SPOT ON SHIPPING LTD.

BVI a.k.a. SPOT ON (hereinafter "Spot On") a.k.a. CLAYTON STAR COMPANY LIMITED

a.k.a. CLAYTON STAR (hereinafter "Clayton Star"),  PEHW ASSET MANAGEMENT

LIMITED a.k.a. PEHW ASSET MANAGEMENT LTD. (hereinafter "Pehw Asset") and

ZHANGGANG SHIPPING LIMITED (hereinafter "Zhanggang")(collectively referred to as the

"Defendants") allege, upon information and belief, as follows:

1.    This is an admiralty and maritime claim within the meaning of Federal Rule of

Civil Procedure 9(h) and 28 United States Code § 1333.

2.    At all material times, Plaintiff was and still is an entity duly organized and

existing by virtue of foreign law.

3.    Upon information and belief, at all material times, the Defendant Spot On was

and still is an entity duly organized and existing by virtue of foreign law places of business in the

British Virgin Islands and Hong Kong with offices at Room 1818-1823, 18th floor, Sun Hung Kai

Centre, No. 30 Harbour Road, Wanchai, Hong Kong.

4.    Upon information and belief, at all material times, the Defendant Pehw Asset was

and still is an entity duly organized and existing by virtue of foreign law with a principal place of

business in Hong Kong and/or the British Virgin Islands operating out of the same address as

Spot On.

5.    Upon information and belief, Spot On notified the Plaintiff on or about March 30,

2007 by email that its name had changed and that: "Spot On Shipping Limited ("The Company")

has been acquired at 100% equity by PEHW Asset Management Limited, which is a subsidiary

company under PEHW Fund Limited.  So the operation of The Company should be named as

"PEHW Asset Management Limited" afterwards, which is also the official name for the purpose

of ffa contract."

6.    Upon information and belief, Pehw Asset notified the Plaintiff on or about May 7,

2007 by email that the name and contact details of "Spot On Shipping Limited, BVI" had been

changed to "Clayton Star Company Limited."  As such, Clayton Star is a name by which Spot

On is also known.

2

7.    Upon information and belief, at all material times, the Defendant Zhanggang was and still is an entity duly organized and existing by virtue of foreign law with a principal place of business in Hong Kong.

8.    By way of a Forward Freight Agreement dated February 26, 2007 (hereinafter the "FFA"), Defendant Spot On agreed to sell and buy freight futures with the Plaintiff.

9.    The FFA provided for settlement dates of the last day of three contract months: April, May and June of 2007.

10.    Despite due demand for payment, Defendant has failed to remit payment to Plaintiff in breach of the FFA.

11.    As a result of Spot On's breach of the FFA contract, Plaintiff has suffered a loss in the total principal sum of $380,769.67, as best can now be estimated, exclusive of interest, recoverable costs and reasonable attorneys fees.

12.    Pursuant to clause 16 of the FFA contract all disputes arising thereunder are to be submitted to the English High Court of Justice with English law to apply.

13.    Plaintiff is currently preparing to commence litigation against the Defendants in the English High Court on its claims as described hereinabove.

14.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in English High Court proceedings conducted pursuant to English Law.  As best as can now be estimated, Plaintiff expects to recover the following amounts:

| | | |
|---|---|---|
| A. | Principal claim: | $380,769.67 |
| B. | Estimated interest on the principal claims at 6.5% for three years: | $79,260.27 |
| C. | Attorneys' fees and other recoverable costs: | $80,000.00 |

3

Total:                                                    **$540,029.94**

15.    Upon information and belief, Pehw Asset is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Pehw Asset is actually carrying on Spot On's business and operations as if same were its own.

16.    Upon information and belief, Defendant Pehw Asset is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Pehw Asset.

17.    Upon information and belief, Defendants Pehw Asset and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, and used to carry on such individuals' own business.  Further, the Defendants share the same offices, employees, telephone numbers, fax numbers and/or email addresses.

18.    Upon information and belief, Defendant Pehw Asset has no separate, independent identity from Defendant Spot On as they use their names interchangeably with design to fraudulently avoid payment of just debts to their creditors.

19.    In the alternative, Defendant Pehw Asset is merely a shell corporation through which Spot On conducts its business.

20.    In the further alternative, Defendants Pehw Asset and Spot On are partners and/or are joint venturers.

21.    In the further alternative, Defendants Pehw Asset and Spot On are affiliated companies such that the Defendant Pehw Asset is now, or will soon be, holding assets belonging to Defendant Spot On and vice versa.

22.    Upon information and belief, Zhanggang is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Zhanggang is actually

4

carrying on Spot On's business and operations as if same were its own.

23.    Upon information and belief, Zhanggang and Spot On have a common address and place of business at: Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong. *See Commercial Services Agreement at page 1 annexed hereto as Exhibit "2."*

24.    Upon information and belief, this is also the address of "Spot On (Hong Kong) Group Corporation Limited" ("Spot On HK GCL") which is another alter ego of "Spot On Shipping Ltd." ("Spot On").

25.    Upon information and belief, Zhanggang and Spot On share a common email address: shipping @ spoton-hk.com. *See Lloyd's MIU Investigation Report on Zhanggang at page 2 annexed hereto as Exhibit "3."*

26.    The corporate research conducted on these companies includes an Infospectrum Report and a Lloyd's MIU report. No information was uncovered that shows that Zhanggang is owned by an entity which is a Chinese government-owned enterprise.

27.    On the contrary, Zhanggang is a joint venture between Spot On and Zhangdian Steel Mill of China. *See Exhibit "3."*

28.    Upon information and belief, Lloyd's MIU telephoned Zhanggang and were told that Zhanggang is a "ship charterer."

29.    Contrary to the false assertions made by Zhanggang, Spot On and Zhanggang do share common ownership. Specifically, upon information and belief, both Spot On HK GCL and Zhanggang are owned and run by the Zhang family. Madam Wei-Lu Zhang reported to be the president of Zhanggang is also a principal director of Spot On HK GCL. *See excerpt from Spot*

*On's Annual Return annexed hereto as Exhibit "4" and compare with Exhibit "3."*

30.    Further, Zhanggang's chartering manager is Ms. Sammy Yu. Ms. Sammy Yu was also the contact between ICAP Hyde Derivatives Limited and Spot On in drafting the February 26, 2007 FFA. *See Email correspondence between ICAP and Spot On annexed hereto as Exhibit "5," see further Exhibit "3" which indicates that Sammy Yu is the manager of Zhanggang.*

31.    Sammy Yu's name appears on the first page of the FFA between Spot On and Brave Bulk as the "contact" for Spot On. *See February 26, 2007 FFA annexed hereto as Exhibit "6."*

32.    Upon information and belief, Spot On and Zhanggang's names are used interchangeably in the industry. *See Baltic Dry Index Dry Cargo Fixture Summary annexed hereto as Exhibit "7."*

33.    Upon information and belief, Defendant Zhanggang is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Zhanggang.

34.    Upon information and belief, Defendants Zhanggang and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, including Mrs. Wei-Lu Zhang and Ms. Sammy Yu, and used to carry on such individuals' own business.

35.    Upon information and belief, Defendant Zhanggang has no separate, independent identity from Defendant Spot On as they use their names interchangeably with design to fraudulently avoid payment of just debts to their creditors.

36.    In the alternative, Defendant Zhanggang is merely a shell corporation through which Spot On conducts its business.

6

37.     In the further alternative, Defendants Zhanggang and Spot On are partners and/or are joint venturers.

38.     In the further alternative, Defendants Zhanggang and Spot On are affiliated companies such that the Defendant Zhanggang is now, or will soon be, holding assets belonging to Defendant Spot On and vice versa.

39.     The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees including, but not limited to, ABN-AMRO, American Express Bank, Bank of America, Bank of New York, Deutsche Bank, Citibank, HSBC Bank USA Bank, J.P. Morgan Chase, Standard Chartered Bank, Wachovia Bank N.A., and/or Commerzbank Aktiengesellschaft AG which are believed to be due and owing to the Defendants.

40.     The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims attaching any assets of the Defendants held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendants, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Verified Second Amended Complaint;

7

B.     That since the Defendants cannot be found within this District pursuant to

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue

an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment

pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and

federal common law attaching all tangible or intangible property in whatever form or any other

funds held by any garnishee, including, but not limited to, ABN-AMRO, American Express

Bank, Bank of America, Bank of New York, Deutsche Bank, Citibank, HSBC Bank USA Bank,

J.P. Morgan Chase, Standard Chartered Bank, Wachovia Bank N.A. and/or Commerzbank

Aktiengesellschaft AG which are due and owing to the Defendants, in the amount of

**$540,029.94** to secure the Plaintiff's claims, and that all persons claiming any interest in the

same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters

alleged in the Verified Second Amended Complaint;

C.     That this Court recognize and confirm any foreign judgment/award of costs on the

claims had herein as a judgment of this Court;

D.     That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof; and

## ATTORNEY VERIFICATION

State of Connecticut )
                     )     ss: Southport
County of Fairfield  )

1.     My name is Lauren C. Davies.

2.     I am over 18 years of age, of sound mind, capable of making this Verification and fully competent to testify to all matters stated herein.

3.     I am the attorney for the Plaintiff in this action. I am fully authorized to make this Verification on its behalf.

4.     I have read the foregoing Verified Second Amended Complaint and the contents thereof are true and accurate to the best of my knowledge, information and belief.

5.     The reason that this Verification was made by me and not the Plaintiff is that the Plaintiff is a corporation none of whose officers are present in this District.

6.     The source of my knowledge is information and records furnished to me by the Plaintiff and its solicitors, all of which I believe to be true and accurate.

Dated: October 31, 2007
       Southport, CT

_____
Lauren C. Davies

10

21

E.    That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: October 31, 2007
New York, NY

The Plaintiff,
BRAVE BULK TRANSPORT LTD.,

By:

Lauren C. Davies (LD 1980)
Thomas L. Tisdale (TT 5263)
TISDALE LAW OFFICES
11 West 42nd Street, Suite 900
New York, NY 10036
(212) 354-0025 (Phone)
(212) 869-0067 (Fax)
ldavies@tisdale-law.com
ttisdale@tisdale-law.com

9

20

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

BRAVE BULK TRANSPORT LTD.,

        Plaintiff,

-against-                                                              4546
                                 07 Civ. 4645 (CM)

SPOT ON SHIPPING LTD., et al.,

        Defendant.

_____ x

DECISION AND ORDER (1) DENYING DEFENDANTS' MOTION TO
VACATE MARITIME ATTACHMENT AGAINST SPOT ON SHIPPING LTD.,
(2) GRANTING PLAINTIFF'S MOTION TO RECONSIDER PREVIOUS
ORDER VACATING THE ATTACHMENT AGAINST DEFENDANT
ZHANGGANG SHIPPING LIMITED (ZSL), (3) DECLINING TO
REINSTATING ATTACHMENT AGAINST ZSL, AND (4) GRANTING
PLAINTIFF PERMISSION TO FILE A SECOND AMENDED COMPLAINT
AND A NEW REQUEST FOR A MARITIME ATTACHMENT AGAINST ZSL,
PROVIDED THOSE PAPERS ARE FILED WITHIN 10 BUSINESS DAYS

McMahon J.:

On July 10, 2007, this Court signed an ex parte order of attachment pursuant to Supplemental
Admiralty Rule B. The order covered the property of all defendants named in the complaint,
including Zhanggang Shipping Limited (ZSL), which was alleged to be an alter ego of
defendant Spot On Shipping Ltd. Spot On was allegedly in breach of "forward freight agreements
that were alleged by plaintiff to be maritime contracts, thereby permitting plaintiff to invoke the
admiralty jurisdiction of this court.

On August 22, 2007, ZSL moved to vacate the attachment of its property, pursuant to Rule
E (4) (f) of the Federal Rules of Civil Procedure, on two grounds: the underlying contract that was
allegedly breached by Spot On was not a maritime contract, and ZSL had not been shown to be Spot
On's alter ego. Plaintiff did not respond to the motion. In a written decision and order dated
September 14, 2007, this Court lifted the attachment as to defendant ZSL, finding that, based on the
information contained in the complaint, ZSL is not an alter ego of Spot On. In that same order, the
Court questioned whether "Forward Freight Agreements" are maritime contracts and directed
plaintiff to show cause why the attachment should not be vacated in its entirety.

Brave Bulk has filed papers in response to the Court's order to show cause, in which they argue that Forward Freight Agreements are maritime contracts. Plaintiff's papers also include a motion for reconsideration of the Court's decision vacating the attachment against ZSL, arguing that *inter alia* plaintiff has a maritime claim and has adequately alleged *prima facie* alter-ego claims against ZSL and the other alter-ego defendants. Defendants, in turn, filed papers asking the Court to vacate the attachment against Spot On, and not to reconsider its ruling vacating the ZSL attachment.

On October 5, 2007, the Court heard argument on the motion pursuant to Rule E (4) (f).

## Forward Freight Agreements are "Salty" Contracts

Brave Bulk and Spot On entered into a Forward Freight Agreement for the swap of the future value of ocean freight. This contract specified the type of vessel to be used, the routes upon which said vessels would travel and the duration of the agreement. *See Forward Freight Agreement.*"

28 U.S.C. § 1333(1) affords this Court original jurisdiction in "any civil case of admiralty or maritime jurisdiction." *See Sea Transport Contractors, Ltd. v. Industries Chemiqes du Senegal*, 411 F. Supp. 2d 386, 2006 A.M.C. 1076, 1082 (S.D.N.Y. January 24, 2006); *see also Stolt-Nielsen S.A. v. Celanese AG*, 430 F. 3d 567, 572 (2d Cir. 2005). To determine the boundaries of admiralty jurisdiction, courts turn to the purpose of the grant. *See Insurance Co. v. Dunham*, 78 U.S. 1, 11 Wall. 1, 24, 20 L. Ed. 90 (1871). As recently confirmed by the United States Supreme Court in *Exxon Corp. v. Central Gulf Lines, Inc.* 500 U.S. 603, 608 (1991), "The fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce.'" *Id.; quoting Sisson v. Ruby*, 497 U.S. 358, 367 (1990); *quoting Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674 (1982). Stated another way, where "the subject matter of the contract relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment it is fairly said to constitute a maritime contract." *Ingersoll Milling Mach. Co. v. M/V BODENA*, 829 F.2d 293, 302 (2d Cir. 1987) (emphasis added).

While initially skeptical about the saltiness of forward freight agreements, I am now persuaded that they are sufficiently part of the business of maritime commerce to confer admiralty jurisdiction.

Forward freight agreements, or FFAs as they are commonly known, are commitments to perform in the future a shipping service between ship owners, charterers and/or traders. The parties to the agreement contract to "pay the difference between a price agreed today and the future price of moving a product from one location to another, or for the future price of hiring a ship over a period of time." Adam Sonin, *Managing Risk with Forward Freight Agreements, Commodities Now*, June 2005, *available online at:* http://www.commodities-now.com/content/market-areas/ags-and-softs/ma-article-7.pdf?PHPSESSID=34967b.

In the shipping industry, FFAs are negotiated with the express purpose of hedging and managing market risks relating to the employment of vessels in today's volatile freight market. For example, in the instant FFA, the parties entered into a Forward Freight Agreement to buy and sell

a specified tonnage freight at an agreed price for an agreed route and time span so that both corporations could reliably predict their ocean freight revenues and costs for the duration of the contract for those ocean routes. Thus, Forward Freight Agreements can fairly be said to constitute maritime contracts.

Forward Freight Agreements have been found to be maritime cases entitled to process of maritime attachment in the following cases: *C. Transport Panamax Ltd. v. North America Steamships Ltd.*, a.k.a. N.A.S.L., 06 CV 13178 (RLC); *Daeyang Shipping Co. Ltd. v. Navitrans Maritime Inc.*, 04 CV 08050 (VM); *Deiulemar v. Source Link Shipping Co. Ltd.*, 07 CV 02983 (SAS); *Deiulemar v. Spot On Shipping Ltd., et. al.*, 07 CV 03820 (VM); *Eurotrade Inc., Liberia v. Source Link Shipping Co. Ltd.*, BVI, 07 CV 3172 (SAS); *Pan Oceanic Maritime Inc. v. Source Link Shipping Co. Ltd.*, 07 CV 03089 (CM); *Perseveranza Di Navigazione S.P.A. v. Source Link Shipping Co. Ltd.*, 07 CV 03091 (RPP); *Taiwan Maritime Transport Co. Ltd. v. Navitrans Maritime Inc. and Navigation Maritime Inc.*, 06 CV 13564 (RJH), and *Setsea S.P.A. v. Source Link Shipping Co. Ltd.*, 07 CV 6230 (DAB).

In *Setsea S.P.A. v. Source Link Shipping Co. Ltd.*, 07 CV 4147 (S.D.N.Y. June 5, 2007), Judge Batts initially denied the plaintiff's application for an *ex parte* order for process of maritime attachment. Judge Batts held that although the FFA in question was "not so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction," it nonetheless fell short of the Second Circuit's requirement that the contract reference "maritime service or maritime transactions." *Setsea S.P.A. v. Source Link Shipping Co. Ltd.*, 07 CV 4147, Order Denying Application for Ex Parte Order (S.D.N.Y. June 5, 2007). Judge Batts allowed Setsea leave to replead within thirty days. On July 5, 2007, Setsea submitted a Verified Amended Complaint laying out more specifically the nature of forward freight agreements and why they are maritime contracts. This time, the Court granted the Plaintiff's application for an ex parte order for process of maritime attachment finding the FFA to be a maritime contract. *See Complaint and Ex Parte Order for process of maritime attachment and garnishment in 07 CV 6230 (DAB)*.

Plaintiff has thus met its burden of demonstrating that the subject matter of this dispute is maritime in nature.

### Plaintiff's Motion for Reconsideration of Court's Order Vacating ZSL Attachment

Plaintiff next asks the Court to revisit its decision vacating the ZSL attachment, on the ground that the Court overlooked several controlling cases that, if taken into account, would have altered the Court's conclusion. Plaintiff's argument is essentially that the Court did not consider the Second Circuit Court of Appeals decision in *Aqua Stoli* as well as and recent (albeit not "controlling") Southern District cases like *Tide Line and Route Holding*, which stand *inter alia* for the proposition that a plaintiff need only allege a *prima facie* maritime claim against the principal defendant and a *prima facia* case against the alleged alter-ego entity in order to satisfy its pleading burden under Rule E (4) (f). Plaintiff argues that they have met that burden in their Amended Complaint. Defendants strongly oppose the motion.

"The standard for granting . . . a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (citing *Schonberger v. Serchuk*, 742 F. Supp. 108, 119 (S.D.N.Y. 1990); *Adams v. United States*, 686 F. Supp. 417, 418 (S.D.N.Y. 1988)). The decision to grant or deny the motion is committed to the sound discretion of the district court. *Devlin v. Transportation Communications Int'l Union*, 175 F.3d 121, 132 (2d Cir. 1999).

In a letter dated September 17, 2007 and at the Rule E (4) (f) hearing held on October 5, 2007, plaintiff's attorneys advised the Court that they did not become aware of defendants' motion to vacate until after they received the Court's decision on the motion. I am satisfied that this is the case and so have agreed to reconsider my decision vacating the ZSL attachment in order to permit plaintiff's to respond to the motion.

The following allegations in the Amended Complaint allegedly support plaintiff's claim that ZSL is an alter ego of Spot On:

22.     Upon information and belief, Zhanggang is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Zhanggang is actually carrying on Spot On's business and operations as if same were its own.

23.     Upon information and belief, Defendant Zhanggang is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Zhanggang.

24.     Upon information and belief, Defendants Zhanggang and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, including Mrs. Wei-Lu Zhang and Ms. Sammy Yu, and used to carry on such individuals' own business.

25.     Upon information and belief, Defendant Zhanggang has no separate, independent identity from Defendant Spot On as they use their names interchangeably with design to fraudulently avoid payment of just debts to their creditors.

26.     In the alternative, Defendant Zhanggang is merely a shell corporation through which Spot On conducts its business.

27.     In the further alternative, Defendants Zhanggang and Spot On are partners and/or are joint venturers.

28.     In the further alternative, Defendants Zhanggang and Spot On are affiliated companies such that the Defendant Zhanggang is now, or will soon be, holding assets belonging to Defendant Spot On and vice versa.

*See* Verified Amended Complaint, ¶¶ *22-28*. Davies Decl. Ex. "1."

In an affidavit submitted in connection with the instant motion (albeit not in its original papers), Brave Bulk's counsel has set forth the basis for the "information and belief" allegations in the Verified Amended Complaint, these include:

(1)     XSL and Spot On share common address and place of business at Suites: 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong.

(2)     They have the same email address

(3)     An inforspectrum and a Lloyd's MIU report on the companies indicates that ZSL is a joint venture between Spot On and Zhangdian Steel Mill of China. No information in these reports indicates that ZSL is owned by the Chinese Government or by an entity that is owned by the Chinese Government.

(4)     Lloyd's MIU advised plaintiff that it telephoned ZSL and was told that ZSL is a "ship charterer."

(5)     Madam Wei-Lu Zhang is president of ZSL and a principal director of Spot On (Hong Kong), which also shares an address with Spot On and ZSL.

(6)     ZSL chartering manager, Ms. Sammy Yu, is also listed as the contact for Spot On on the first page of the FFA between Spot ON and Brave Bulk, where she is listed as the "contact" for Spot On.

(7)     The names of Spot On and ZSL are used interchangeably in the industry.

Plaintiff bolsters each of these contentions with citations to exhibits, and avers that additional connections between Spot On and ZSL will be revealed with discovery.

*See* Declaration of Lauren C. Davies ¶¶ 23-36.

Under Rule E (4) (f), the plaintiff has the initial burden to show that its attachment satisfies the requirements of Supplemental Rules B and E. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.*, 460 F. Supp. 434, 445 n. 5 (2d Cir. 2006). In order to sustain an attachment, a plaintiff must prove that it has satisfied the "filing and service requirements of Rules B and E" and that: (1) it has a valid *prima facie* admiralty claim against the defendant, (2) the defendant is not present in the district, (3) defendant's property can be found within the district, and (4) there is no maritime law or statutory bar to the attachment. *Aqua Stoli*, 460 F.3d at 445. The Rule(E) (4) (f) hearing is not intended to resolve the dispute between the parties, but to determine if the technical requirements of the Rule were met. *Aqua Stoli, Shipping Ltd. v. Gardner Smith Pty Ltd.*, 2006 U.S. App. LEXIS 19302, at *35 (2d Cir. 2006). Thus, as long as the plaintiff can establish that it has alleged a prima facie maritime claim, that the defendant is not present in the district and that the defendant's property has been restrained in the district and no other statutory bar to the attachment exists, the attachment should be upheld. *See Aqua Stoli*, at *28-29. *Aqua Stoli's* holding marks a departure from the prior

"probable cause/reasonable basis standard" that certain courts applied before *Aqua Stoli*.

Once a plaintiff has established the technical requirements stated in Rule B, the burden shifts to the defendant to prove the limited bases for vacatur. An otherwise facially valid Rule B attachment may only be vacated if the defendant shows at post-seizure hearing that (1) the defendant is subject to suit in a convenient adjacent jurisdiction; (2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or (3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. *See Aqua Stoli*, at *27. Defendant has not moved on any of these grounds. So as long as the allegations in the Amended Complaint states a *prima facia* case that ZSL is an alter ego of Spot On, the attachment against ZSL must stand.

In the *Tide Line* case, Chief Judge Kimba M. Wood vacated an attachment that was based on overly general alter-ego allegations. *See* Order dated August 15, 2006 in *Tide Line, Inc. v. Eastrade Commodities Inc. and Transclear, S.A.*, 06 Civ. 1979 (KMW). Chief Judge Wood found that mere allegations that entity B was the "paying agent" for entity A, and that entity B had arranged for other non-parties to pay the debts of Entity A, was insufficient to state an alter-ego claim for Rule E (4) (f) purposes. Remarking on the paucity of alter-ego allegations, the Court noted that the complaint did not even contain the phrase "alter-ego." The Chief Judge vacated the attachment but stayed the release of any funds for 15 days, to allow plaintiff time to file an amended complaint with additional alter-ego allegations and to apply for a new order of attachment. The Court adopted this procedure because plaintiffs – like Brave Bulk in the present case – submitted additional support for their alter ego allegations in their motion to vacate opposition papers.

By contrast *Route Holding Inc. and Beam Company v. IOOI and Marina World Shipping*, 06 Civ. 3428 (PKC), Judge Castel held – on allegations strikingly similar to those in the amended complaint presently before the Court – that Route Holding and Beam Company has sufficiently pleaded their alter-ego claims against Marina World Shipping. The plaintiffs had alleged that Marina World Shipping was an alter-ego because it dominated and controlled the principal, IOOI. The district court found that plaintiffs' pleadings were sufficient to uphold the attachment, finding that:

> the plaintiff alleges that MWS is the alter-ego of IOOI, but it does not simply leave it as a conclusory allegation. It goes on to allege that the reason it believes it is the alter-ego is because IOOI dominates an disregards MWS' corporate form to the extent that MWS is actually carrying on IOOI's business and operations as if the same were its own. It further goes on to allege that MWS, acting as paying agent, acts as paying agent or arranges for other nonparties to satisfy the debts and obligations of IOOI. It seems to me a sufficient allegation.

*See* Transcript of *Route Holding* at 12, lines 14-24.

Like Brave Bulk in the case at bar and the plaintiffs in *Tide Line*, the *Route Holdings* plaintiffs submitted additional information and affidavits in support of their alter-ego claims, along with their opposition papers. Finding that the alter-ego allegations in the complaint were sufficient

for Rule B purposes, Judge Castel sidestepped the open question of whether a Court assessing the validity of a maritime claim at a Rule E (4)(f) proceeding can resort to supplemental materials outside the four corners of the complaint.

The allegations set forth above are sufficient for the Court to conclude that Brave Bulk has a good faith basis for alleging that ZSL is Spot On's alter ego. However, I agree with Chief Judge Wood that the place where those allegations should appear is in the complaint- not in material submitted to the Court for the first time in opposition to a motion to vacate. The wholly conclusory allegations in the Amended Complaint are, upon reflection, simply insufficient. Were a plaintiff to be permitted to rely on such allegations to obtain an attachment against an entity that is not a party to a contract sued on, the already thinly stretched remedy of maritime attachment could disrupt the commercial activities of entities whose links to the real defendant in interest are tenuous of non-existent. By including specific factual allegations that support "on information and belief" contentions in the complaint, the plaintiff's counsel subjects himself to Rule 11 sanctions should they prove erroneous. That is, it seems, a salutary result.

Upon reconsideration, thereof, I decline to vacate my original decision.

However, because the record reveals that plaintiff did have a good faith basis for alleging that ZSL was Spot On's alter ego. I will afford plaintiff 10 business days to file a second amended complaint, containing the basis for the alter ego allegations. Plaintiff may accompany this amended pleading with an application for a new order of attachment. Assuming the second amended complaint complies with this order, it will be granted.

This constitutes the decision and order of the Court.

October 30, 2007

_____
U.S.D.J.

BY FAX TO:

    Tisdale Law Offices (212-869-0067)
    Edward A. Keane. Esq. (212-385-1605)

# EXHIBIT 2

# COMMERCIAL SERVICES AGREEMENT

THIS AGREEMENT is made on the 27th of February, 2006 BETWEEN: -

(1) **ZHANGGANG SHIPPING LIMITED** a Company incorporated and existing under the laws of Hong Kong whose registered office is at Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong ("the Principal") and.

(2) **SPOT ON (HONG KONG) GROUP CORPORATION LIMITED**, a Company incorporated and existing under the laws of Hong Kong whose registered office is at Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong ("the Manager").

## WHEREAS : -

The Principal is desires to share office with the Manager and to appoint the Manager as manager to provide certain commercial services to the Principal in the respect of the management of business, accounts, shipping settlement and following operations and the Manager has agreed to render such services to the Principal, all upon the terms and conditions hereinafter set out.

## IT IS MUTUALLY AGREED AS FOLLOWS : -

1. **APPOINTMENT**

   The Principal hereby appoints the Manager to act as manager of their business, accounts, shipping settlement and following operations with effect from 27th February, 2006 (the "Commencement Date") to provide the services set for the in clause 2 and otherwise upon the terms and conditions set forth in this Agreement, and the Manager hereby accepts such appointment.

2. **SERVICES**

   The Manager shall provide to the Principal all commercial services which relate to their business, accounts, shipping settlement and following operations, as per following listed items:

   2.1 The Principal declare in writing every shipment of iron ore with its details (laycan, cargo quantity, loading port and etc.) to the Manager at least 30 days prior to each laycan commencement. Accordingly, the Manager select and fix vessels by way of voyage charter, time charter on trip basis or other charters (subject to prior consent of the Principal) for the declared shipment. The Manager should nominate a performing vessel to Principal at least

15 days prior to the declared laycan commencement.

2.2  Regarding the rate at which every vessel is fixed for relevant shipment, the Manager need to follow the Principal's instruction and get prior final confirmation.

2.3  The Manager calculate and collect, on behalf and into the account of the Principal, all freight and demurrage payable in respect of the fixtures/agreements/contracts from Zhangdian Iron Steel Works and/or relevant Shippers; all dispatch payable in respect of the fixtures/agreements/contracts from relevant Owners.

2.4  The Manager calculate and pay, on behalf and from account of the Principal, all hire, freight and demurrage payable in respect of the fixtures/agreements/contracts to relevant Owners; all dispatch payable in respect of the fixtures/agreements/contracts to Zhangdian Iron Steel Works and/or relevant shippers.

2.5  The Manager perform day to day operations and duties in respect of the chartered vessels which may be required under any charter or contracts fixed.

2.6  The Manager contract for fuel and bunker for the fixtures/agreements/contracts when necessary and appointing agents at loading or discharging ports or other ports of call wherever necessary.

2.7  The Manager execute documents relating to fixing shipments and pass the original contracts to the Principal for their stamp and signature. The Manager shall get one final both parties signed original contract of each shipment and keep them in office.

2.8  The Manager operate the Principal's banking account or accounts as the Manager may deem necessary for the purposes hereof under supervision of the Principal.

2.9  The Manager handle claims and collections arising out of or in connection with the fixtures/agreements/contracts of vessels and following operations.

2.10  The Manager appoint surveyor in connection with the fixtures/agreements/contracts of vessels.

2.11  The Manager obtain legal advice in relation to disputes or other matters affecting the interests of the Principal in respect of the fixtures/agreements/contracts fixed and following operations, and to bring actions, suits, or proceedings or to make any (interim) appointment, employment or other arrangement to accomplish the foregoing with respect to disputes with any owners or supplier of services where time does not permit prior consultation with the Principal;

2.12  The Manager pay, on behalf and from the account of, the Principal all expenses incurred in or about the provision of the foregoing services.

2.13  All sums or earnings, receivable from a third party arising out of or in connection with the management of the business, accounts, shipping settlement and following operations shall be remitted or caused to be remitted by the Manager to such bank account as the Principal may designate.

2.14  The Manager shall send to the Principal all documents relating to the fixtures/agreements/contracts vessels and other contracts from time to time as may be required by the Principal including copies of any fixture note, charter or other documents setting out the terms of those fixtures/agreements/contracts.

3.  OFFICE SHARING

For purpose of shipping market information share, register, and liaison/communication, the Principal share the office (Suites 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong) with the Manager against sharing the leasing hire, service charges and other relevant cost to maintain the office upon the terms and conditions set forth in this Agreement.

3.1   The Principal can use the sharing office in shipping market information share, register, and liaison/communication, purpose.

3.2   The Principal can dispatch employees to work in the sharing office for short period or under whole Agreement period. The Principal will pay for their dispatched employee, including their salary, allowance, bonus, premium, traveling expenses and other expenses.

3.3   The Principal equally share (50%) with the Manager in the office leasing hire, service charges and other relevant cost to lease the office against invoice from landlord.

3.4   The Principal pay for the necessary office furniture and computers, which their employees will use.

3.5   The Principal bear part of other expenses, including but not limited to administration cost, incidental expenses, depreciation, miscellaneous, etc., caused by leasing the office and/or doing business in the office upon mutual further agreement.

3.6   If the Manager pay any of above mentioned cost/expenses for the Principal, the Principal shall return such cost to the Manager within 5 (ten) days after their receipt of notice and relevant invoice.

## 4.   MANAGEMENT SERVICE FEE

4.1   For and in consideration of the services to be performed under this Agreement, the Principal shall pay to the Manager an annual fee in the amount of 10% of the Principal's profit in each financial year. Every annual fee is payable no later than six consecutive calendar months after ending of the previous financial year, starting from 1st April to 31st March of following year.

4.2   If during the period of this Agreement the Manager shall be called upon by the Principal to render any services other than those described in Clause 2 hereof, compensation therefore shall be mutually agreed upon between the parties before the performance of such services.

## 5.   REPORTING

The Manager shall prepare and furnish to the Principal detailed accounts for the management of the business, accounts, shipping settlement and following operations at the request of the Principal from time to time and also such provisions for accruing and anticipated incomes and liabilities and contingencies as the Manager shall consider justified.

## 6.   LIABILITIES

It is agreed that all of the rights, benefits, obligations and liabilities under all fixtures /agreements/contracts concluded by the Manager in accordance with provisions of this

Agreement, even if concluded in the name of the Manager, shall be for the account of the Principal. Such fixtures/agreements/contracts may be concluded and executed in the name of the Manager always in accordance with the provisions of this Agreement, in which case such fixtures/agreements/contracts shall be regarded as if concluded by the Principal, and the Manager shall be fully released and discharged from all responsibilities, obligations and liabilities thereunder unless the Manager was acting in bad faith or willful misconduct in entering into such fixtures/agreements/contracts on behalf of Principal.

## 7.    INDEMNITIES

7.1    The Manager shall not be liable for any loss of or damage to the Principal and/or any loss, damage, expense and liability incurred by the Principal directly or indirectly, unless caused by willful misconduct on the part of the Manager.

7.2    The Principal shall indemnify the manager and hold the Manager harmless against any and all claims and demands (including costs and attorney's fees in the defending any such claim and demand, whether or not such claim or demand is found to be valid) which may be brought against the Manager pursuant to and in accordance with the provisions of this Agreement unless the Manager was acting in bad faith or willful misconduct in taking such action.

## 8.    MANAGEMENT PERIOD AND TERMINATION

8.1    The appointment of the Manager shall be deemed to have commenced and taken effect from the Commencement Date for a period of Five (5) years and such appointment shall (subject as hereinafter provided) continue automatically for a further period of Five (5) years.

8.2    Notwithstanding the terms of Clause 8.1, and without prejudice to the accrued rights hereunder, either party may terminate this Agreement, if and when:
a)    this Agreement has been in operation for twelve months or at the expiry of any forms of fixtures/agreements/contracts whichever is the later but subject to giving three month prior notice in writing to the other party; or
b)    the Principal ceases for any reason to be lawfully entitled to continue the appointment of the Manager made under this Agreement; or
c)    either party goes into liquidation or becomes bankrupt or insolvent or has a receiver appointed or is unable to meet its debts as they fall due.

8.3    In the event the appointment of the Manager being terminated by either party pursuant to provisos (a), (b) and (c) of Clause 8.2, the management service fee payable to the Manager as stipulated in Clause 4.1 shall continue to be payable in proportion base on the period of that fiscal year.

8.4    Notwithstanding termination for any reason, the Manager shall continue to be responsible for the settlement of any outstanding matters in respect of the fixtures/agreements/contracts and shall co-operate with the Principal in prosecuting or defending any claims in connection with the fixtures/agreements/contracts provided always that the Principal shall continue to be responsible for the payment of all sums arising in respect of the fixtures/agreements/contracts, the Principal also undertakes to pay an extra management

service fee to the Manager for handling all outstanding claims in respect of the fixtures/agreements/contracts in the amount to be mutually agreed.

## 9.    INSPECTION OF BOOKS AND RECORDS

The Manager shall keep customary business records respecting all collections, expenditures, accounts and records of transaction relating to the activities pursuant to this Agreement. The Principal shall have the right, upon giving prior notice to the Manager, to inspect all the accounting books, original vouchers under the custody of the Manager.

## 10.    NOTICES

Any notice or other communication to a party hereunder shall be in writing and shall be delivered or sent by postage prepaid mail or airmail, or by telex, telegram, cable or facsimile or other electronic transmission addressed to the address of such party or to such other address as such party shall have communicated to the other. In urgent situation, oral instruction can be made by the Principal for the Manager to continue the operations or business, which followed by written.

## 11.    ARBITRATION AND GOVERNING LAW

11.1  Any dispute between the parties arising out of or in connection with this Agreement or in relation to the rights and obligations of the Principal and the Manager hereunder shall be submitted to arbitration in London, in accordance with the provisions of the Arbitration Acts and any amendments thereto, each party nominating one arbitrator, and if the arbitrators cannot agree, then to nominate an umpire.

11.2  The decision of the arbitrators shall be final and binding and may be enforced by any judicial tribunal having jurisdiction thereof. Throughout the pendency of any dispute, the parties shall continue to perform their respective obligations under this Agreement except for matters in dispute.

11.3  This Agreement shall be governed by and interpreted in accordance with the laws of Hong Kong.

## 12.    ASSIGNMENT

It is mutually agreed between the parties hereto that the Manager may assign or appoint any other entities or individuals to perform all duties and obligations set forth in this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized signatories of the day and year first above written.

SIGNED by      Zhang Jinglu           )
For and on behalf of                  )
ZHANGGANG SHIPPING LIMITED            )


SIGNED BY      Bi Min                 )
For and on behalf of                  )
SPOT ON (HONG KONG) GROUP             )
CORPORATION LIMITED                   )

# EXHIBIT 3

Zhanggang Shipping Limited

## Your instructions:

We were provide information on Zhanggang Shipping Limited. The main focus should be to name its past and present shareholders, directors and management, and we were also expected to provide some historical information on the company.

## Research:

Lloyd's MIU has been asked to report on Zhanggang Shipping Limited once before. That was on 16 June 2006 when we wrote a standard credit report on the company. These are the main extracts from that report:

*Operating Address:*

*Unit 5*
*31F Office Tower*
*Convention Plaza*
*1 Harbour Road*
*Wanchai*
*Hong Kong*

*Phone: +852 21113866*
*Fax: +852 21113606*
*Email: shipping@spoton-hk.com*
*Website: Not Available*

*Incorporation Style: Private limited company*

*Incorporation Date: 27 February 2006*

*Place Incorporated: Hong Kong*

*Ownership: A joint venture between Spot On (Hong Kong) Group Corporation Ltd and Zhangdian Steel Mill of China.*

*Directors: Mdm Wei-Lu Zhang - President*
*Managers: Ms Sammy Yu - Chartering Manager*

*Affiliate Offices: Spot On (Hong Kong) Group Corporation Ltd of the same address. Also an office in Qingdao, China.*

*Bankers: HSBC*

# EXHIBIT 4



周年申報表
Annual Return

(公司條例第 107(1)條)
(Companies Ordinance s. 107(1))

公司註冊處
Companies Registry

表格 AR1
Form

公司編號 Company Number

794937

**重要事項 Important Notes**

⊙ 填表前請參閱〈填表須知〉。
  請用黑色墨水列印。
  Please read the accompanying notes before completing this form.
  Please print in black ink.

1 公司名稱 Company Name

SPOT ON (HONG KONG) GROUP CORPORATION LIMITED
華熹 (香港) 集團股份有限公司

(註 Note 8)  2 商業名稱 Business Name

3 公司類別 Type of Company

請在有關空格內加 ✓ 號 Please tick the relevant box

[✓] 有股本的私人公司
    Private Company having a share capital

[ ] 其他
    Others

4 本申報表日期 Date of this Return

本申報表所載公司截至右列日期爲止的資料
The information in this Return is made up to

| 24 | 04 | 2007 |
|---|---|---|
| 日 DD | 月 MM | 年 YYYY |

(如屬有股本的私人公司,本申報表應列載截至公司成立爲法團的周年日期的
資料。如屬其他公司,所列載的資料則應截至公司周年大會日期或以代替周年
大會的書面決議的日期爲止。
For a private company having a share capital, the information in this Return should
be made up to the anniversary of the date of incorporation. For other companies,
the information should be made up to the date of the annual general meeting
(AGM) or the date of written resolution passed in lieu of AGM.)

(註 Note 9)  5 註冊辦事處地址 Address of Registered Office

Suites 1818-1823, 18/F, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong

(註 Note 10)  6 電郵地址 E-mail Address

(註 Note 3)  提交人的資料 Presentor's Reference

請勿填寫本欄 For Official Use

姓名 Name:  Acctax Company Secretary Limited

地址 Address: Suite 6307, 63/F, Central Plaza
              18 Harbour Road, Wanchai, Hong Kong



23400224768
AR1L          0794937
26/04/2007

電話 Tel:  2246 6828    傳真 Fax:    2246 8448

電郵地址 E-mail Address:

檔號 Reference:

說明書編號 2/2004 (修訂) (2004 年 2 月)
Specification No. 2/2004 (Revision) (Feb. 2004)

8800

公司編號 Company Number
794937

## 12 董事 Director

### A. 個人董事 Individual Director
(如超過兩名個人董事，請用續頁 C 填報  Use Continuation Sheet C if more than 2 individual directors)

(註 Note 19)　1　身份　☑ 董事　　☐ 侯補董事　　代替 Alternate to
　　　　　　　　Capacity　　Director　　　Alternate Director

中文姓名　　　張瑋璐
Name in Chinese

英文姓名　　　ZHANG　　　　　　Wei-lu
Name in English　姓氏 Surname　　　名字 Other Names

前用姓名
Previous Names

別名
Alias

(註 Note 20)　住址
　　　　　　　Residential
　　　　　　　Address

Suites 1818-1823, 18/F, Sun Hung Kai Centre,
30 Harbour Road, Wanchai, Hong Kong

China

國家 Country

(註 Note 21)　電郵地址
　　　　　　　E-mail Address

(註 Note 22)　身份證明 Identification
　a　香港身份證號碼
　　　Hong Kong Identity Card Number

　b　海外護照　　　The People's Republic of China　　G06090087
　　　Overseas Passport
　　　　　　　　　　簽發國家 Issuing Country　　　　號碼 Number

指明編號 2/2004 (修訂) (2004 年 2 月)
Specification No. 2/2004 (Revision) (Feb. 2004)

C600

# EXHIBIT 5

Mitsou Pinelopi

From:           Dryfreight [dryfreight@icap.com]
Sent:           Thursday, May 10, 2007 12:18 PM
To:             Mitsou Pinelopi
Subject:        Spot On email from 30/03/2007


Please find below an email from Spot On which we originally sent to you on 30th March
2007, as requested.

Kind regards,


Paul Ingram
Dry FFA Desk


Direct Line: +44 20 7000 5357
Fax:         +44 20 7000 5942
Email:       paul.ingram@icap.com

ICAP Hyde Derivatives Limited
2 Broadgate
London
EC2M 7UR
United Kingdom

-----Original Message-----
From: SPOT ON - SAMMY [mailto:shipping@spoton-hk.com]
Sent: 30 March 2007 09:49
To: Sander Bots
Cc: dryfreight; shipping
Subject: re: SANDER / SAMMY

TO: ICAPHYDE / SANDER

PLS NOTE BLW THE IMPORTANT NOTICE WE GOT FROM "PEHW FUND LIMITED".

QTE

TO ALL:

Spot On Shipping Limited ("The Company") has been acquired at 100% equity by PEHW Fund
Limited ("PEHW Fund"). So the operation of The Company will be under "PEHW Fund"
afterwards and the official name for the purpose of ffa contract is "PEHW Asset
Management Limited", which is a subsidiary company under "PEHW Fund Limited".

Although the ownership of The Company is separated from Spot On Group, Spot On Group
will provide assistance to PEHW Fund in managing their FFA business.

UNQTE

ACCORDING TO THIS, PLS ICAPHYDE CHANGE THE SELLER'S NAME TO "PEHW ASSET MANAGEMENT
LIMITED" IN ALL THE FFA CONTRACTS (THREE HALF Q2) CONCLUDED BY "SPOT ON SHIPPING
LIMITED" BEFORE AND DELETE THE DETAILS REGARDING "SPOT ON SHIPPING LIMITED". AND SEND
US THE REVISED THREE ORIGINAL CONTRACTS FOR SIGNATURE/STAMP.

B.RGDS
SAMMY YU


****************************************************************************

# EXHIBIT 6



FFABA 2005 (TM)

FORWARD FREIGHT AGREEMENT BROKERS ASSOCIATION ('FFABA')

FORWARD FREIGHT 'SWAP' AGREEMENT

Trade Ref            185711
Contract Date        26 February 2007

The purpose of this confirmation is to state the terms and conditions of the forward freight swap agreement entered into between:

Seller

SPOT ON SHIPPING LIMITED

Room 1816-1823, 18th floor,
Sun Hung Kai Centre
No.30 Harbour Road,
Wanchai
Hong Kong

Contact: Sammy Yu
Phone: +852-3667 9091
Fax: +852-3667 9096
Email: ffa@clayton-star.com

and

Buyer

BRAVE BULK TRANSPORT OF MALTA

Apollon Building No 2
331 Kifisias Ave
145 61 Kifisia
Greece
Contact: George Leventis
Phone: +30 2106250001
Fax: +30 2106250018
Email: leventisg@brave.gr

Trade Ref     185711

This agreement between the parties as constituted by this confirmation is referred to as the "Agreement"

Until superseded by notice information in subsequent confirmation or other communication, the above addresses are hereby recognized as the correct addresses to which any notification under this Agreement may properly be served.

## 1. Contract Route

As per BCI TC - Baltic Capesize Index Average of Routes (8/9/10/11) as defined on the Contract Date including any relevant official forthcoming amendments published at the Contract Date which will become effective prior to the settlement of this Agreement.

## 2. Contract Rate

USD 72000.00 per Day

## 3. Contract Quantity

45.5 Days

## 4. Contract Months

April 2007, May 2007, June 2007

## 5. Contract Period

Average of All BCI Index days of the contract month(s) up to and including the Settlement date(s)

## 6. Settlement Date

The last Baltic Exchange Index publication day of each Contract Month

## 7. Settlement Rate

(a) The Settlement Rate shall be the average of the rates for the Contract Route(s) published by the Baltic Capesize Index over the Settlement Period defined as All of the Baltic Capesize Index publication days of the Contract Month(s) up to and including the Settlement Date.

(b) If for any reason the Baltic Capesize Index cannot provide any rate required for establishing the Settlement Rate, then the current chairman of the FFABA may be instructed by either party to form a panel comprising of a minimum of three independent brokers (the "Panel") to determine an appropriate rate, which determination will be final and binding on both parties.

(c) Each party shall bear its own costs and expenses in connection with any determination made pursuant to this clause 7.

(d) The parties shall severally indemnify and hold harmless each of the members of the Panel, the Baltic Capesize Index and its members and the FFABA and its members (the "Indemnified Persons") against all liabilities, actions, demands,

Trade Ref    185711

costs and expenses incurred by any of them arising directly out of or in connection with the formation of the Panel and any determination made by the Panel.

(e) As between the parties, each party shall have a right of contribution against the other party in respect of any indemnity payment made pursuant to the preceding paragraph so that their respective liabilities pursuant to that paragraph shall be equal.

## 8. Settlement Sum

The "Settlement Sum" is the difference between the Contract Rate and the Settlement Rate multiplied by the Contract Quantity. If the Settlement Rate is greater than the Contract Rate, the Seller shall pay the Buyer the Settlement Sum. If the Settlement Rate is less than the Contract Rate, the Buyer shall pay the Seller the Settlement Sum.

## 9. Payment Procedure and Obligations

(a) Payment of the Settlement Sum is due on the later of two (2) London business days after presentation of payee's invoice (with complete payment instructions) or (5) London business days after the Settlement Date and for this purpose a "London business day" means a day (other than Saturday or Sunday) on which commercial banks are open for business in London). The Settlement Sum will be deemed "paid" when it has been received into the bank account designated by the payee.

(b) Payment of the Settlement Sum shall be made telegraphically, in full, in United States dollars. The cost incurred in effecting payment shall be for the account of the payer. Payment may only be affected directly between parties. The Settlement Sum shall be paid without any deduction or set off unless agreed by the Buyer and Seller in writing.

## 10. ISDA Master Agreement

This Agreement incorporates by reference the 1992 ISDA Master Agreement (Multicurrency - Cross Border) (without Schedule) as if it were fully set out in this Agreement and with only the following specific modifications and elections:

(a)  Section 2(c)(ii) shall not apply so that a net amount due will be determined in respect of all amounts payable on the same date in the same currency in respect of two or more Transactions;

(b)  Seller is the Calculation Agent;

(c)  The most current published set of ISDA ® Commodity Definitions and ISDA Definitions shall apply;

(d)  Credit Event Upon Merger is applicable to both parties;

(e)  For the purposes of payments on Early Termination, Loss will apply and the Second Method will apply;

(f)  The Termination Currency is United States dollars;

(g)  The Applicable Rate shall mean the one month USD-LIBOR plus 2%, reset daily and compounded monthly ; and

(h)  Local Business Day or banking day shall each refer to such a day in London;

(such form, as modified, the "Standard Agreement" and this Agreement, including the incorporated Standard Agreement,

Trade Ref    185711

shall govern the transaction referred to In and constituted by this Agreement except as expressly modified by this Agreement.

## 11. Capacity and Good Standing

In addition to the representations contained in Section 3 of the Standard Agreement, each party warrants that:

(a) It is duly organized and validly exists under the jurisdiction of its organization or incorporation, and is solvent and in good standing;

(b) It has the power to execute, deliver and perform this Agreement;

(c) All governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(d) In the event that either party to this Agreement is a person organized under, domiciled in, or having principle place of business in, the United States, each party represents to the other party that it is an "eligible contract participant" as defined in paragraph 1a(12) of the Commodity Exchange Act (7 U.S.C. paragraph 1a(12), as amended).

## 12. Telephone Recording

Each party consents to the recording of telephone conversations in connection with this Agreement.

## 13. Commission

Each of the parties agrees to pay brokers' commission to any broker (a "Broker") as agreed with any Broker.

## 14. Non-Assignability

Except as provided in Section 7 of the Standard Agreement, this Agreement is non-assignable unless otherwise agreed in writing between the parties to this Agreement.

## 15. Principal To Principal

This is a principal to principal contract with settlement directly between the two parties. Both parties agree that any Broker shall be under no obligation or liability in relation to this Agreement. Both parties agree jointly and severally to indemnify and hold harmless any Broker against all actions, including but not limited to all claims, demands, liabilities, damages, costs and expenses both from the two parties and any third party. Claims, demands, liabilities, damages, costs and expenses suffered or incurred are to be settled directly by or between the two parties.

## 16. Law and Jurisdiction

Pursuant to Section 13(b) of the Standard Agreement, this Agreement shall be governed by and construed in accordance with English law and shall be subject to the exclusive jurisdiction of the High Court of Justice in London, England. The terms of Section 12(a) of the Standard Agreement notwithstanding, proceedings may be validly served upon either party by sending the same by ordinary post and/or by fax to the addresses and/or fax numbers for each party given above.

Trade Ref    185711

**17. Entire Agreement**

This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

**18. Payment Account Information**

For Seller:
BANK NAME: HSBC Hong Kong
BANK ADDRESS: 1 Queen's Road Central, Hong Kong
A/C NO: 817-088388-838
SWIFT CODE: HSBCHKHHHKH IN FAVOUR OF: SPOT
ON SHIPPING LIMITED

For Buyer:
HSBC Bank plc
93 Akti Miaouli Street
Piraeus
Greece
Account: 001-012244.036
Swift: MIDLGRAAA
In favour of: Brave Bulk Transport Limited
Corp. bank: HSBC Bank plc - New York
Swift code: MRMDUS33

**19. Third party rights**

(a) Unless provided to the contrary in this Agreement, a person who is not a party to this Agreement has no rights under the contract (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Agreement.

(b) Any Indemnified Person and any Broker shall have the right to enjoy the benefit of and enforce the terms of clause 7(d) in the case of any Indemnified Person and clause 13 in case of any Broker.

(c) Notwithstanding any term of this Agreement, the consent of any person who is not a party to this Agreement is not required to rescind or vary this Agreement.

**20. Inclusion of historical FFAs under Master Agreement**

(a) Unless the parties to this Agreement specifically agree otherwise in writing, this clause 20 shall apply in accordance with its terms.

(b) This clause 20 applies to this Agreement and every other agreement entered into between parties to this Agreement (and no other persons) before the date of this Agreement:

(i) that expressly stated to be subject to, or is subject to substantially the same terms as, either the FFABA 2000 terms or the FFABA 2005 terms, (excluding for the avoidance of doubt terms as to the Contract Route(s), Contract Rate, Contract Quantity, Contract Month(s), Contract Period and Settlement Date), with or without amendment; and

(ii) that does not incorporate a clause substantially in the same form as this clause 20.

(c) Each agreement to which this clause 20 applies shall be treated as a confirmation (each a "Confirmation") under a master agreement (the "Master Agreement") constituted by the Standard Agreement as modified by, and in the form as incorporated in, the Agreement pursuant to clause 10 as if such an agreement has been entered into between parties on the terms of the Master Agreement on the date of the first such Confirmation.

Trade Ref   185711

(d) If there is any inconsistency between the provisions of any agreement constituted pursuant to paragraph (c) above and the agreement constituting a transaction to which this clause 20 applies, the provisions of the agreement constituting the transaction to which this clause 20 applies will prevail for the purposes of the transaction under such agreement.

(e) This clause 20 shall not affect the rights or obligations of the parties under any transaction accrued before the date of this Agreement.

(f) This clause 20 is effective notwithstanding any entire agreement clause or similar provision in any such agreement relevant to any such transaction.

21. Inclusion of subsequent FFAs under Master Agreement

(a) Unless the parties to this Agreement specifically agree otherwise in writing, this clause 21 shall apply in accordance with its terms.

(b) This clause 21 applies to every agreement entered into between the parties to this Agreement (and no other persons) after an agreement incorporating a Master Agreement (as defined in and pursuant to a clause substantially in the same form as and equivalent to clause 20) has been entered into by them.

(c) This Agreement shall constitute a Confirmation under the Master Agreement on the terms of clauses 20 (c), (d), (e) and (f) as if they were incorporated and fully set out in this clause 21 with appropriate and necessary modifications for such incorporation.

Trade Ref    185711

Signed for the Buyer by                          Signed for the Seller by
[printed name]                                   [printed name]


Duly authorised signatory                        Duly authorised signatory

Date .....................                        Date .....................

[Company Seal or Stamp]                           [Company Seal or Stamp]


Trade Ref    185711

ICAP Hyde Derivatives Ltd 2 Broadgate, London EC2M 7UR. Tel: +44(0)20 7532 4934  Fax: +44(0)20 7000 5942

Each of the Buyer and the Seller (the "counterparties") has agreed that ICAP Hyde Derivatives Limited is its broker for the sole purposes of 'passing names' and for confirming the details of the transaction set out above in accordance with accepted market practice. ICAP Hyde Derivatives Limited has arranged the transaction as name passing or introducing broker. Nothing in the transaction shall create any fiduciary or agency relationship between ICAP Hyde Derivates Limited and either of the counterparties. Each of the counterparties agrees that no reliance has or may be placed by either of them on any representation made by ICAP Hyde Derivates Limited, its directors, employees or agents. ICAP Hyde Derivates Limited is not responsible for the provision of advice to any person in connection with the transaction. It is also not responsible for the exercise of any options. ICAP Hyde Derivates Limited is not responsible for any other obligation or liability arising under the transaction and is not liable for the capacity, reliability, or performance of the counterparties with regard to the transaction; in particular, ICAP Hyde Derivates Limited accepts no liability for the commercial advisability of the transaction. ICAP Hyde Derivates Limited is not responsible for the failure by either of the above-named counterparties or any other person in supplying relevant information relating to the transaction, in properly documenting the transaction or in satisfying any legal requirements or taxation issues or conditions in relation thereto, including, without limitation, the obtaining of any necessary consents or the failure for whatever reason of completion of such transaction. Transaction times are available on request. ICAP Hyde Derivates Limited is authorised and regulated by the Financial Services Authority. The transaction is subject to English law.

Please advise ICAP Hyde Derivates Limited immediately if the details of this confirmation differ from your understanding.