UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
BRAVE BULK TRANSPORT LTD.,                      07 Civ. 4546 (CM)

                         Plaintiff,


          -against-


SPOT ON SHIPPING LTD., a.k.a. SPOT
ON SHIPPING LTD. BVI, a.k.a. SPOT ON,
a.k.a. CLAYTON STAR COMPANY LIMITED
a.k.a. CLAYTON STAR and PHEW ASSET
MANAGEMENT LIMITED a.k.a. PEHW ASSET
MANAGEMENT LTD. and ZHANGGANG SHIPPING
LIMITED,


                         Defendant.
----------------------------------------X




                    **MEMORANDUM OF LAW**
                 **IN SUPPORT OF MOTION**






Edward A. Keane (EK 1398)
Garth S. Wolfson (GW 7700)

     Of Counsel




                    **MAHONEY & KEANE, LLP**
                 **Attorneys for Defendant**
             **ZHANGGANG SHIPPING LIMITED**
                 **111 Broadway, Tenth Floor**
                 **New York, New York 10006**
                       **(212) 385-1422**

## TABLE OF CONTENTS

*Page*

ARGUMENT..................................................1

POINT I.     RECONSIDERATION  SHOULD BE GRANTED WITH
             RESPECT TO THE COURT'S FINDING THAT THE
             FFA WAS A MARITIME CONTRACT.................1

POINT II.    IN THE ALTERNATIVE,  THE COURT SHOULD
             CERTIFY  AN INTERLOCUTORY APPEAL ON THE
             QUESTION OF WHETHER  THE FFA IS A
             MARITIME CONTRACT........................11

CONCLUSION............................................14

<u>ARGUMENT</u>

POINT I.          RECONSIDERATION SHOULD BE GRANTED WITH RESPECT TO
                  THE COURT'S FINDING THAT THE FFA WAS A MARITIME
                  CONTRACT.

The Court may grant a motion pursuant to Fed. R. Civ. P. 52(b) in its own discretion, <u>see</u>, <u>United States v. Anderson</u>, 591 F. Supp. 1, 4 (E.D. Wash. 1992), "to correct manifest errors of law or fact," <u>see</u>, <u>United States v. Local 1804-1, International Longshoremen's Ass'n</u>, 831 F. Supp. 167, 169 (S.D.N.Y. 1993), or to otherwise supplement or amend the Court's findings. <u>See</u>, <u>Johnson v. Colt Indus. Operating Corp.</u>, 609 F. Supp. 776, 779 (D. Kan. 1985), <u>aff'd</u>, 797 F.2d 1530 (10th Cir. 1986).

The Court also enjoys broad discretion to grant a motion pursuant to Fed. R. Civ. P. 59(e), <u>see</u>, <u>Oxford House, Inc. v. Albany</u>, 155 F.R.D. 409, 410 (N.D.N.Y. 1994); <u>Atlantic States Legal Fund, Inc. v. Karg Bros., Inc.</u>, 841 F. Supp. 51, 55 (N.D.N.Y. 1993), and should grant such a motion in order to correct a clear error of law, such as a failure to follow a controlling decision which would have affected the earlier ruling. <u>See</u>, <u>Motor Vehicle Mfrs Ass'n, Inc. v. New York State Dep't of Environmental Conservation</u>, 831 F. Supp. 57, 60 (N.D.N.Y. 1993), <u>aff'd in part, reversed in part on other grounds</u>, 17 F.3d 521 (2d Cir. 1994).

As previously discussed, after attaching property under Rule B, "plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Fed. R. Civ. P. E(4)(f).    "The

1

plaintiff has the burden of showing why the seizure should not be vacated." Fed. R. Civ. P. E advisory committee's note.

``Absent the requisite admiralty or maritime jurisdiction, a *Rule B* maritime attachment is void.'' Aston Agro-Indus. AG v. Star Grain Ltd., No. 06 Civ. 2805 (GBD), 2006 U.S. Dist. LEXIS 91636, **7-9 (S.D.N.Y. Dec. 20, 2006) (``In this case, the contracts are not maritime contracts because their primary objective was not the transportation of goods by sea.''); see also, Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 268 (2d Cir. 2002) (``[T]he plaintiff's claim must be one which will support a finding of admiralty jurisdiction under *28 U.S.C. § 1333*.''); Maritima Petroleo e Engenharia Ltda v. Ocean Rig 1 AS, 78 F. Supp. 2d 162, 172 (S.D.N.Y. 1999) (``Because of the absence of subject matter jurisdiction . . . the maritime attachment is vacated.'').

In determining whether a contract is ``maritime'' so as to support admiralty jurisdiction, a court must look to ``the subject matter of the . . . contract'' and ``the services performed under the contract.'' Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 612 (1991); see also, Norfolk Southern Ry. Co. v. Kirby, 543 U.S. 14, 24 (2004) (holding bills of lading to be maritime contracts ``because their primary objective [wa]s to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States.''). ``[T]he subject matter of the contract must be directly and intimately related to

2

the operation of a vessel and navigation; it is not enough that the contract relate in some preliminary (shoreside) manner to maritime affairs.'' T.J. Schoenbaum, <u>Admiralty and Maritime Law</u> § 3-10 at 131 (4th ed., West 2004).

In particular, agreements to cover liabilities only arising from underlying maritime contractual obligations have consistently been held not to constitute maritime contracts. <u>See</u>, <u>Folksamerica Ins. Co. v. Clean Water of New York, Inc.</u>, 413 F.3d 307, 323, 2005 A.M.C. 1747 (2d Cir. 2005) (``[W]e will not construe the contractual liability coverage of the Policy as marine.''); <u>Fednav, Ltd. v. Isoramar, S.A.</u>, 925 F.2d 599, 601 (2d Cir. 1991) (agreement to act as surety for another's breach of charter party is non-maritime) (citing <u>Pacific Surety Co. v. Leatham & Smith Towing & Wrecking Co.</u>, 151 F. 440, 444 (7th Cir. 1907) (``[T]he money liability is assumed in a new contract, under a new form and by a new party, and is thus equally distinguishable from the original maritime contract.'')); <u>Bermuda Express, N.V. v. M/V Litsa</u>, 872 F.2d 554, 563, 1989 A.M.C. 1537 (3d Cir. 1989) (``[W]e believe that in any event it is unreasonable to include commissions for solicitation of freight and provision of financial services as necessaries. Such commissions are outside the realm of stevedoring maritime contracts and cannot be the subject of a maritime lien.'') (citations omitted); <u>Peralta Shipping Corp. v. Smith & Johnson Shipping Corp.</u>, 739 F.2d 798, 802 (2d Cir. 1984) (``[N]either an agreement to procure insurance, or crews, nor an undertaking to

act as broker in securing cargo, or a charter party, have been cognizable in admiralty.''); Patricia Hayes & Assoc's, Inc. v. M/V Big Red Boat II, No. 00 Civ. 6925 (GBD), 2002 U.S. Dist. LEXIS 9867, **10-14, 2002 A.M.C. 1722 (S.D.N.Y. May 31, 2002) (holding ``Federal Maritime Commission Passenger Vessel Surety Bond . . . which requires Sureties to refund a maximum of $5,000,000 to passengers for unperformed cruises'' are not maritime contracts); United Philippine Lines, Inc. v. Western Bulk Carriers, No. 96 Civ. 8868 (MBM), 1997 U.S. Dist. LEXIS 5616, **9-11, 1997 A.M.C. 2132 (S.D.N.Y. Apr. 28, 1997) (holding letters of indemnity for issuance of clean bills of lading pursuant to charter party are not maritime contracts).

Moreover, even when services are provided directly with respect to vessels in maritime commerce, contracts relating to services for multiple vessels, or even one vessel over a span of time, unlike agreements relating to the supplying of one service to a specific vessel, have been held to fall outside of admiralty jurisdiction. See, Dolco Investments, Ltd. v. Moonriver Development, Ltd., 486 F. Supp. 2d 261, 268 2007 A.M.C. 1178 (S.D.N.Y. 2007) (citing Compania Argentina De Navegacion Dodero v. Atlas Mar. Corp., 144 F. Supp. 13, 14 (S.D.N.Y. 1956); The Yankee, 37 F. Supp. 512, 514 (E.D.N.Y. 1941); Steamship Oversale Co. v. Turner, 206 F. 339, 341 (E.D. Pa. 1913)).

ZSL respectfully submits that the Court's Order of October 30, 2007 was founded upon the inaccurate understanding suggested by plaintiff's counsel concerning what an FFA is. The Court

found that FFA's are ``commitments to perform in the future a shipping service between shipowners, charters and/or traders,'' and that ``the parties entered into a Forward Freight Agreement to buy and sell a specified tonnage freight.'' (Exhibit C).

All four corners of the FFA were and are before the Court. (Exhibit A). Nowhere do the parties undertake to perform a shipping service, and nowhere does anyone buy or sell actual freight. _Id._ The FFA concerns only freight rates, not freight itself. _Id._ Obligations under the FFA were governed by the average rates as determined by an industry-wide index. _Id._ at ¶ 7(a)(``The Settlement Rate shall be the average of all the rates for the Contract Routes(s) published by the Baltic Capesize Index over the Settlement Period.'').

FFA's are essentially just bets on future market performance, open to anyone willing to speculate in them. They deal in abstract numbers based on untold numbers of anonymous underlying maritime transactions throughout the market. By betting on future rates the parties to the FFA were not paying freight and not performing any shipping contract. The only connection between a FFA and the maritime industry is a FFA is settled according to the Baltic Marketing Indices of Shipping Industry.

That it is a gambling or speculating device, not a maritime endeavor, can be ascertained by looking to the definitions found in common use, such as that offered by BusinessDictionary.com, which defines a forward freight agreement as ``a principal-to

principal contract used by two parties to bet on the price of a particular freight-route on a particular date.  Although in the past, shipping companies were the predominant force in the FFA market, now more pure financial players are joining in on the gambling on FFA volatility. Increasingly, those with no maritime nexus ``are engaged in speculative trading in risk, contrasted with risk mitigating. The past two years have seen an influx in interest from financial players including hedge funds. In conference presentations, speakers from the financial sector have estimated that more than 100 participants from the financial fold had entered the freight derivatives markets.'' *The Forward freight Agreement (FFA) Market For Shipping,* Barry Parker available                                                                at http://files.irwebpage.com/shipping/articles/the_forward_freight_ agreement.pdf. Even Wikipedia now contains a definition: ``A **Freight derivative**, or Forward Freight Agreement (FFA), is a financial instrument for trading in future levels of freight rates, for dry bulk carriers and tankers. These instruments are settled against various freight rate indices published by the Baltic Exchange and Platt's. FFA's are usually traded over the counter, but screen-based trading is becoming more popular as time                           passes                           by.'' http://en.wikipedia.org/wiki/fright_derivative.

Thus, not only are no physical cargoes moved on physical ships under FFA agreements, but those betting on which way the

physical world of maritime transportation costs will move are not even necessarily part-time maritime actors. They are just speculators who like the risk offered by the volatility of the market. The rhetoric of plaintiff's counsel aside, when guided by the actual contract language, there is no salt to be found in the Agreement.

It should be noted that ZSL understands accords with that of other courts, which have found FFA's to be ``essentially a derivatives contract''. <u>Erne Shipping Inc. v. HBC Hamburg Bulk Carriers GmbH & Co.</u>, 409 F. Supp. 2d 427, 430 (S.D.N.Y. 2006), <u>overruled on other grounds</u>, <u>Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.</u>, 460 F.3d 434, 2006 A.M.C. 1872 (2d Cir. 2006); <u>see also</u>, <u>In re: Interbulk, Ltd. v. Louis Dreyfus Corp.</u>, No. 97-44202 (TLB), 240 B.R. 195, 1999 Bankr. LEXIS 1336 (Bankr. S.D.N.Y. 1999) (``[T]he FFA's essentially swap freight rates at a future date based on the changes of an index.''). This hardly describes a commitment to perform a shipping service or an actual agreement to pay freight. Again, the parties to an FFA deal in freight rates, not actual freight. While initially it was employed as a hedging device for those in the maritime arena, more and more it is now only a tool for hedge fund and other financial speculators to bet on yet another market that shows volatility. In any event, a FFA does not address actual movement of cargo aboard a vessel, now or in the future. It only deals with which way the macro-market for such a hypothetical event will move. It is no more maritime than a bet on a football game

is an athletic competition. FFA contractors do not provide shipping services by placing their bet any more than gambling on football makes one a quarterback.

The term FFA is not found in texts on charter parties and bills of lading; they are defined in the Legal Certainty for Bank Products Act of 2000, 7 U.S.C. § 27, the Securities Exchange Act of 1934, 15 U.S.C. § 78(c)(47), and the Commodity Exchange Act, 7 U.S.C. § 1, where they are treated as financial instruments.

As discussed in this Court's orders, one other court known has specifically addressed the issue of whether an FFA may qualify as a ``maritime contract.'' See, Setsea S.P.A. v. Source Link Shipping Co. Ltd., No. 07 Civ. 4147 (DAB) (S.D.N.Y. Jun. 5, 2007). And that opinion held that it does not.

> The Court finds that the Agreements, when signed, related to reciprocal future promises of payment in cash and that **they do not address maritime services or transactions such as the transportation of specific cargoes or the involvement of specific vessels.** The Agreements merely seek to establish a means of minimizing financial risk and establishing a formula to make future costs and revenues more predictable. Plaintiff has therefore failed to establish that this Court has admiralty jurisdiction over the alleged breach of the Agreements. The Court accordingly DENIES Plaintiff's application for an Ex Parte Order for Process of Maritime Attachment and DISMISSES this action for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3). (emphasis supplied)

Id. at 8. However, based on nothing more than the fact that an amended complaint, containing undisclosed additional allegations,

was subsequently accepted by Judge Batts without revisiting her decision, the Court adopted plaintiff's argument that Judge Batts reversed herself. ZSL respectfully submits that <u>Setsea</u> remains good law and should not have been deemed overruled based only on the filing of an amended complaint and the issuance of a new writ of attachment.

So too, ZSL respectfully submits the Court should reconsider adopting plaintiff's suggestion that the mere issuance of other Rule B attachments sought by plaintiff's counsel with respect to FFA's provide precedent in support of plaintiff's position. As ZSL previously pointed out, none of those attachments have been opposed or otherwise challenged pursuant to Rule E.

``To begin the process, a plaintiff must file a verified complaint praying for an attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district. If the plaintiff's filings comply with these conditions, the court must enter an order authorizing the attachment.'' <u>Aqua Stoli Shipping Ltd. v. Gardner Smith Pty</u>, 460 F.3d 434, 438 (2d Cir. 2006) (citations omitted). Most judges do not, therefore, undertake to analyze whether maritime jurisdiction is lacking at the time the Rule B order is signed.

Indeed, in the cases cited in the Court's October 30, 2007 decision, not only had none been opposed, but in none were copies of the actually FFA contracts placed before the Court as attachments to the pleadings. ``Jurisdiction in admiralty cannot

be effectively acquired by concealing for a time the facts which establish that it does not exist.'' <u>Armour & Co. v. Forts Morgan S.S. Co.</u>, 270 U.S. 253, 46 S. Ct. 212, 70 L. Ed. 571 (1926).

Accordingly, and as a matter of express statute, Rule B attachments are designed to be meaningfully tested at a Rule E hearing, only subsequent to issuance, not before. Fed. R. Civ. P. Supp. R. E. The description of the issuance of Rule B processes as judicial ``findings,'' when their very constitutionality hinges upon only post-attachment review under Rule E, should thus be corrected.

Rule E aside, the very <u>ex parte</u> nature of the initial Rule B Order renders its precedential effect highly suspect, at best. <u>See</u>, <u>In re Bartley Lindsay Co.</u>, 120 B.R. 507, 515 n.8 (D. Minn. Bankr. 1990) (``The opinion turns out to be an unpublished, one page, *ex parte* order dealing with an uncontested application. Its lack of precedential value should be obvious.''); <u>see also</u>, <u>Burke v. Morphy</u>, 109 F.2d 572, 574 (2d Cir. 1940) (``[T]he order was hardly the sort that could be made *res judicata*. Issued *ex parte*, it simply instructed the receiver to take certain steps. Its chief purpose was to protect the receiver from personal liability for his subsequent action, not to adjudicate rights and duties among contesting litigants.'').

In fact, there can be no question that FFA's are more akin to the kind of agreements which have been not to constitute maritime contracts than to the kind of agreements traditionally found to

support maritime jurisdiction. Plaintiff relied on cases involving marine insurance, boat storage, container leasing, and marine fueling contracts. The suggestion that FFA's are anything like such agreements stretches credulity. The cases relied upon by plaintiff all relate to actually existing objectives or materials which operating businesses contracted for to achieve concrete maritime purposes, such as specific vessel insurance or boat storage. All services referred to in those instances are to specific maritime services to be actually performed by the contracting parties. FFA's are admittedly derivatives contracts, such that the party to the FFA (uninvolved in the underlying maritime transportation and freight payment) might benefit or lose based on future freight rates incurred by other parties. Such FFA contracts stand in stark contrast to the examples relied upon by plaintiff as they have no connection with the actual carriage of cargo by the parties involved. No vessels, cargo or freight payments are contracted for by the parties to the FFA. Their closest analogy in the maritime jurisprudence can thus be found in the many cases finding that contracts covering liabilities only arising from underlying maritime contractual obligations (such as contractual liability policies, surety agreements, financial agreements, brokerage agreements, and indemnity agreements) do not themselves constitute maritime contracts. Though the connection of FFA's to true maritime commerce are, to be sure, far more attenuated, since FFA liabilities relate only to general market rates over a broad period of time, not to a specific

maritime service performed by any one vessel.

There is a fundamental disconnection between preliminary, shoreside FFA's and the actual ocean voyages earning freight. The Court should be guided by the terms of the FFA contract, rather than the characterizations of plaintiff's counsel, and grant reconsideration accordingly.

POINT II.    IN THE ALTERNATIVE, THE COURT SHOULD CERTIFY AN INTERLOCUTORY APPEAL ON THE QUESTION OF WHETHER THE FFA IS A MARITIME CONTRACT.

Certification of an interlocutory appeal is warranted when the district judge is of the opinion that the order ``involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.''   28 U.S.C. § 1292(b).   ``[D]istrict courts [have] first line discretion to allow interlocutory appeals.''   Swint v. Chambers County Comm'n, 514 U.S. 35, 47, 115 S. Ct. 1203, 131 L. Ed. 60 (1995); In re Kassover, 343 F.3d 91, 94 (2d Cir. 2003).

In this regard, more than most matters, Rule B attachments in particular often involve pure, and frequently unsettled, matters of law, the resolution of which can prove outcome-determinative, or at least materially effect the outcome of the litigation. See, Consub Delaware LLC v. Schahin Engenharia Limitada, 476 F. Supp. 2d 305 (S.D.N.Y. 2007); Seamar Shipping Corp. v. Kremikovtzi Trade Ltd., 461 F. Supp. 2d 222 (S.D.N.Y. 2006); Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co., 890 F. Supp. 322 (S.D.N.Y. 1995).

Whether or not the Court is inclined to adhere to its October 30, 2007 ruling, this case cries out for interlocutory appeal. It involves a pure matter of contract and controlling law which will readily resolve the case one way or another, the alternative being lengthy discovery and trial on the fact-intensive alter-ego issue, before the dispositive jurisdictional dispute is even reached. The Second Circuit has not ruled on the issue, and both Rule B and maritime contract standards are in a great deal of flux at the moment. As the Court has noted, several other attachments based on FFA's have been issued and are awaiting challenge, and the FFA market continues to expand. The availability of Rule B security for alleged breaches of FFA's, including Judge Batts's now inconsistent decision in Setsea, has received international attention, having been addressed on an ongoing basis in leading publications, such as Tradewinds, see, e.g., September 21, 2007 ed., and is a matter of importance to the industry. The very fact the this Court initially against maritime jurisdiction in its September 17, 2007 decision, (Exhibit B), only to find otherwise the following month, (Exhibit C), demonstrates at the very least that this is a close issue, with substantial grounds for differences of opinion best addressed by the Court of Appeals.

**CONCLUSION.**

WHEREFORE, ZSL urges the Court to grant ZSL's motion for reconsideration and, upon reconsideration, to vacate the order of attachment in this case, or in the alternative, to certify for immediate appeal the issue of whether FFA's constitute maritime contracts so as to give rise to Rule B attachments, and to award to ZSL such other and further relief as this Honorable Court may deem just and proper.

Dated:    New York, New York
          November 13, 2007

                              Respectfully submitted,

                              MAHONEY & KEANE, LLP
                              Attorneys for Defendant
                              ZHANGGANG SHIPPING LIMITED

                      By:     _____
                              Edward A. Keane (EK 1398)
                              111 Broadway, Tenth Floor
                              New York, New York 10006
                              (212) 385-1422

TO:   TISDALE LAW OFFICES, LLC
      11 West 42nd Street, Suite 900
      New York, New York  10036
      Fax: (212) 869-0067

14



FFABA 2005 (TM)

### FORWARD FREIGHT AGREEMENT BROKERS ASSOCIATION ('FFABA')
### FORWARD FREIGHT 'SWAP' AGREEMENT

Trade Ref              185711

Contract Date          26 February 2007

The purpose of this confirmation is to state the terms and conditions of the forward freight swap agreement entered into between:

**Seller**

**SPOT ON SHIPPING LIMITED**

Room 1818-1823, 18th floor,
Sun Hung Kai Centre
No.30 Harbour Road,
Wanchai
Hong Kong

Contact: Sammy Yu
Phone: +852-3667 9091
Fax: +852-3667 9096
Email: ffa@clayton-star.com

and

**Buyer**

**BRAVE BULK TRANSPORT OF MALTA**

Apollon Building No 2
331 Kifisias Ave
145 61 Kifisia
Greece
Contact: George Leventis
Phone: +30 2106250001
Fax: +30 2106250018
Email: leventisg@brave.gr

Trade Ref     185711

This agreement between the parties as constituted by this confirmation is referred to as the "Agreement"

Until superseded by notice information in subsequent confirmation or other communication, the above addresses are hereby recognized as the correct addresses to which any notification under this Agreement may properly be served.

**1. Contract Route**

As per BCI TC - Baltic Capesize Index Average of Routes (8/9/10/11) as defined on the Contract Date including any relevant official forthcoming amendments published at the Contract Date which will become effective prior to the settlement of this Agreement.

**2. Contract Rate**

USD 72000.00 per Day

**3. Contract Quantity**

45.5 Days

**4. Contract Months**

April 2007, May 2007, June 2007

**5. Contract Period**

Average of All BCI Index days of the contract month(s) up to and including the Settlement date(s)

**6. Settlement Date**

The last Baltic Exchange Index publication day of each Contract Month

**7. Settlement Rate**

(a) The Settlement Rate shall be the average of the rates for the Contract Route(s) published by the Baltic Capesize Index over the Settlement Period defined as All of the Baltic Capesize Index publication days of the Contract Month(s) up to and including the Settlement Date.

(b) If for any reason the Baltic Capesize Index cannot provide any rate required for establishing the Settlement Rate, then the current chairman of the FFABA may be instructed by either party to form a panel comprising of a minimum of three independent brokers (the "Panel") to determine an appropriate rate, which determination will be final and binding on both parties.

(c) Each party shall bear its own costs and expenses in connection with any determination made pursuant to this clause 7.

(d) The parties shall severally indemnify and hold harmless each of the members of the Panel, the Baltic Capesize Index and its members and the FFABA and its members (the "Indemnified Persons") against all liabilities, actions, demands,

Trade Ref    185711

costs and expenses incurred by any of them arising directly out of or in connection with the formation of the Panel and any determination made by the Panel.

(e) As between the parties, each party shall have a right of contribution against the other party in respect of any indemnity payment made pursuant to the preceding paragraph so that their respective liabilities pursuant to that paragraph shall be equal.

## 8. Settlement Sum

The "Settlement Sum" is the difference between the Contract Rate and the Settlement Rate multiplied by the Contract Quantity. If the Settlement Rate is greater than the Contract Rate, the Seller shall pay the Buyer the Settlement Sum. If the Settlement Rate is less than the Contract Rate, the Buyer shall pay the Seller the Settlement Sum.

## 9. Payment Procedure and Obligations

(a) Payment of the Settlement Sum is due on the later of two (2) London business days after presentation of payee's invoice (with complete payment instructions) or (5) London business days after the Settlement Date and for this purpose a "London business day" means a day (other than Saturday or Sunday) on which commercial banks are open for business in London). The Settlement Sum will be deemed "paid" when it has been received into the bank account designated by the payee.

(b) Payment of the Settlement Sum shall be made telegraphically, in full, in United States dollars. The cost incurred in effecting payment shall be for the account of the payer. Payment may only be affected directly between parties. The Settlement Sum shall be paid without any deduction or set off unless agreed by the Buyer and Seller in writing.

## 10. ISDA Master Agreement

This Agreement incorporates by reference the 1992 ISDA Master Agreement (Multicurrency - Cross Border) (without Schedule) as if it were fully set out in this Agreement and with only the following specific modifications and elections:

(a) Section 2(c)(ii) shall not apply so that a net amount due will be determined in respect of all amounts payable on the same date in the same currency in respect of two or more Transactions;

(b) Seller is the Calculation Agent;

(c) The most current published set of ISDA ® Commodity Definitions and ISDA Definitions shall apply;

(d) Credit Event Upon Merger is applicable to both parties;

(e) For the purposes of payments on Early Termination, Loss will apply and the Second Method will apply;

(f) The Termination Currency is United States dollars;

(g) The Applicable Rate shall mean the one month USD-LIBOR plus 2%, reset daily and compounded monthly ; and

(h) Local Business Day or banking day shall each refer to such a day in London,

(such form, as modified, the "Standard Agreement" and this Agreement, including the Incorporated Standard Agreement,

**Trade Ref** 185711

shall govern the transaction referred to in and constituted by this Agreement except as expressly modified by this Agreement.

**11. Capacity and Good Standing**

In addition to the representations contained in Section 3 of the Standard Agreement, each party warrants that:

(a)  It is duly organized and validly exists under the jurisdiction of its organization or incorporation, and is solvent and in good standing;

(b)  It has the power to execute, deliver and perform this Agreement;

(c)  All governmental and other consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(d)  In the event that either party to this Agreement is a person organized under, domiciled in, or having principle place of business in, the United States, each party represents to the other party that it is an "eligible contract participant" as defined in paragraph 1a(12) of the Commodity Exchange Act (7 U.S.C. paragraph 1a(12), as amended).

**12. Telephone Recording**

Each party consents to the recording of telephone conversations in connection with this Agreement.

**13. Commission**

Each of the parties agrees to pay brokers' commission to any broker (a "Broker") as agreed with any Broker.

**14. Non-Assignability**

Except as provided in Section 7 of the Standard Agreement, this Agreement is non-assignable unless otherwise agreed in writing between the parties to this Agreement.

**15. Principal To Principal**

This is a principal to principal contract with settlement directly between the two parties. Both parties agree that any Broker shall be under no obligation or liability in relation to this Agreement. Both parties agree jointly and severally to indemnify and hold harmless any Broker against all actions, including but not limited to all claims, demands, liabilities, damages, costs and expenses both from the two parties and any third party. Claims, demands, liabilities, damages, costs and expenses suffered or incurred are to be settled directly by or between the two parties.

**16. Law and Jurisdiction**

Pursuant to Section 13(b) of the Standard Agreement, this Agreement shall be governed by and construed in accordance with English law and shall be subject to the exclusive jurisdiction of the High Court of Justice in London, England. The terms of Section 12(a) of the Standard Agreement notwithstanding, proceedings may be validly served upon either party by sending the same by ordinary post and/or by fax to the addresses and/or fax numbers for each party given above.

Trade Ref    185711

**17. Entire Agreement**

This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

**18. Payment Account Information**

For Seller:
BANK NAME: HSBC Hong Kong
BANK ADDRESS: 1 Queen's Road Central, Hong Kong
A/C NO: 817-088388-838
SWIFT CODE: HSBCHKHHHKH IN FAVOUR OF; SPOT
ON SHIPPING LIMITED

For Buyer:
HSBC Bank plc
93 Akti Miaouli Street
Piraeus
Greece
Account: 001-012244.036
Swift: MIDLGRAAA
In favour of: Brave Bulk Transport Limited
Corp. bank: HSBC Bank plc - New York
Swift code: MRMDUS33

**19. Third party rights**

(a) Unless provided to the contrary in this Agreement, a person who is not a party to this Agreement has no rights under the contract (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Agreement.

(b) Any Indemnified Person and any Broker shall have the right to enjoy the benefit of and enforce the terms of clause 7(d) in the case of any Indemnified Person and clause 13 in case of any Broker.

(c) Notwithstanding any term of this Agreement, the consent of any person who is not a party to this Agreement is not required to rescind or vary this Agreement.

**20. Inclusion of historical FFAs under Master Agreement**

(a) Unless the parties to this Agreement specifically agree otherwise in writing, this clause 20 shall apply in accordance with its terms.

(b) This clause 20 applies to this Agreement and every other agreement entered into between parties to this Agreement (and no other persons) before the date of this Agreement:

(i) that expressly stated to be subject to, or is subject to substantially the same terms as, either the FFABA 2000 terms or the FFABA 2005 terms, (excluding for the avoidance of doubt terms as to the Contract Route(s), Contract Rate, Contract Quantity, Contract Month(s), Contract Period and Settlement Date), with or without amendment; and

(ii) that does not incorporate a clause substantially in the same form as this clause 20.

(c) Each agreement to which this clause 20 applies shall be treated as a confirmation (each a "Confirmation") under a master agreement (the "Master Agreement") constituted by the Standard Agreement as modified by, and in the form as incorporated in, the Agreement pursuant to clause 10 as if such an agreement has been entered into between parties on the terms of the Master Agreement on the date of the first such Confirmation.

Trade Ref    185711

(d) If there is any inconsistency between the provisions of any agreement constituted pursuant to paragraph (c) above and the agreement constituting a transaction to which this clause 20 applies, the provisions of the agreement constituting the transaction to which this clause 20 applies will prevail for the purposes of the transaction under such agreement.

(e) This clause 20 shall not affect the rights or obligations of the parties under any transaction accrued before the date of this Agreement.

(f) This clause 20 is effective notwithstanding any entire agreement clause or similar provision in any such agreement relevant to any such transaction.

## 21. Inclusion of subsequent FFAs under Master Agreement

(a) Unless the parties to this Agreement specifically agree otherwise in writing, this clause 21 shall apply in accordance with its terms.

(b) This clause 21 applies to every agreement entered into between the parties to this Agreement (and no other persons) after an agreement incorporating a Master Agreement (as defined in and pursuant to a clause substantially in the same form as and equivalent to clause 20) has been entered into by them.

(c) This Agreement shall constitute a Confirmation under the Master Agreement on the terms of clauses 20 (c), (d), (e) and (f) as if they were incorporated and fully set out in this clause 21 with appropriate and necessary modifications for such incorporation.

Trade Ref    185711

Signed for the Buyer by
[printed name]

Signed for the Seller by
[printed name]

Duly authorised signatory

Duly authorised signatory

Date .......................

Date .......................

[Company Seal or Stamp]

[Company Seal or Stamp]

**Trade Ref    185711**

ICAP Hyde Derivatives Ltd 2 Broadgate, London EC2M 7UR. Tel: +44(0)20 7532 4934 Fax: +44(0)20 7000 5942
Each of the Buyer and the Seller (the "counterparties") has agreed that ICAP Hyde Derivatives Limited is its broker for the sole purposes of 'passing names' and for confirming the details of the transaction set out above in accordance with accepted market practice. ICAP Hyde Derivatives Limited has arranged the transaction as name passing or introducing broker. Nothing in the transaction shall create any fiduciary or agency relationship between ICAP Hyde Derivates Limited and either of the counterparties. Each of the counterparties agrees that no reliance has or may be placed by either of them on any representation made by ICAP Hyde Derivates Limited, its directors, employees or agents. ICAP Hyde Derivates Limited is not responsible for the provision of advice to any person in connection with the transaction. It is also not responsible for the exercise of any options. ICAP Hyde Derivates Limited is not responsible for any other obligation or liability arising under the transaction and is not liable for the capacity, reliability, or performance of the counterparties with regard to the transaction; in particular, ICAP Hyde Derivates Limited accepts no liability for the commercial advisability of the transaction. ICAP Hyde Derivates Limited is not responsible for the failure by either of the above-named counterparties or any other person in supplying relevant information relating to the transaction, in properly documenting the transaction or in satisfying any legal requirements or taxation issues or conditions in relation thereto, including, without limitation, the obtaining of any necessary consents or the failure for whatever reason of completion of such transaction. Transaction times are available on request. ICAP Hyde Derivates Limited is authorised and regulated by the Financial Services Authority. The transaction is subject to English law.

Please advise ICAP Hyde Derivates Limited immediately if the details of this confirmation differ from your understanding.

**Trade Ref    185711**

LEXSEE 2007 U.S. DIST. LEXIS 69751

**BRAVE BULK TRANSPORT LTD., Plaintiff, -against- SPOT ON SHIPPING LTD., et al., Defendant.**

**07 Civ. 4546 (CM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 69751*

**September 14, 2007, Decided
September 17, 2007, Filed**

**COUNSEL:** [*1] For Brave Bult Transport, Ltd., Plaintiff: Lauren Cozzolino Davies, LEAD ATTORNEY, Thomas Leonard Tisdale, LEAD ATTORNEY, Tisdale Law Offices, LLC, New York, NY.

For Zhanggang Shipping Limited, Defendant: Garth S. Wolfson, LEAD ATTORNEY, Mahoney & Keane, LLP, New York, NY.

**JUDGES:** Colleen McMahon, U.S.D.J..

**OPINION BY:** Colleen McMahon

**OPINION**

DECISION AND ORDER VACATING MARITIME ATTACHMENT AGAINST DEFENDANT ZHANGGANG SHIPPING LIMITED (ZSL) AND ORDER REQUIRING PLAINTIFF TO SHOW CAUSE WHY THE COMPLAINT SHOULD NOT BE DISMISSED FOR LACK OF JURISDICTION

McMahon J.:

On July 10, 2007, this Court signed an ex parte order of attachment pursuant to Supplemental Admiralty Rule B. The order covered the property of all defendants named in the complaint, including Zhanggang Shipping Limited (ZSL), which was alleged to be an alter ego of defendant Spot On Shipping Ltd. Spot On was allegedly in breach of contracts that were alleged by plaintiff to be maritime contracts, thereby permitting plaintiff to invoke the admiralty jurisdiction of this court.

On August 22, 2007, ZSL moved to vacate the attachment of its property on two grounds: the underlying contract that was allegedly breached by Spot On was not a maritime contract, and ZSL [*2] had not been shown to be Spot On's alter ego.

The time for filing opposition to the motion has expired and no opposition has been received from plaintiff.

The motion to lift the attachment as to defendant ZSL is hereby granted.

First, on the record before this court, ZSL is not an alter ego of Spot On. The verified complaint alleges that ZSL hsa no separate or independent identity from Spot On, that the two corporations use their names interchangeably with a design to fraudulently avoid payment of just debts. Alternatively, it alleges that ZSL is merely a shell corporation through which Spot On conducts business. Alternatively, it alleges that ZSL and Spot On are partner and/or joint venturers. And alternatively it alleges that the two companies are affiliated. All these allegations are made on information and belief.

In moving to dismiss, ZSL has provided a declaration from one Zhang Jinlu, a director and shareholder of ZSL, who avers that there is no connection whatever between ZSL and Spot On and that ZSL is in fact the captive shipper for Zhangdian Iron Steel Works, which is owned by the Chinese Government. No contrary evidence having been presented, I conclude that there is no basis [*3] for the "information and belief" allegations contained in the verified amended complaint concerning any relationship between ZSL and Spot On. Since a Rule B attachment on an alleged alter ego's property cannot be sustained in the absence of a showing of at least some specific facts demonstrating the type of corporate domination and control sufficient to pierce the corporate veil, *See Dolco Investments, Ltd. V. Moon River Development, Ltd. 486 F. Supp. 2d 261, 2007 U.S. Dist. LEXIS 31101 (S.D.N.Y. April 26, 2007)*, I must lift the attachment as against ZSL on that basis alone.

Moreover, it does not appear that plaintiff has asserted a maritime claim. The complaint alleges that Spot

On has breached a "forward freight agreement" (FFA), which is an agreement to buy and/or sell freight futures. An FFA is not a "'maritime contract." Setsea S.P.A. v. Source Link Shipping Co. Ltd., No. 07 Civ. 4147 (S.D.N.Y. Jun. 5, 2007), but rather is a means of hedging financial risk and making costs and revenues more predictable. For this reason, too, the attachment must be lifted as against ZSL.

The fact that the underlying FFA contract is not a maritime contract means that the court lacked jurisdiction to attach any assets  [*4] in the first place. Accordingly, plaintiff is directed to show cause, by submission of papers no later than 5 PM on September 20, why the attachment should not be vacated in its entirety and this action dismissed. The court will not adjourn this date. Additionally, plaintiff's counsel is directed to explain to the court, at the same time and in the same manner, what facts or circumstances led to his "information and belief" allegations of some relationship between Spot On and ZSL. Failure to respond to this order to show cause may result in the imposition of sanctions if the court determines that this action was commenced in bad faith.

Dated: September 14, 2007

Colleen McMahon

U.S.D.J.

LEXSEE 2007 U.S. DIST. LEXIS 81137

**BRAVE BULK TRANSPORT LTD., Plaintiff, -against- SPOT ON SHIPPING LTD., et al., Defendant.**

**07 Civ. 4546 (CM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 81137*

**October 30, 2007, Decided
October 30, 2007, Filed**

**COUNSEL:** [*1] For Brave Bult Transport, Ltd., Plaintiff: Lauren Cozzolino Davies, Thomas Leonard Tisdale, LEAD ATTORNEYS, Tisdale Law Offices, LLC, New York, NY.

For Zhanggang Shipping Limited, Defendant: Garth S. Wolfson, LEAD ATTORNEY, Mahoney & Keane, LLP, New York, NY.

**JUDGES:** Colleen McMahon, U.S.D.J.

**OPINION BY:** Colleen McMahon

**OPINION**

DECISION AND ORDER (1) DENYING DEFENDANTS' MOTION TO VACATE MARITIME ATTACHMENT AGAINST SPOT ON SHIPPING LTD., (2) GRANTING PLAINTIFF'S MOTION TO RECONSIDER PREVIOUS ORDER VACATING THE ATTACHMENT AGAINST DEFENDANT ZHANGGANG SHIPPING LIMITED (ZSL), (3) DECLINING TO REINSTATING ATTACHMENT AGAINST ZSL, AND (4) GRANTING PLAINTIFF PERMISSION TO FILE A SECOND AMENDED COMPLAINT AND A NEW REQUEST FOR A MARITIME ATTACHMENT AGAINST ZSL, PROVIDED THOSE PAPERS ARE FILED WITHIN 10 BUSINESS DAYS

McMahon J.:

On July 10, 2007, this Court signed an ex parte order of attachment pursuant to *Supplemental Admiralty Rule B*. The order covered the property of all defendants named in the complaint, including Zhanggang Shipping Limited (ZSL), which was alleged to be an alter ego of defendant Spot On Shipping Ltd. Spot On was allegedly in breach of "forward freight agreements that were alleged by plaintiff to be maritime [*2] contracts, thereby permitting plaintiff to invoke the admiralty jurisdiction of this court.

On August 22, 2007, ZSL moved to vacate the attachment of its property, pursuant to Rule E (4)(f) of the Federal Rules of. Civil Procedure, on two grounds: the underlying contract that was allegedly breached by Spot On was not a maritime contract, and ZSL had not been shown to be Spot On's alter ego. Plaintiff did not respond to the motion. In a written decision and order dated September 14, 2007, this Court lifted the attachment as to defendant ZSL, finding that, based on the information contained in the complaint, ZSL is not an alter ego of Spot On. In that same order, the Court questioned whether "Forward Freight Agreements" are maritime contracts and directed plaintiff to show cause why the attachment should not be vacated in its entirety.

Brave Bulk has filed papers in response to the Court's order to show cause, in which they argue that Forward Freight Agreements are maritime contracts. Plaintiff's papers also include a motion for reconsideration of the Court's decision vacating the attachment against ZSL, arguing that *inter alia* plaintiff has a maritime claim and has adequately alleged *prima* [*3] *facie* alter-ego claims against ZSL and the other alter-ego defendants. Defendants, in turn, filed papers asking the Court to vacate the attachment against Spot On, and not to reconsider its ruling vacating the ZSL attachment.

On October 5, 2007, the Court heard argument on the motion pursuant to Rule E (4)(f).

Forward Freight Agreements are "Salty" Contracts

Brave Bulk and Spot On entered into a Forward Freight Agreement for the swap of the future value of ocean freight. This contract specified the type of vessel

to be used, the routes upon which said vessels would travel and the duration of the agreement. *See Forward Freight Agreement.*"

28 U.S.C. § 1333(1) affords this Court original jurisdiction in "any civil case of admiralty or maritime jurisdiction." *See Sea Transport Contractors, Ltd. v. Industries Chemiqes Du Senegal, 411 F. Supp. 2d 386, 2006 A.M.C. 1076, 1082 (S.D.N.Y. January 24, 2006); see also Stolt-Nielsen S.A. v. Celanese AG, 430 F. 3d 567, 572 (2d Cir. 2005).* To determine the boundaries of admiralty jurisdiction, courts turn to the purpose of the grant. *See Insurance Co. v. Dunham, 78 U.S. 1, 11 Wall. 1, 24, 20 L. Ed. 90 (1871).* As recently confirmed by the United States [*4] Supreme Court in *Exxon Corp. v. Central Gulf Lines, Inc. 500 U.S. 603, 608, 111 S. Ct. 2071, 114 L. Ed. 2d 649 (1991),* "The fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce.'" *Id.; quoting Sisson v. Ruby, 497 U.S. 358, 367, 110 S. Ct. 2892, 111 L. Ed. 2d 292 (1990); quoting Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674, 102 S. Ct. 2654, 73 L. Ed. 2d 300 (1982).* Stated another way, where "the subject matter of the contract relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment it is fairly said to constitute a maritime contract." *Ingersoll Milling Mach. Co. v. M/V BODENA, 829 F.2d 293, 302 (2d Cir. 1987)* (emphasis added).

While initially skeptical about the saltiness of forward freight agreements, I am now persuaded that they are sufficiently part of the business of maritime commerce to confer admiralty jurisdiction.

Forward freight agreements, or FFAs as they are commonly known, are commitments to perform in the future a shipping service between ship owners, charterers and/or traders. The parties to the agreement contract to "pay the difference between a price agreed today and the future price of moving a product from one location to another, or for [*5] the future price of hiring a ship over a period of time." Adam Sonin, *Managing Risk with Forward Freight Agreements, Commodities Now,* June 2005, *available online at:* http://www.commodities-now.com/ content/ market-areas/ags-and-softs/ma-article-7.pdf?PHPSESSID=34967b.

In the shipping industry, FFAs are negotiated with the express purpose of hedging and managing market risks relating to the employment of vessels in today's volatile freight market. For example, in the instant FFA, the parties entered into a Forward Freight Agreement to buy and sell a specified tonnage freight at an agreed price for an agreed route and time span so that both corporations could reliably predict their ocean freight revenues and costs for the duration of the contract for those

ocean routes. Thus, Forward Freight Agreements can fairly be said to constitute maritime contracts.

Forward Freight Agreements have been found to be maritime cases entitled to process of maritime attachment in the following cases: *C. Transport Panamax Ltd. v. North America Steamships Ltd., a.k.a. N.A.S.L.,* 06 CV 13178 (RLC); *Daeyang Shipping Co: Ltd. v. Navitrans Maritime Inc.,* 04 CV 08050 (VM); *Deiulemar v. Source Link Shipping Co.* [*6] *Ltd,* 07 CV 02983 (SAS); *Deiulemar v. Spot On Shipping Ltd., et. al.,* 07 CV 03820 (VM); *Eurotrade Inc., Liberia v. Source Link Shipping Co. Ltd.,* BVI, 07 CV 3172 (SAS); *Pan Oceanic Maritime Inc. v. Source Link Shipping Co. Ltd.,* 07 CV 03089 (CM); *Perseveranza Di Navigazione S.P.A. v. Source Link Shipping Co. Ltd.,* 07 CV 03091 (RPP); *Taiwan Maritime Transport Co. Ltd. v. Navitrans Maritime Inc. and Navigation Maritime Inc.,* 06 CV 13564 (RJH), and *Setsea S.P.A. v. Source Link Shipping Co. Ltd.,* 07 CV 6230 (DAB).

In *Setsea S.P.A. v. Source Link Shipping Co. Ltd.,* 07 CV 4147 (S.D.N.Y. June 5, 2007), Judge Batts initially denied the plaintiff's application for an *ex parte* order for process of maritime attachment. Judge Batts held that although the FFA in question was "not so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction," it nonetheless fell short of the Second Circuit's requirement that the contract reference "maritime service or maritime transactions." *Setsea S.P.A. v. Source Link Shipping Co. Ltd.,* 07 CV 4147, Order Denying Application for Ex Parte Order (S.D.N.Y. June 5, 2007). Judge Batts allowed [*7] Setsea leave to replead within thirty days. On July 5, 2007, Setsea submitted a Verified Amended Complaint laying out more specifically the nature of forward freight agreements and why they are maritime contracts. This time, the Court granted the Plaintiff's application for an ex parte order for process of maritime attachment finding the FFA to be a maritime contract. *See Complaint and Ex Parte Order for process of maritime attachment and garnishment in 07 CV 6230 (DAB).*

Plaintiff has thus met its burden of demonstrating that the subject matter of this dispute is maritime in nature.

Plaintiff's Motion for Reconsideration of Court's Order Vacating ZSL Attachment

Plaintiff next asks the Court to revisit its decision vacating the ZSL attachment, on the ground that the Court overlooked several controlling cases that, if taken into account, would have altered the Court's conclusion. Plaintiff's argument is essentially that the Court did not consider the Second Circuit Court of Appeals decision in

*Aqua Stoli* as well as and recent (albeit not "controlling") Southern District cases like *Tide Line and Route Holding,* which stand *inter alia* for the proposition that a plaintiff need only allege a [*8] *prima facie* maritime claim against the principal defendant and a *prima facia* case against the alleged alter-ego entity in order to satisfy its pleading burden under Rule E (4)(f). Plaintiff argues that they have met that burden in their Amended Complaint. Defendants strongly oppose the motion.

"The standard for granting . . . a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)* (citing *Schonberger v. Serchuk, 742 F. Supp. 108, 119 (S.D.N.Y. 1990); Adams v. United States, 686 F. Supp. 417, 418 (S.D.N.Y. 1988)).* The decision to grant or deny the motion is committed to the sound discretion of the district court. *Devlin v. Transportation Communications Intl Union, 175 F.3d 121, 132 (2d Cir. 1999).*

In a letter dated September 17, 2007 and at the Rule E (4)(f) hearing held on October 5, 2007, plaintiff's attorneys advised the Court that they did not become aware of defendants' motion to vacate until [*9] after they received the Court's decision on the motion. I am satisfied that this is the case and so have agreed to reconsider my decision vacating the ZSL attachment in order to permit plaintiff's to respond to the motion.

The following allegations in the Amended Complaint allegedly support plaintiff's claim that ZSL is an alter ego of Spot On:

> 22. Upon information and belief, Zhanggang is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Zhanggang is actually carrying on Spot On's business and operations as if same were its own.

> 23. Upon information and belief, Defendant Zhanggang is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Zhanggang.

> 24. Upon information and belief, Defendants Zhanggang and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, including Mrs. Wei-Lu Zhang and Ms. Sammy Yu, and used to carry on such individuals' own business.

> 25. Upon information and belief, Defendant Zhanggang has no separate, independent identity from Defendant Spot On as they use their names interchangeably with design to fraudulently avoid payment [*10] of just debts to their creditors.

> 26. In the alternative, Defendant Zhanggang is merely a shell corporation through which Spot On conducts its business.

> 27. In the further alternative, Defendants Zhanggang and Spot On are partners and/or are joint venturers.

> 28. In the further alternative, Defendants Zhanggang and Spot On are affiliated companies such that the Defendant Zhanggang is now, or will soon be, holding assets belonging to Defendant Spot On and vice versa.

*See* Verified Amended Complaint, PP*22-28,* Davies Decl. Ex. "1."

In an affidavit submitted in connection with the instant motion (albeit not in its original papers), Brave Bulk's counsel has set forth the basis for the "information and belief" allegations in the Verified Amended Complaint, these include:

> (1) XSL and Spot On share common address and place of business at Suites: 1818-23, 18<th> Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong.

> (2) They have the same email address

> (3) An inforspectrum and a Lloyd's MIU report on the companies indicates that ZSL is a joint venture between Spot On and Zhangdian Steel Mill of China. No information in these reports indicates that ZSL is owned by the Chinese Government or by [*11] an entity that is owned by the Chinese Government.

> (4) Lloyd's MIU advised plaintiff that it telephoned ZSL and was told that ZSL is a "ship charterer."

> (5) Madam Wei-Lu Zhang is president of ZSL and a principal director of Spot On (Hong Kong), which also shares an address with Spot On and ZSL.

(6) ZSL chartering manager, Ms. Sammy Yu, is also listed as the contact for Spot On on the first page of the FFA between Spot ON and Brave Bulk, where she is listed as the "contact" for Spot On.

(7) The names of Spot On and ZSL are used interchangeably in the industry.

Plaintiff bolsters each of these contentions with citations to exhibits, and avers that additional connections between Spot On and ZSL will be revealed with discovery.

*See* Declaration of Lauren C. Davies PP 23-36.

Under Rule E (4)(f), the plaintiff has the initial burden to show that its attachment satisfies the requirements of *Supplemental Rules B* and *E. Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd., 460 F. 3d 434, 445 n. 5 (2d Cir. 2006).* In order to sustain an attachment, a plaintiff must prove that it has satisfied the "filing and service requirements of *Rules B* and *E*" and that: (1) it has a valid *prima facie* admiralty claim [*12] against the defendant, (2) the defendant is not present in the district, (3) defendant's property can be found within the district, and (4) there is no maritime law or statutory bar to the attachment. *Aqua Stoli, 460 F.3d at 445.* The Rule(E) (4) (0 hearing is not intended to resolve the dispute between the parties, but to determine if the technical requirements of the Rule were met. *Aqua Stoli, Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 2006 U.S. App. LEXIS 19302, at *35 (2d Cir. 2006).* Thus, as long as the plaintiff can establish that it has alleged a prima facie maritime claim, that the defendant is not present in the district and that the defendant's property has been restrained in the district and no other statutory bar to the attachment exists, the attachment should be upheld. *See Aqua Stoli, at *28-29.* Aqua Stoli's holding marks a departure from the prior "probable cause/reasonable basis standard" that certain courts applied before *Aqua Stoli.*

Once a plaintiff has established the technical requirements stated in Rule B, the burden shifts to the defendant to prove the limited bases for vacatur. An otherwise facially valid Rule B attachment may only be vacated if the defendant shows [*13] at post-seizure hearing that (1) the defendant is subject to suit in a convenient adjacent jurisdiction; (2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or (3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. *See Aqua Stoli, at *27.* Defendant has not moved on any of these grounds. So as long as the allegations in the Amended Complaint states

a *prima facia* case that ZSL is an alter ego of Spot On, the attachment against ZSL must stand.

In the *Tide Line* case, Chief Judge Kimba M. Wood vacated an attachment that was based on overly general alter-ego allegations. *See* Order dated August 15, 2006 in Tide Line, Inc. v. Eastrade Commodities Inc. and Transclear, S.A., 2006 U.S. Dist. LEXIS 60770, 06 Civ. 1979 (KMW). Chief Judge Wood found that mere allegations that entity B was the "paying agent" for entity A, and that entity B had arranged for other non-parties to pay the debts of Entity A, was insufficient to state an alter-ego claim for Rule E (4)(f) purposes. Remarking on the paucity of alter-ego allegations, the Court noted that the complaint did not even contain the phrase "alter-ego." [*14] The Chief Judge vacated the attachment but stayed the release of any funds for 15 days, to allow plaintiff time to file an amended complaint with additional alter-ego allegations and to apply for a new order of attachment. The Court adopted this procedure because plaintiffs -- like Brave Bulk in the present case -- submitted additional support for their alter ego allegations in their motion to vacate opposition papers.

By contrast *Route Holding Inc. and Beam Company v. IOOI and Marina World Shipping,* 06 Civ. 3428 (PKC), Judge Castel held -- on allegations strikingly similar to those in the amended complaint presently before the Court -- that Route Holding and Beam Company has sufficiently pleaded their alter-ego claims against Marina World Shipping. The plaintiffs had alleged that Marina World Shipping was an alter-ego because it dominated and controlled the principal, IOOI. The district court found that plaintiffs' pleadings were sufficient to uphold the attachment, finding that:

> the plaintiff alleges that MWS is the alter-ego of 1001, but it does not simply leave it as a conclusory allegation. It goes on to allege that the reason it believes it is the alter-ego is because IOOI dominates [*15] an disregards MWS' corporate form to the extent that MWS is actually carrying on IOOI's business and operations as if the same were its own. It further goes on to allege that MWS, acting as paying agent, acts as paying agent or arranges for other nonparties to satisfy the debts and obligations of IOOI. It seems to me a sufficient allegation.

*See* Transcript of *Route Holding* at 12, lines 14-24.

Like Brave Bulk in the case at bar and the plaintiffs in *Tide Line,* the *Route Holdings* plaintiffs submitted additional information and affidavits in support of their

alter-ego claims, along with their opposition papers. Finding that the alter-ego allegations in the complaint were sufficient for *Rule B* purposes, Judge Castel side-stepped the open question of whether a Court assessing the validity of a maritime claim at a Rule E (4)(f) proceeding can resort to supplemental materials outside the four corners of the complaint.

The allegations set forth above are sufficient for the Court to conclude that Brave Bulk has a good faith basis for alleging that ZSL is Spot On's alter ego. However, I agree with Chief Judge Wood that the place where those allegations should appear is in the complaint-- not in [*16] material submitted to the Court for the first time in opposition to a motion to vacate. The wholly conclusory allegations in the Amended Complaint are, upon reflection, simply insufficient. Were a plaintiff to be permitted to rely on such allegations to obtain an attachment against an entity that is not a party to a contract sued on, the already thinly stretched remedy of maritime attachment could disrupt the commercial activities of entities whose links to the real defendant in interest are tenuous of non-existent. By including specific factual allegations that support "on information and belief" contentions in the complaint, the plaintiff's counsel subjects himself to Rule 11 sanctions should they prove erroneous. That is, it seems, a salutary result.

Upon reconsideration, thereof, I decline to vacate my original decision.

However, because the record reveals that plaintiff did have a good faith basis for alleging that ZSL was Spot On's alter ego, I will afford plaintiff 10 business days to file a second amended complaint, containing the basis for the alter ego allegations. Plaintiff may accompany this amended pleading with an application for a new order of attachment. Assuming the [*17] second amended complaint complies with this order, it will be granted.

This constitutes the decision and order of the Court.

October 30, 2007

Colleen McMahon

U.S.D.J.